# Exhibit 2

*BRIAN T. BORDERS vs.*
*GOODYEAR DUNLOP NA & SUMITOMO RUBBER*

---

*BRIAN T. BORDERS*
*January 23, 2019*

---




METSCHL
AND ASSOCIATES
COURT REPORTERS • LEGAL VIDEO SERVICES

**Buffalo, NY**: 716 856-1906
**Rochester, NY**: 585 697-0969
**Toll Free**: 800 397-1796

*Min-U-Script® with Word Index*

```
 1   UNITED STATES DISTRICT COURT

 2   WESTERN DISTRICT OF NEW YORK

 3   _____

 4   BRIAN T. BORDERS,

 5            Plaintiff,

 6
              vs        Civil Action No. 17-cv 1159
 7

 8   GOODYEAR DUNLOP NA, SUMITOMO RUBBER,

 9            Defendant.
     _____

10

11   Examination Before Trial of BRIAN T. BORDERS, held

12   pursuant to the Federal Rules of Civil Procedure, in the

13   law offices of HARTER, SECREST & EMERY, LLP, 50 Fountain

14   Plaza, Suite 1000, Buffalo, New York, on Wednesday,

15   January 23, 2019 at 9:15 a.m. before Molly Fenske, Notary

16   Public.

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2
     LAW OFFICE OF LINDY KORN
 3   BY:   CHARLES MILLER, ESQ.
     535 Washington Street, 9th Floor
 4   Buffalo, New York  14203
     cmiller@lkorn-law.com
 5   Appearing for the Plaintiff.

 6
     HARTER, SECREST & EMERY, LLP
 7   BY:   AMY L. HEMENWAY, ESQ.
     50 Fountain Plaza, Suite 1000
 8   Buffalo, New York  14202
     ahemenway@hselaw.com
 9   Appearing for the Defendant.

10
     SUMITOMO RUBBER USA, LLC
11   BY:   AMY MEYER, ESQ.
     and TIMOTHY RENTSCHLER, ESQ.
12   10 Sheridan Drive
     Tonawanda, New York  14150
13   amy_meyer@sumitomorubber-usa.com
     timothy_rentschler@sumitomorubber-usa.com
14   General counsel and staff counsel for Sumitomo Rubber USA,
     LLC.
15

16

17

18

19

20

21

22

23

24

25
```

3

1                        INDEX TO WITNESS

2

3   BRIAN T. BORDERS                                        PAGE

4

5   Examination by Ms. Hemenway........................   6

6   Examination by Mr. Miller.......................... 112

7

8

9

10                      INDEX TO EXHIBITS

11

12  EXHIBIT                                                 PAGE

13

14  Exhibit 1, questionnaire...........................  64

15  Exhibit 2, performance evaluation..................  65

16  Exhibit 3, 2014 objective plan.....................  82

17  Exhibit 4, 2014 objective plan.....................  85

18  Exhibit 5, summons.................................  89

19  Exhibit 6, disclosures pursuant to

20          Fed. R. Civ. P. 26(a)(1)................... 105

21          Exhibits retained by counsel.

22

23

24

25

```
 1                    (Whereupon, the following stipulations
 2          were entered into by the respective parties:
 3                    It is hereby stipulated by and between
 4          counsel for the respective parties that the oath of
 5          the referee is waived, that signing, filing and
 6          certification of the transcript are waived, and all
 7          objections, except as to the form of the question,
 8          are reserved until the time of trial.)
 9                    THE REPORTER:  Ms. Hemenway and Ms.
10          Meyer, you'll split and supply Mr. Miller?
11                    MS. HEMENWAY:  Yes.
12                    MS. MEYER:  Yeah, that's fine.
13                    MS. HEMENWAY:  Actually, you can just --
14          she can just put -- send it all to me.
15                    THE REPORTER:  So you will supply Mr.
16          Miller?
17                    MS. HEMENWAY:  Yes.
18                    MR. MILLER:  Thank you.
19                    THE REPORTER:  Usual stipulations or read
20          and sign?
21                    MR. MILLER:  Usual stipulations.  I'm
22          good with those.
23                    MS. HEMENWAY:  That's fine.
24                    BRIAN THOMAS BORDERS, 26 Prestonwood
25          Lane, East Amherst, New York 14051, having been duly
```

1    called and sworn, was examined and testified as

2    follows:

3              MS. HEMENWAY:  Good morning, Mr. Borders.

4    My name is Amy Hemenway.  I'm an attorney here at

5    Harter, Secrest and Emery.  I represent Sumitomo and

6    I'll be conducting your deposition today.  We're

7    here so I can ask you questions about your claims in

8    the lawsuit you have against Sumitomo and so

9    throughout the day I'll ask you a series of

10    questions.

11              It's important that we only speak one at

12    a time because the court reporter here is taking

13    down your testimony, so just make sure that I'm

14    finished with my question before you answer and I

15    will do my best to let you complete your answer

16    before I ask my next question.

17              It's also important that you give verbal

18    answers, so a yes or no.  If you shake your head or

19    say mhmm, uh-uh, that's hard for the court reporter

20    to take down.  She can't take down a non-verbal

21    response, so please make sure you're giving verbal

22    responses, and if I catch it and you don't do so, I

23    may remind you yes or no, and the court reporter may

24    also, from time to time, ask you to give verbal

25    responses.

```
 1                  If at any time you don't understand a
 2       question that I ask, please ask me to repeat it or
 3       rephrase it.  I'm happy to do so.  If you answer a
 4       question that I've asked, I'm going to assume that
 5       you understood it.
 6                  At any point today, if you need to take a
 7       break to get some coffee or water or to use the
 8       restroom, feel free to ask.  The only thing that I
 9       would ask is that you finish answering any question
10       that's pending before we take the break.  Do you
11       have any questions about those instructions?
12                  THE WITNESS:  No, ma'am.
13   EXAMINATION BY MS. HEMENWAY:
14       Q.   Are you on any medications today that may
15   impact on your ability to give truthful testimony?
16       A.   No.
17       Q.   So your claims in this lawsuit are brought
18   against Sumitomo and, as I understand it, you were
19   placed at Sumitomo as a contract employee for a period
20   of time; correct?
21       A.   That is correct.
22       Q.   When were you first placed there?
23       A.   It was 2007.  I think it was the beginning of
24   April.
25       Q.   How did that placement come about?
```

7

```
 1        A.   I was let go from my previous position at

 2   Univera Healthcare and I was looking for a new

 3   position.

 4        Q.   How did you get connected to the position at

 5   Sumitomo?

 6        A.   It was a staffing company.  Systems Personnel

 7   arranged for the interview.

 8        Q.   Was there a particular individual that you

 9   recall working with at Systems Personnel in arranging

10   that interview?

11        A.   I think it was Lynn Baranyi.

12        Q.   Did you interview for any other positions

13   through Systems Personnel?

14        A.   No, I did not.

15        Q.   So you interviewed with someone at Sumitomo

16   then?

17        A.   No.  It was Goodyear Dunlop Tires North

18   America.

19        Q.   Okay.  And when you interviewed with -- well,

20   Goodyear Dunlop Tires was the predecessor to Sumitomo;

21   right?

22        A.   Could you repeat that?

23        Q.   Goodyear Dunlop was the predecessor to

24   Sumitomo?

25        A.   It was actually a joint venture at that time
```

8

```
 1   between the two companies, but it was primarily listed

 2   as just Goodyear Dunlop Tires North America.

 3       Q.   And then, at some point during the time that

 4   you were placed at the Sumitomo site, the joint venture

 5   ended and it simply became the Sumitomo site; right?

 6       A.   Correct.

 7       Q.   So when you had your interview, do you recall

 8   who you interviewed with?

 9       A.   Yes, the IT manager, Mark Papelow.

10       Q.   Was there anyone else present at the

11   interview?

12       A.   I can't remember.

13       Q.   Was anyone from Systems Personnel present at

14   the interview?

15       A.   I can't remember.  Sorry.

16       Q.   What happened after the interview?

17       A.   They hired me on as a contractor with the

18   implication that it was going to be a contract to hire.

19       Q.   When you say there was an implication it would

20   be a contract to hire, what led you to that conclusion?

21       A.   Well, that's what they were advertising when

22   they brought me in for the interview, that it was a

23   contract position, then to hire, but Goodyear stopped

24   all hiring, they weren't hiring any people, so I just

25   remained on a contract.
```

9

1      Q.   As a contract employee, how did that work for

2   you?

3      A.   I was there at the -- whatever the manager

4   wanted me to do as a unit systems administrator.  They

5   told me what to do, when to be there and what to work

6   on.

7      Q.   When you say they told me --

8      A.   That's the manager, Mark Papelow.

9      Q.   When you say you were hired as a contract

10  employee, was that through Systems Personnel?

11     A.   Yes.

12     Q.   And so was Systems Personnel also your

13  employer at the time?

14     A.   Yeah, they would have been, yes.

15     Q.   And so what did Systems Personnel do as your

16  employer?

17     A.   Basically, they paid me.  That's pretty much

18  all the -- most of the interaction I had with them was

19  filing the hours.  Dunlop approved it.  They paid

20  Systems and Systems paid me.

21     Q.   Did you receive any benefits through your

22  employment with Systems Personnel?

23     A.   Just, initially, just ten days of vacation and

24  then I was added into the 401(k) program with them and

25  that was it.

1    Q.    And the vacation and the 401(k) were through

2    Systems Personnel?

3    A.    Yes.

4    Q.    Did you receive any vacation or other paid

5    time off through Goodyear or Sumitomo?

6    A.    I'm trying to think.  They did have some

7    holidays included, but they didn't match up with

8    Goodyear's holidays.

9    Q.    So the holidays were through Systems

10   Personnel?

11   A.    Yeah.  They paid for, I think, just some

12   federal holidays, but Goodyear was open generally more,

13   or they had some other holidays off that I didn't get

14   paid for.

15   Q.    Did you receive any paid time off, whether

16   vacation, sick, personal, other, that was covered by

17   Goodyear or Sumitomo?

18   A.    No.

19   Q.    Did you receive any 401(k) benefits through

20   Goodyear or Sumitomo?

21   A.    No.

22   Q.    Did you receive any other types of benefits or

23   compensation from Goodyear or Sumitomo?

24   A.    I guess the only kind of benefit that I was

25   allowed was the allowance for some flexible time and

1    the ability to bank some hours to backfill sick time

2    when I was out.

3        Q.   So can you explain how that worked?  When you

4    say you were allowed the ability to flex your time and

5    bank hours, how did that work?

6        A.   Yeah.  If I had a migraine in the morning, I

7    would generally be able to come in in the afternoon and

8    work -- usually be able to get in like eight hours that

9    day, if I could, later in the evening, and then there

10   were times too, where, if I had worked more than forty

11   hours, I would be able to leave that on the books and

12   backfill that when I was out sick to make up time,

13   because they didn't pay any overtime at all and any

14   overtime would have been paid at straight time.

15       Q.   When did that occur?  When do you recall the

16   timeframe when you were doing this flexing of time?

17       A.   Would have been anytime, probably from not

18   long after I was hired in 2007 all the way up to a

19   little bit into 2014 after Kirk Rawls put a stop to all

20   flex time or anything.  He didn't offer any allowances

21   for that were previously authorized.

22       Q.   And did that include the backfilling where you

23   would --

24       A.   Yes.

25       Q.   -- work from time and hold it?

1     A.    Yes, it did.

2     Q.    That continued up until early 2014?

3     A.    I'm not sure if I had anything to backfill at

4     that point because I was out for a month in October

5     when I started with an illness.

6     Q.    When you say you were out in October, was that

7     October of 2014 or --

8     A.    2013.

9     Q.    So, to your knowledge, did that -- or from

10    your recollection, did that use of time where you would

11    sort of create a sick bank, it sounds that's what you

12    were doing, you created a bank of hours that ended

13    sometime in late 2013?

14    A.    Probably.  I can't exactly remember.  I would

15    have to kind of look at my time log to see what I had.

16    Q.    And do you have a time log?

17    A.    Yes.

18    Q.    When did you prepare the time log?

19    A.    Every day.

20    Q.    And how did you go about preparing that?  Is

21    it in a notebook?

22    A.    It's on a spreadsheet.

23    Q.    Why did you prepare the spreadsheet?

24    A.    Because I needed to do it for my logging of

25    hours on a weekly basis.

13

1    Q.   Did you provide the spreadsheet to anyone?

2    A.   May have provided a couple pieces here and

3  there, but they didn't generally want it.

4    Q.   When you say they didn't want it, who are you

5  referring to?

6    A.   The managers, the people who I reported to.

7    Q.   And who was that?

8    A.   That would have been Mark Papelow, Kirk Rawls.

9    Q.   Since you were placed through Systems

10  Personnel, did you have a designated manager with

11  Systems Personnel that you worked with?

12    A.   It would have probably been Lynn Baranyi would

13  have been the main contact.

14    Q.   Do you know how to spell her last name?

15    A.   No, I do not.

16    Q.   And it was -- can you pronounce it one more

17  time?

18    A.   Lynn with a B, Baranyi or something.  I'm not

19  really sure how to -- I never really talked to her by

20  last name that much.

21    Q.   You mentioned that Mr. Rawls ended the flex

22  time arrangement, and you think that was maybe sometime

23  in late 2013, early 2014?

24    A.   Yes.

25    Q.   To your knowledge, did he allow any employees

14

1  to have flex time?

2      A.   I don't know.

3      Q.   Do you recall, prior to that timeframe,

4  whether employees of Sumitomo that you would have

5  observed, or Goodyear at that time, if any of those

6  other employees had flex time arrangements, or would

7  adjust their hours similar to how you had done?

8      A.   Well, there was people who worked different

9  hours, but they were generally Goodyear employees.

10  Some people would come in early and leave earlier.

11  Some people would come in a little later and get their

12  time in.

13      Q.   So you mentioned Goodyear employees.  Just for

14  sake of avoiding confusion, I may refer to Sumitomo,

15  you may refer to Goodyear, but can we agree that they

16  are one in the same?  For purposes of reference we can

17  use them interchangeably?

18      A.   Yes.

19          MS. MEYER:  I think you might have a

20      problem with that, only from the perspective that in

21      October of 2015, when the joint venture ended, there

22      were certain employees that were at the Sumitomo

23      plant now who were Goodyear employees and who went

24      back to Goodyear, so there really was that divide,

25      unfortunately, which gets a little confusing.  Some

1          stayed and became Sumitomo employees.  Most of those

2          are actually gone now, but there was also -- so it's

3          kind of -- so I think until when you're looking at

4          timeframe, I think you may have to --

5                    THE WITNESS:  Well, that's what I'm kind

6          of differentiating is with the timeframe of Goodyear

7          versus Sumitomo, but I do understand the reference.

8    BY MS. HEMENWAY:

9        Q.   So at the time you were -- you mentioned there

10   were some other employees who seemed to have different

11   work hours, but they were Goodyear employees.  How did

12   your placement at the company -- how did your

13   experience being placed at the company differ from the

14   experience of the actual employees that worked directly

15   for Goodyear, as you understood it?

16       A.   I don't think it was really any different per

17   se because it was really kind of a flexible, you know,

18   kind of environment.  If you came in early you left.

19   As long as you got what you needed to get done you

20   could come in later.  It was all kind of based on

21   almost individual personal scheduling.  If they had

22   something going on and one of the other contractors who

23   was there was on, I think, a thirty-hour contract.

24       Q.   Do you recall that individual's name?

25       A.   That would be John Cook.  It might have been

1    35, but it was a non-40 contract that he was on because

2    he was also -- he was also working as a part-time -- or

3    I really can't say part-time because he was, I think,

4    doing full-time work as a realtor off hours.

5        Q.   Okay.  Did your experience change once the

6    joint venture ended and the company transitioned from,

7    you know, a Goodyear Sumitomo plant to a Sumitomo

8    plant?

9        A.   No, nothing changed in that perspective.  The

10   change took place when the new manager, Kirk Rawls,

11   took over at the end of 2013.  If I think correctly,

12   Ms. Meyer can probably -- I think it was 2015 they

13   started the dissolution efforts.  Is that...

14               MS. MEYER:  It actually started a little

15       before that.

16               THE WITNESS:  Okay.

17   BY MS. HEMENWAY:

18       Q.   So, you mentioned one of the changes that

19   occurred when Mr. Rawls came in was sort of an end to

20   the flex time arrangement that you had.  Were there any

21   other changes that you experienced in your placement

22   when Mr. Rawls took over as manager of the IT area?

23       A.   Well, it was really -- I guess it was attitude

24   towards me, that he would make comments that, you know,

25   that I'm out sick a lot, and some of the other comments

1  that he made was that he would say that he needs

2  somebody full-time and then he also had said that maybe

3  I should be looking for part-time work somewhere else.

4  I guess, if I want to expand on that, I know, in

5  reference to John Cook, he did, I think, tell him that

6  he couldn't do some of his realtor stuff anymore.  I'm

7  not really sure what the extent of that was, but I know

8  that comment was made, that he didn't want him to be

9  taking as many calls or whatever, during work or

10 whatever.

11      Q.   To your knowledge, did Mr. Cook have any

12 disabilities that impacted on his ability to perform

13 his work?

14      A.   The only one that I know of, he has some

15 issues with medical treatment.

16      Q.   What are those issues?

17      A.   I guess the thing that I could put on, and I

18 guess kind of being like high-strung.  He got really

19 stressed out with medical, certain medical procedures.

20      Q.   Okay.  Do you know if he needed to miss work

21 in order to or because of a disability?

22      A.   Well, he would have to, I'm trying to think,

23 take some extended time for his appointments because he

24 had to take some medication prior to some appointments.

25      Q.   Do you have any idea how frequently that

1  occurred?

2      A.   No.  I can't really remember at this time.

3  Maybe, given a little time, I might be able to, but I

4  wouldn't --

5      Q.   But you do recall learning that Mr. Rawls had

6  told Mr. Cook he couldn't do his realtor stuff on the

7  clock anymore?

8      A.   Yeah, I believe so, and then, because he was

9  really wanting to push Mr. Cook into a 40-hour work

10  week, and then they ended up hiring him there as a

11  full-time employee.  That would have been after the

12  transition to Sumitomo because they wanted to convert

13  all the contractors to employees.

14      Q.   Did you have any discussions with anyone, and

15  this would have been with Sumitomo, right, about

16  converting from contractor status to a permanent

17  employee status?

18      A.   No, I didn't really talk to anybody about

19  that.  It was just mentioned that the focus was to

20  convert people from contracts to permanent positions.

21      Q.   And you said it was mentioned that was a

22  focus.  How did you come to understand that was the

23  focus?

24      A.   That was, I believe, in one of the weekly

25  meetings with Mr. Rawls with the team.

1        Q.   You mentioned that Mr. Cook was a contract

2   employee.  Were there other contract employees in the

3   IT area during the time that you were placed at

4   Sumitomo?

5        A.   Yes.

6        Q.   Who were those individuals?

7        A.   There was a Paul Grabowski and a Mike

8   Adamitis.  Brian Keogh was brought on as a contractor

9   before they converted him to full-time, and I'm trying

10  to think if there was any others, but I can't think of

11  any others at this time.  I'm sorry.

12       Q.   You mentioned Paul Grabowski.

13       A.   Grabowski.

14       Q.   Do you know if Mr. Grabowski was also placed

15  through Systems Personnel?

16       A.   No, I do not.

17       Q.   What about Mike Adamitis?

18       A.   I don't know who he was through.

19       Q.   Mr. Cook?

20       A.   He mentioned it, but I can't think of who it

21  was.  I think Mr. Grabowski was through Global Quest,

22  but I...

23       Q.   What about Mr. Keogh?  Was that his last name?

24       A.   Brian Keogh.

25       Q.   Oh, Keogh.  Okay.

1    A.   I don't remember who he was with, but he was

2   with somebody else.

3    Q.   And you mentioned Mr. Grabowski.  Did he

4   become a full-time employee?

5    A.   No, he was -- head count was cut under

6   Goodyear.  He was released.

7    Q.   What about Mr. Adamitis?

8    A.   Kirk Rawls ended up terminating his contract

9   before he went out on medical leave for back surgery.

10    Q.   And what was Mr. Adamitis' role?  What did his

11   placement relate to?

12    A.   He worked on the -- I think it was Lawson.  It

13   was the Lawson system for payroll and financials.

14    Q.   What about Mr. Grabowski?

15    A.   He was a desktop support person.

16    Q.   You say that Mr. Rawls terminated Mr.

17   Adamitis' contract before he took some leave for back

18   surgery.  What led you to believe that was the reason

19   for terminating his contract?

20    A.   Well, I don't know if that was the reason.  It

21   was just -- he was getting ready to go out on back

22   surgery and he was planning on coming back, but Mr.

23   Rawls terminated his contract before he was going out

24   on his surgery.

25    Q.   Now, when you had -- with respect to your

1  contract through Systems Personnel, was that a contract

2  for any specific period of time?

3      A.   Like I said at the beginning, it was supposed

4  to be a contract to hire and then it was just a

5  constant extension.

6      Q.   So, when you say it was a constant extension,

7  were there defined periods of time that?

8      A.   Not that I was aware of.  As far as I know, it

9  was an ongoing purchase order request every year.

10     Q.   If Systems Personnel had wanted to move you to

11  a different site or a different type of position, could

12  they have done that?

13     A.   I guess they could have offered me to go

14  somewhere else, but there wasn't any active request by

15  me or that I got from them to say we want to move you

16  to a different position.

17     Q.   And if, to your understanding, if Goodyear or

18  Sumitomo had wanted to request for Systems Personnel to

19  send a different person to serve in that unit

20  administrator role, could they have done that?

21     A.   I don't see why they couldn't have.  New York,

22  being an at-will work state, there's no guarantee of

23  anything, even if you're a full-time employee.

24     Q.   What was Mr. Cook's role in his placement?

25     A.   He was a Windows administrator and networking

1    on the Windows side.

2        Q.    And you mentioned that he was hired on

3    permanently?

4        A.    Yes.

5        Q.    Do you know when that occurred?

6        A.    I don't know the exact date.  All I know is

7    when Sumitomo was the company then.

8        Q.    What about Mr. Keogh, what was his role as

9    a --

10       A.    He was a desktop support, a general IT

11   support.

12       Q.    Do you know if he was hired on as a regular

13   employee at any point in time?

14       A.    Yes, he was.

15       Q.    Do you recall when that occurred?

16       A.    No, I do not.  I believe he was a contractor

17   for maybe six months.

18       Q.    How is it that your placement through Systems

19   Personnel at Sumitomo came to an end?

20       A.    Can you start that over?  You were ruffling

21   the papers and I couldn't...

22       Q.    Sorry.  How is it that your placement at

23   Sumitomo through Systems Personnel came to an end?

24       A.    That was in October of 2016.  I was called up

25   for a meeting with Mr. Rawls and a Systems Personnel

1   representative was there.  I think it was Jack Hayes

2   and Jeff Jensen.  And I was informed at that time that

3   the contract was not going to be renewed at the end of

4   -- after the end of 2016.

5       Q.   Who's Jeff Jensen?

6       A.   He's a manager of the software side of the

7   group.

8       Q.   Was he employed by Sumitomo or Systems

9   Personnel?

10      A.   Sumitomo.

11      Q.   And Jack Hayes?

12      A.   He's the Systems Personnel manager.

13      Q.   Did you have any understanding of why Mr.

14  Hayes was at the meeting where you were informed that

15  your contract would not be renewed?

16      A.   Can you ask that again?

17      Q.   Do you have any understanding of why Mr. Hayes

18  was present at the meeting when you were informed your

19  contract would not be renewed?

20      A.   Generally, whenever we had a meeting review

21  with Mr. Rawls -- but it wasn't really that I knew of

22  was going to be a review, so I had no idea that Mr.

23  Hayes was going to be there.  I thought it was just

24  going to be another talk with Mr. Rawls, like it was in

25  September.

1    Q.   When you say you had a talk with Mr. Rawls in

2    September, you're talking about September of 2016?

3    A.   Yes.

4    Q.   What was that talk?

5    A.   He had basically said that I needed to improve

6    on attendance or something like that, and, if it didn't

7    improve, he wasn't going to renew the contract.

8    Q.   During the discussion in October of 2016 with

9    Mr. Rawls, yourself, Mr. Hayes and Mr. Jensen, was

10   there any discussion about what would happen at the end

11   of 2016 when the position was not renewed?

12   Specifically, was there any discussion about

13   opportunities, other opportunities for you, whether at

14   Sumitomo or elsewhere?

15   A.   Not at that meeting, no, there wasn't.  There

16   was discussion later on.

17   Q.   When did that later discussion occur?

18   A.   I don't know the exact date or time, but it

19   was probably end of November-December timeframe.  He

20   had said that he was opening up another position for

21   desktop support and that I would be able to apply for

22   it, and then he also emphasized again that he needed

23   somebody who was going to be -- he needed a 40-hour

24   employee, and then he stated about how much the pay

25   would be, somewhere, fifty to fifty-five K, because he

1   constantly, whenever he had the opportunity, I guess,

2   he would say that, you know, he would always still

3   bring up my absentees for my disability and he would

4   always kind of bring that up, saying I was out sick a

5   lot.

6       Q.   How much were you earning from Systems

7   Personnel during the time you were placed at Goodyear

8   and Sumitomo?

9       A.   I think -- I believe it was 34.70 an hour.

10      Q.   Do you have a recollection of approximately

11  how much that equaled per year?

12      A.   I think the rough estimate, that would be like

13  68 to 69,000 a year.  I think it's usually double the

14  hourly rate to get an annual.

15      Q.   But you think it was around 34.70 per hour?

16      A.   I'm pretty sure that's what it was.

17      Q.   How many hours per week did you typically

18  work?

19      A.   Well, typical would be to do the forty hours.

20  If I had a migraine, it could be that I would be out

21  four hours in the morning and then take some medication

22  and be able to be in around -- tried to be in around

23  noon or by one o'clock, to be able to get four to five

24  hours in.

25      Q.   How frequently were you absent as a result of

1    migraines?

2         A.    Could be as many as two, two times a week.

3    Sometimes none.  Maybe up to four or five times a

4    month.  But all that would generally be in the -- my

5    time log would show my absences.  I guess, let me add

6    on to the typical hours.  There was a period when my

7    hours were reduced to thirty hours a week.

8         Q.    How did that come about?

9         A.    That came about in a review in 2014.  I was

10   under, I guess, a lot of self-imposed duress to the

11   fact of with Kirk, Mr. Rawls, stating that I was being

12   out sick a lot.  I was -- there was a time period there

13   where I was just not taking any time and constantly

14   working through problems with the migraines, not

15   feeling well and not really working at my best ability,

16   so, after a period of time, I made an appointment to

17   talk to -- went to a law firm of Hogan & Willig to get

18   some information on employment advice, and they stated

19   that --

20        Q.    I'm going to -- did you formally retain Hogan

21   & Willig --

22        A.    No, I did not.

23        Q.    -- as your attorney?  Okay.  I don't need to

24   know about the advice that they gave you.  I don't want

25   to, whether it's privileged or not, I think we could --

1    there's a question, so I don't want to delve into that,

2    so don't tell me about what they discussed with you,

3    but you said you were under some self-imposed duress

4    because you weren't taking time and you weren't feeling

5    well so you weren't working to the best of your

6    ability.  Did you, in order to address it, did you

7    request to work a reduced schedule?

8         A.    No.  I had -- the advice that I got from

9    Hogan & Willig was to go to Goodyear at the time and

10   request to be -- to fill out the forms to use the

11   Family Medical Leave Act, and with the person in HR,

12   Linda Walleshauser, and that's discussing with her

13   about my situation about not feeling well and being

14   able to need to take some time, and when I brought up

15   FMLA, Family Medical Leave Act, she said, oh, you don't

16   need to do that, and we know that you have disabilities

17   for the migraines, and she refused to allow me to fill

18   out the paperwork for that program, and not long after

19   that there was a review with Mr. Rawls, and Linda

20   Walleshauser was there, and everything that I discussed

21   with her Kirk brought up as supposedly his observations

22   of my work and then reduced my hours to thirty hours

23   per week because his statement was, you're not here

24   forty all the time anyway, so we'll -- I'm going to

25   reduce your hours to thirty and we'll see if you can do

```
1    thirty, and then there was also the understanding that
2    he made that, if I was available for more, that the
3    hours would be given to work more than thirty, and I
4    actually ended up working thirty-two per week because
5    for the most part, because that was four eight hour
6    days was thirty-two.  He didn't seem to worry about
7    that.  And then, when I would ask him about me coming
8    in on the Friday to do the extra eight hours, it was
9    usually a no, and then I finally stopped asking.
10        Q.   When you had the meeting with Mr. Rawls and
11   Ms. Walleshauser, was anyone else present?
12        A.   I believe Jeff Jensen was there.
13        Q.   Was anyone from Systems Personnel present?
14        A.   I can't remember.  There may have been, but I
15   can't.  Maybe Mr. Hayes was there, Jack Hayes, but I
16   can't really remember.  Probably, there probably was.
17        Q.   When you went to speak with Ms. Walleshauser
18   about needing some time, I guess it would be time off,
19   and you were asking about the FMLA, was there a
20   specific amount of time that you were seeking to be out
21   or --
22        A.   No.  Sorry about starting too quickly.
23        Q.   That's fine.
24        A.   No.  It was just the ability to use the FMLA
25   as the, I guess you would say the backstop of being
```

1    able to use the FMLA portion of the federal law as a

2    day here or there for my migraines.  Instead of just

3    being out for the migraines I would use the FMLA as a

4    day for the migraines absence, because it's all

5    considered, I believe, unpaid time anyway with the

6    FMLA.

7        Q.   Did Ms. Walleshauser give any reason for why

8    you didn't need to fill out the FMLA paperwork?

9        A.   Linda Walleshauser basically said that

10   everybody at Dunlop knows that I have a disability.

11   They know I'm a disabled veteran.  And I had also

12   filled out the paperwork at their request with the --

13   because I guess there's a federal form that you fill

14   out as if you're a protected veteran status and they

15   have you fill that out for Dunlop so they would have

16   the credit of saying that they're hiring a disabled

17   veteran, I guess.  I don't really know how that all

18   works, but I filled out a form that said, yes, I'm a

19   veteran disability and signed it for them.

20       Q.   Was that at the time you were initially placed

21   with Goodyear?

22       A.   No.  That was several years after that came

23   about.  They just asked if there's any veterans who

24   they wanted us to get on record that they were working

25   for Dunlop because I had specifically asked that, you

1  know, I'm a contractor, does this still apply, and they
2  said just to fill it out.
3      Q.    You said you asked if you needed to fill it
4  out because you were a contractor.  In your mind, did
5  your status as a contractor impact the types of
6  benefits you were entitled to from Goodyear or
7  Sumitomo?
8      A.    I'm trying to think.  I don't get any benefits
9  wise from Sumitomo or Dunlop, but they were having me
10  fill out a form that was being registered with the
11  federal government and I'm signing it and I don't want
12  to sign something inadvertently that would get me in
13  trouble with federal law, kind of thing.  So that's why
14  I had asked that question about I'm not really a
15  physical employee of Dunlop filling out that form.  So
16  that was the question why I had asked that.  But every
17  other aspect of what I knew or what I had read online
18  or looked up and got confirmation when I went and
19  talked to Hogan & Willig was, even though I'm a
20  contractor, I am still considered basically a de facto
21  employee of the company I'm contracted to.
22      Q.    At any point in time did you approach Systems
23  Personnel about filling out a request for family
24  medical leave?
25      A.    On the advice from Hogan & Willig they said

1  take it directly to Goodyear at the time because they

2  were the ones who I would be taking the absence from,

3  requesting the absence from, was from their site,

4  working directly for them.

5      Q.   But when Ms. Walleshauser said you don't need

6  to fill out paperwork here, you didn't go to Systems

7  Personnel --

8      A.   No, I did not.

9      Q.   -- and check with them at any point in time?

10  During the time that you were reduced to thirty hours

11  per week, did you have a set schedule that you worked

12  or did it flex?

13      A.   Well, it would be thirty hours through the

14  week.  If I was out sick a day earlier in the week then

15  it didn't matter what four days I worked, but it was --

16  I guess the implication was that it would be Monday

17  through Friday, four days.

18      Q.   And did you have the flexibility yourself to

19  determine which four days you would work in a

20  particular week, subject --

21      A.   It would all be based on if I had a migraine

22  or not.

23      Q.   When did you first start to experience

24  migraines?

25      A.   My earliest recollection was after November of

1    1985.

2       Q.    And, if we focus in on the timeframe that you

3    worked or you were placed at Goodyear and Sumitomo, how

4    frequently did you experience migraines and, if it

5    changed over that period of time, let's parse it out.

6       A.    From what I've kind of been able to ascertain

7    on my migraines is they seem to revolve around changes

8    in weather, so it's hard, because we went through

9    several doctors with, even at the Dent Neurologic

10   clinic, about trying to determine if I had any

11   triggers, and we couldn't determine if I had any

12   triggers because, you know, they say nitrates and other

13   kinds of stuff, you know, like processed meats, nuts,

14   all the kind of normal things, and I would eat a lot of

15   that stuff and it didn't trigger a migraine, and we

16   also tried pretty much every medication on the planet

17   to try and stop them and none of them seemed to really

18   work, so I stopped taking all those pharmaceuticals

19   because they didn't seem to really be doing me any

20   benefit, and that was also brought up in 2007 that I

21   was, I had the ability to use oxycodone for the

22   migraines for a while until they stopped, all that

23   because of the opioid mess where they said there's no

24   real benefit, we're afraid you're going to get

25   addicted, and my response to that was, you give me 20

1    pills, they last a year, but they were still not going

2    to give them to me anymore at the VA, and I had brought

3    up that I was on oxycodone and the 27 -- 2007 interview

4    because there was a drug test involved.  I wanted to

5    let them know that I was taking a narcotic, that I had

6    issues with migraines, and that didn't seem to be a

7    problem because they hired me for the contract.

8        Q.    When did you stop using the oxy?

9        A.    I don't know the exact timeframe.

10       Q.    Okay.

11       A.    It would have been -- it was before -- it

12   would have been before 2012 because 2012 was -- the end

13   of 2012 was the last time I went to the VA.

14       Q.    So the end of 2012?

15       A.    Would have been before that because I'm not

16   sure exactly when they stopped, but I got deathly ill

17   in July of 2012 and didn't go back to the VA after

18   that.

19       Q.    Okay.  Did you continue medical treatment

20   somewhere else after the end of 2012?

21       A.    Yeah.  I just went to my regular general

22   practicing doctor.  Because I'm a disabled vet, rated

23   at 80 percent, if I go to the VA everything is covered

24   one hundred percent.  If I am -- I retired army so I

25   can go anywhere.

34

1       Q.    The Tricare?

2       A.    Yeah, exactly.

3       Q.    During the time that you were placed at

4   Goodyear and Sumitomo, were you receiving medical

5   treatment for migraines, specifically?

6       A.    Yes.

7       Q.    And what period of time -- was there a

8   specific period of time or was it ongoing through the

9   placement?

10      A.    It's pretty much ongoing until the one point

11  where it was like, well, I'm not really getting any

12  benefit of any of this and I haven't -- I'm not sure

13  when I stopped going to Dent for it, but what I use now

14  is, I take the Excedrin Migraine and that seems to work

15  pretty well.  The only drawback is it has a lot of

16  aspirin in it, which prevents getting a lot of things

17  done because your blood is too thin.

18      Q.    So you said at some point you stopped going to

19  Dent?

20      A.    Yes.

21      Q.    Do you have any recollection of when that

22  might be, or can you pinpoint it in any manner?

23      A.    I can't remember on that one.  Given some

24  time, I might be able to narrow it down, but...

25      Q.    Did you continue going to Dent after you

1    stopped going to the VA?

2        A.    I think it all stopped before 2012 when I got

3    to a point where the medications that we're trying

4    didn't seem to be doing anything for me so I really

5    didn't see the value of going and paying the money.

6        Q.    During the time that you were treating with

7    Dent, were you seeing the same regular doctor?

8        A.    Yeah.  I was seeing Dr. Mechtler.

9        Q.    How do you spell that last name?

10       A.    I have no idea, sorry.  But he's the main guy.

11   You see him on the news all the time.

12       Q.    And that's your regular doctor?

13       A.    That's who the -- no, that's the doctor at

14   Dent.  My regular doctor is Dr. Heyden.  I think it's

15   H-E-Y-D-A-N.  It's either an A or an E.

16       Q.    Okay.  And during the time that you were

17   seeing Dr. Mechtler, were you also seeing Dr. Heyden?

18       A.    Well, Dr. Heyden would be my general doctor

19   and Dr. Mechtler would be a specialist, so I can --

20       Q.    Sometimes people switch primary doctors so I'm

21   just trying to pinpoint if, for example, you were

22   seeing Dr. Mechtler and he was sending reports, would

23   they have gone to Dr. Heyden?

24       A.    Yes.  All my medical records would be at Dr.

25   Heyden.  I tried getting some stuff sent from the VA,

```
 1   but the VA doesn't send them to anybody.  I have to
 2   physically go get them and take them.  It's too much
 3   trouble.
 4       Q.   So, after we think, maybe sometime in 2012,
 5   perhaps before 2012, you stopped going to Dent and you
 6   were only treating with your regular doctor, Dr.
 7   Heyden; right?
 8       A.   Yes.
 9       Q.   Did you see Dr. Heyden to receive treatment
10   for migraines?
11       A.   Not specifically.  I did ask if he could write
12   a prescription for the oxycodone, which he didn't
13   write.  So I would -- my alternate option, that the VA
14   wasn't happy with when I told them when they were
15   stopping the oxycodone, was two to four ounces of
16   vodka, and they didn't like that, saying I was
17   self-medicating, and I said, well, you're not giving me
18   much of a choice, but that doesn't -- I don't use that
19   very often.  A lot of times, to elaborate on that, if I
20   have a really bad migraine and the Excedrin or whatever
21   doesn't work, I'll end up at the MASH Urgent Care or
22   possibly Immediate Care, whoever is open, to get a shot
23   of Toradol, which generally takes care of it in 15 to
24   30 minutes.
25       Q.   When Mr. Rawls started, it sounds like it was
```

1    around 2012, 2013; is that correct?  I'm sorry, 2013.

2    October of 2013 you thought maybe he started and at

3    that time he ended the flex time arrangement.  Did you

4    have a conversation with him about that?

5        A.    No.  He just said that I couldn't do it

6    anymore.

7        Q.    Did he give any reason why?

8        A.    No.

9        Q.    Did you ask for any reason?

10       A.    I can't remember at this time.

11       Q.    Did you ever apply for any full-time positions

12   at Goodyear or Sumitomo during the time that you were

13   placed there as a contractor?

14       A.    I just want to -- there was two positions that

15   I applied for.  There was a network engineering

16   position that opened up and it came back and said that

17   I was unqualified for that position.  It was --

18   ultimately, Brian Keogh moved into that position,

19   although I feel I was much more qualified than he was.

20   He was moved into that.  And the other position I

21   applied for was that desktop generalist support that

22   Mr. Rawls offered to me to say he was going to be

23   opening up this position.  It was my understanding at

24   that time that he was hiring around an additional

25   desktop support person because it wasn't released yet

1   that Brian Keogh was moving to the network side, so I

2   thought, oh, they're expanding the desktop side, so it

3   wouldn't be as stressful, moving from Unix

4   administration Linux over to Windows side.  I would

5   have a little more support with three guys doing it,

6   generally three to four as opposed to just two of the

7   main, because Carey Dewer was there.  He was kind of on

8   the desktop team, but he was really kind of the main

9   help desk answer guy there.

10      Q.   Okay.  So do you recall when you applied for

11  the network engineer position?

12      A.   It might have been in November.  It was after

13  they informed that the contract was terminated.

14      Q.   So November of 2016?

15      A.   Yeah, because they had hired a network

16  engineer to work with John McClain, the other network

17  engineer, and then they had opened up a position for

18  operations, I think it was operations support manager,

19  something that -- Adrian went by AJ, but I think it was

20  Adrian Franzyck moved into that position opening, the

21  network support role for applications.

22      Q.   So, when you applied for the network engineer

23  position, what form did that application take?

24      A.   It was online, through the online portal with

25  Sumitomo.

1      Q.    Were you interviewed for the position?

2      A.    No, I was not.  I was sent an E-mail from HR

3   saying I was not qualified.

4      Q.    Did you follow up with anyone to ask about why

5   you were deemed unqualified?

6      A.    No, because it was still -- it was hard to

7   talk to Mr. Rawls and get things, you know, because it

8   was kind of like, always seemed like an adversarial

9   conversation with him all the time.  If you asked him a

10  question, he would generally say, I never said that, or

11  he would say, this is what I said.  So he was always

12  kind of like a hard person to go and talk to.

13     Q.    Do you know whether any of the other

14  individuals in the IT area had similar experiences with

15  Mr. Rawls and they found him adversarial or difficult

16  to talk to?

17     A.    It was pretty much everybody, and there were a

18  lot of times when he would, as a group or

19  semi-individually, say, if you can't get it done, I'll

20  bring in a whole new group.  It was constant threats

21  about being fired by him.

22     Q.    And you witnessed that occurring --

23     A.    Yes.

24     Q.    -- with others in the area?

25     A.    Yes.

1      Q.   Are there any specific instances of that that

2  you can recall particular employees or situations that

3  you witnessed?

4      A.   I think he pretty much said it to almost

5  everybody who was working there.

6      Q.   And when you say he said it to pretty much

7  everyone, are you referring to threatening to fire?

8      A.   Fire, yeah.

9      Q.   Let's talk about the desktop generalist

10  position.  You said that was a position recommended by

11  Mr. Rawls; right?

12      A.   Yes.

13      Q.   And so did you apply for that through the

14  online portal as well?

15      A.   Yes, I did.

16      Q.   And so what happened after you applied to that

17  position?

18      A.   An interview was scheduled for, I believe

19  January 3rd, the week -- maybe it wasn't January 3rd,

20  but it was the first week after the new year to come

21  back for an interview.

22      Q.   And did you have that interview?

23      A.   No, I did not.

24      Q.   Why not?

25      A.   Because there was another confrontation with

1   Mr. Rawls about a failed system, that he was basically

2   blaming me for the failed system and it was not a

3   system that I no longer managed or had anything longer

4   to do with.

5       Q.   So how did that influence your decision

6   relative to the interview?

7       A.    Well, he was berating me again and, about

8   that, I had left the night the system failed late in

9   the afternoon, and the other person who was my

10  replacement and John Cook were working on trying to

11  restore that system from VMware from a backup, and when

12  we came back it still didn't work.  I wasn't the

13  application person.  I was just involved with the

14  initial installation of that software on a Windows

15  platform.  After an upgrade was completed, I think it

16  might have been in 2015, but I can't remember, the

17  whole thing was transitioned over to John Cook and

18  under VMware control, because he was the VMware

19  administrator, so it was all his responsibility and

20  then the system failed.  They were trying to get it

21  back.  I was -- the only real thing I had was, I had an

22  idea of how the application worked.  It was called

23  Interpage.  It was for sending out pages, site-wide

24  paging to site pagers, and when I went to test it I

25  realized that it wasn't working, all the names were

1  gone, so we had them do a restore.  All the names were
2  gone.  What it turned out is that the system had failed
3  a long time ago.  It ran out of disc space.  So when
4  somebody went in and modified the paging table, it
5  cleared the on-disc reference.  The stuff was still in
6  memory because it was RAM, but as soon as the system
7  failed, that file that couldn't write was empty so it
8  couldn't bring anything back.  I didn't know how that
9  worked at the time, but that's what we found out in the
10  aftermath and he was -- he had talked to the other guy
11  who was hired to end up being, replacing me, Robert
12  Dege, about why did he leave at seven something in the
13  evening when he should have stayed all night until the
14  system was fixed but, when we left, they were doing
15  another restore.  He was going to check on it later
16  from home through VPN access and see if it was working.
17  There was really nothing I could do because I had no
18  access to VMware to do any of this.  I was just there,
19  basically, because I had knowledge of the application.
20  So as he was berating me, he then said, tell me why I
21  should bring you back, and he said that a couple of
22  times, and I just said cancel the interview because I
23  had enough of being berated and belittled and
24  constantly told that, for the most part, I was not
25  worth having around because I had issues with migraines

1   and being out sick, and it just came to a point at that

2   thing, and the other observation I made about Mr.

3   Rawls, that I had said earlier about where he would say

4   I never said that or I said this and you would think

5   that, okay, maybe he forgets stuff, but when he was

6   berating Robert Dege at the time, he -- I think the

7   interview was in June, and in December it appeared that

8   Mr. Rawls had total recall of the interview with Robert

9   Dege, basically saying on how things were to work, that

10  if something is broke you don't leave until it's fixed,

11  and went through that in pretty explicit detail, that

12  he remembered it perfectly, that interview, and Mr.

13  Dege responded, yes, he remembered the interview and

14  the transaction of the whole thing.  He didn't question

15  anything that Mr. Rawls said was incorrect or anything,

16  so it's -- that was another thing that I picked up on

17  and said to myself that, okay, this guy is a guy that I

18  really can't trust anymore.  That was another thing

19  that was leading me to saying I don't need to work for

20  him anymore, to come back and be constantly berated on

21  at least a weekly basis.

22      Q.   So, at the time of this incident, it sounds

23  like it was maybe in December of 2016?

24      A.   Yeah, it was at the very end of December.

25      Q.   He was berating you, but he was also, it

1  sounds like, berating Mr. Dege?

2      A.   Yes.

3      Q.   Who was also associated with all of that;

4  right?

5      A.   Correct.

6      Q.   Okay.  And what about Mr. Cook?

7      A.   He wasn't there.

8      Q.   Okay.  So you decided to cancel that

9  interview.  What about, you said Mr. Dege came in and

10  replaced you or took over the Unix function; is that

11  correct?

12      A.   I wasn't really sure that it was replacement

13  at the time because in, I think it was May, and

14  whatever, our meetings, after we completed the AS/400

15  project that I was in charge of, he had mentioned that

16  he was putting out a req to hire an AS/400

17  administrator.

18      Q.   When you say he mentioned he was putting out a

19  req, are you referring to Mr. Rawls?

20      A.   What was that?

21      Q.   When you say he mentioned putting out a

22  requisition, were you referring to Mr. Rawls mentioned

23  that?

24      A.   Yes.  And, when the job was posted, it was

25  posted as a Unix/Linux systems administrator and I

1    looked through all the requirements for it.  It did

2    have -- it had a lot of stuff that I didn't know.  It

3    had a lot of Windows stuff on there.  It had --

4    basically the job title was -- or the title was Unix --

5    was Linux/Unix administrator, something like that, and

6    all the duties and responsibilities seemed like a

7    combination of what I did and Mr. Cook did and they

8    also had the requirement of a bachelor's degree, which

9    I did not have.  It looked like from that requisition

10   he was taking a bunch of needs that he had and put it

11   in to create another position, an additional position

12   that was going to bridge the knowledge between myself

13   and Mr. Cook to have a third person to be able to cover

14   both sides of the environment.  So that's what I had

15   looked at when I saw it, but with that degree on there

16   that said a requirement, I was -- I couldn't even apply

17   for that because I didn't meet the basic requirements

18   for the position.

19        Q.   Did you talk to anyone about whether your

20   experience could be a substitute for the degree

21   requirement?

22        A.   No, I did not.

23        Q.   So what happened?  You didn't apply or, I'm

24   sorry, you canceled the interview for the desktop

25   generalist position.  I assume your contract ended at

1    the end of December 2016.  What have you been doing

2    since?

3        A.    I filed for unemployment and I was actively

4    looking for jobs that there weren't any, and all of the

5    jobs that were listed for what I did, all had the

6    stipulation of a required bachelor's degree, so what I

7    ended up doing is kind of shifting my prospects a

8    little bit and applied for the New York State SEAP

9    program, which is the Self-Employment Assistance

10   Program, because in 2016 I had come up with an idea and

11   I was working on getting that patented and that's where

12   I was going down the business side to be able to take

13   advantage of that patent and open up a business to

14   pursue selling that idea.  I was still, I was still

15   looking for positions, but it was still limited on that

16   degree requirement, but the shifting over to working on

17   the self-employment side, there was no requirement that

18   I have to keep reporting that I'm looking for a job.  I

19   was actively working on the business preparation side,

20   going to all the classes and learning a lot about how

21   to start a business.  I opened an LLC and the patent

22   just got approved December of last year so I'm still

23   working on that and I was looking for a job in, I think

24   it was June or July of 2017, I had applied for a

25   position at M&T Bank, did a phone interview, and that

1  was the end of it and then, towards the end of 2017, I

2  had gotten word from Tech Systems that there was a

3  possible position available with a defense contractor

4  so I interviewed for that position and was brought in

5  as a contractor for that company.

6      Q.    Okay.  So --

7      A.    I know it was a little wordy.

8      Q.    That's okay.  I just want to break it down.

9  So during 2017 you -- it sounds like you started your

10  own self-employment, your own business at that point in

11  time.  What was the name of that business?

12      A.    It's SSBC Arms, LLC.

13      Q.    And what's the nature of that business?

14      A.    Firearms.  The patent that I came up with was

15  a modified part for the AR-15 platform firearms, to

16  convert them from semiautomatic operation to single

17  shot operation, so that's what my thing was is a single

18  shot bull catch for SSBC, so that's the premise around

19  that whole thing.  I haven't made any money yet.  It's

20  all been outgoing money on this whole patent and

21  everything, but hopefully soon I'll be able to start

22  selling the part under my patent.

23      Q.    And then, so during that timeframe you had a

24  phone interview with M&T Bank?

25      A.    Yes.

1    Q.    And you said that was in June or July of 2017?

2    A.    I believe so, yes.

3    Q.    Did you have any other interviews or

4  screenings between the time you left your placement

5  with Sumitomo up through June or July of 2017?

6    A.    That was the only one.  I was looking and I

7  was filling out the online applications for several

8  companies, but none of them really got back to me for

9  any other contact, other than saying they received it,

10  it's under review, or after that it was they weren't

11  interested.

12    Q.    Did you work with any recruiters or temporary

13  agencies in an effort to secure employment after your

14  placement ended?

15    A.    It was Tech Systems.  I had contacted them, I

16  believe it was in October, after I was notified that

17  the contract was canceled.

18    Q.    Did you attempt to seek any further placement

19  through Systems Personnel?

20    A.    No, I did not.  There was nothing available.

21  I had -- they knew I was looking and there was nothing

22  that came up that was in my skill set.

23    Q.    So you said the end of 2017 Tech Systems

24  linked you up with a defense contractor and you started

25  working there as a contract employee?

1      A.   Yes.

2      Q.   What's your rate of pay in that position?

3      A.   I think it's 42 an hour.

4      Q.   Is it full-time forty hours per week?

5      A.   Yes, and they allow the flex time.  Well, not

6   necessarily, I guess you would call it flex time,

7   because I can work more than eight hours a day, so I

8   could have more hours logged during the week.  So if

9   I'm out some, I would still have the opportunity to

10  make forty hours a week with respect to the flex time

11  with them.  No saving of hours because everything with

12  the defense is billed on six minute intervals so

13  everything is specifically logged against the specific

14  project that you're working on that.  It's really

15  tracked strictly because of defense contracting.

16     Q.   So when you talk about flex time as it related

17  to your time, the time of your placement at Goodyear

18  and Sumitomo, what did you consider that flex time to

19  be?  How did you personally envision it or define it?

20     A.   Well, Mr. Papelow allowed me to work to make

21  up time in the evening where if I was out in the

22  morning I could come in at noon and the ability to work

23  until eight p.m. to make eight hours, or, if I ended up

24  having more hours during the week with him than forty,

25  I could save those hours for a different time period,

1    so he allowed me the flexibility to work around issues

2    with my migraines, and I had also put out there, as I

3    always do, if there's something you really need call me

4    and I'll see what I can do for you.  I never said, if

5    I'm out don't call me, because I know how the nature of

6    the business works.  If they need you, they contact

7    you.  They gave us VPN access to be able to access the

8    systems from home, if need be, to do things, which was

9    convenient.  I then added the additional request that

10   they give me a notebook, a notebook from the company

11   just on the -- because I go, well, if my PC breaks it's

12   broken.  I may not get it fixed.  If you need me, I

13   can't get in.  If you give me a notebook.  It came

14   around in the 2013 timeframe after Mr. Papelow left.  I

15   was going away on vacation for a week and I requested a

16   notebook to say, if you need me I'll have your notebook

17   to be able to get into the systems, and I had kept it

18   throughout until the end for that purpose guaranteed

19   that it's a company asset.  If it's broke, I take it to

20   them.  They give me another one.

21        Q.   And that was Mr. Rawls approved?

22        A.   No.  That was approved by Jeff Jensen and John

23   McClain in the interim when Mr. Papelow retired and Mr.

24   Rawls started, but he knew I had it and he allowed it

25   to stay in my possession because I also had a desktop

51

1   computer too.

2       Q.    So during the time that you were working on

3   setting up SSBC Arms, you said you were taking some

4   classes; right?

5       A.    Yes.

6       Q.    Approximately how much time per week were you

7   devoting to that venture?

8       A.    I don't really know.  I was going to night

9   classes and some day things with small business

10  development.  Whenever they had them available, I was

11  scheduling to go.  I believe I have a log of that, if

12  you're interested.  I could possibly provide that.  But

13  I might have been twenty at the low side to maybe forty

14  or more, I don't remember, but I was going to classes

15  at Niagara Community College.  I was going to classes.

16  It was the small business, SBA, Small Business

17  Administration of the US government and the SCORE

18  organization for free classes, they had it, was it -- I

19  think it's Medaille College that they have stuff.  So I

20  was kind of going all over to these different classes

21  because there was requirements that you had to meet

22  with the program to get all the stuff in and you had to

23  log all the stuff with the state so I was doing that,

24  and I think more than all that stuff, so...

25      Q.    And you think you may have a log of the

1  different activities that you undertook?

2      A.   I may have.  Is that something you would

3  really want or is it --

4      Q.   Yeah.  So we will probably start some

5  documents requests.

6              MR. MILLER:  There's been a couple of

7      documents mentioned.  If you would just go through

8      the transcript and see what you think and send us

9      that, we'll work on it.

10 BY MS. HEMENWAY:

11     Q.   Aside from the work with the defense

12 contractor -- and you said that was through Tech System

13 -- did the Tech Systems pay you or does the contractor

14 pay you?

15     A.   Well, the contractor pays Tech Systems.

16     Q.   But your pay comes from Tech Systems?

17     A.   Yes, but I guess I still consider myself a de

18 facto employee of the defense contractor that I'm not

19 really supposed to mention.

20     Q.   Aside from that employment, have you received

21 any other income from employment since your contract

22 position at Sumitomo ended?

23     A.   No.  The only thing I received was

24 unemployment benefits.

25     Q.   And how long did you receive unemployment?

```
 1        A.   I think it was six months; whatever the
 2   regulatory time period was.  I think it was six months.
 3        Q.   I know it's varied over time depending on
 4   what's going on, so...
 5        A.   I think it ended in July.
 6        Q.   Okay.  So January through July timeframe we
 7   think?
 8        A.   Yeah, but it was probably like mid-January to
 9   something.  I think it was just -- whatever the amount,
10   I think it was just six months when I was...
11        Q.   Do you recall the amount of your benefit?
12        A.   It might have been something around four
13   hundred a month, but that I could also provide the
14   exact number if you want it.  I would just have to log
15   it in.
16        Q.   Would it maybe --
17        A.   What?
18        Q.   Would it maybe have been four hundred a week?
19   If you don't remember, that's fine.
20        A.   Yeah.  I don't remember.  That's why I'm
21   saying I could get more information for you because --
22   I'm sorry.
23        Q.   No, that's okay.  I don't want you to guess.
24             MS. HEMENWAY:  Why don't we take a quick
25        break just to stretch our legs, grab a drink?
```

```
 1                    (A recess was taken.)
 2    BY MS. HEMENWAY:
 3        Q.   Mr. Borders, I want to circle back to a couple
 4    of things that you mentioned earlier, one of which was
 5    that you had some review meetings during the time you
 6    were placed at Goodyear and Sumitomo, and I'm just
 7    wondering if you could give me some more details about
 8    those meetings, starting with who would be present when
 9    you have those?
10        A.   Do you want the meetings that were with Mr.
11    Rawls or all meetings prior to and the ones with Mr.
12    Rawls?
13        Q.   Well, let's start with the meetings with Mr.
14    Rawls, when you had review meetings with Mr. Rawls.
15    Who was present at those meetings?
16        A.   Most of the time Mr. Jeff Jensen was there.
17    There were a couple of times when I believe I was
18    called in and just talked to by Mr. Rawls individually.
19        Q.   Who, if anyone, from Systems Personnel would
20    be present?
21        A.   Generally, for the official annual review
22    meetings there was a representative from Systems
23    Personnel and it could have been either the owner --
24    Jim Cipriani might have been there for one or two
25    meetings, but I can't remember if it was prior to Mr.
```

1    Rawls or after.  I know Jack Hayes was at some of the

2    meetings.  I believe Jeff Jensen was pretty much at all

3    the meetings because for some reason -- I'm not sure

4    why -- I was system administrator like John Cook, and

5    John Cook was directly under Mr. Rawls, but for some

6    reason I was under the development team because, for

7    some reason, I think Mr. Kirk thought that I was a

8    developer and not a system administrator working on,

9    you know, the hardware operating systems and patching

10   and software installs.

11       Q.   So at these meetings for -- the meetings where

12   Mr. Hayes was present, what role would he take in the

13   meeting?

14       A.   He was just sitting there listening to what

15   Mr. Rawls and I were discussing about the year in

16   review.

17       Q.   Would he offer any comments of his own?

18       A.   I can't recall.

19       Q.   Would you have any separate meetings where you

20   met with just Mr. Hayes about your performance?

21       A.   No.

22       Q.   Were there any occasions when you met only

23   with individuals from Systems Personnel without anyone

24   from Sumitomo present?

25       A.   They would occasionally.  Basically, Lynn B --

1    we'll just refer to her as Lynn B because I can't spell

2    her name or really say it -- would take me out to lunch

3    and have a little lunch meeting.

4        Q.    What types of things would you discuss during

5    those lunch meetings?

6        A.    We would talk about how the job was going,

7    that kind of stuff, you know.  I may have mentioned

8    things about Mr. Rawls to her or not, you know, general

9    chitchat I don't tend to remember.  I would say if you

10   probably call me back in a month to ask me what I

11   talked about here, I probably wouldn't really know.

12       Q.    Okay.  Is there a particular reason that you

13   -- do you have any issues with your memory?

14       A.    No.  I just don't really commit things that I

15   guess I would say aren't really overly important to

16   storage and trying to -- I'm very horrible with names

17   and I didn't have that problem when I was in the army

18   because everybody has their name on their shirts, so...

19       Q.    So occasionally you would meet with Lynn B.

20   We talked about Mr. Hayes' role at the review meetings.

21   What role would Mr. Jensen play at the meetings?

22       A.    He would be there last -- like I said, he was

23   -- I was assigned to him as he was the supervisor, so

24   he was there as the supervisor role in the meeting with

25   Mr. Rawls, and I don't know if it came up with Jeff or

1   not in a discussion at one point as to why Jeff wasn't

2   counseling me as opposed to Mr. Rawls, because it was

3   almost kind of like why was Jeff Jensen even there,

4   because it was really me and Rawls' situation is going

5   on, and he was just there as a third person it seemed

6   like.  He would put down some comments, I think, on the

7   review and maybe provide a little input, but I wouldn't

8   be able to tell you what it was.  I would say ask Jeff

9   Jensen, ask Mr. Hayes.

10       Q.   What role would Mr. Rawls take at the

11  meetings?

12       A.   He was the meeting leader.

13       Q.   And then what role did you take?

14       A.   I was just there asking -- answering any

15  questions that he had.  If he asked me a question, I

16  would try to provide some input.  We would go over the

17  thing and then it was like he would say, is there

18  anything I wanted to do or did I agree with everything

19  he said, and, trying to avoid confrontation with him at

20  all costs I would, for the most part, either if it was

21  something really blatant, I would maybe try to make a

22  correction, or I would just let it all go to avoid the

23  confrontation.

24       Q.   How frequently did you have these review

25  meetings?

1      A.    I think there was generally two a year and

2   then sometimes those would be like the official

3   meetings and then maybe a couple, you know, chance for

4   to come by and say, you know, why isn't this done and

5   then threaten to fire you and move on, and then other

6   things where he would call you in the office and say

7   and question about time that I was submitting, question

8   why I'm working a certain set of hours, why is my start

9   time at this time and not why am I not coming in like

10  everybody else, and he would ask me what time I would

11  want to come in and then I would say that and he would

12  say okay, and then later he may question it again and

13  then change my start hours to something else.

14     Q.    Do you know if that was occurring with any of

15  the regular employees of Sumitomo or Goodyear, similar

16  conversations?

17     A.    I'm not really sure because I didn't really

18  try to go and query a lot of people.  If something came

19  up, all I know is the one developer there, Renee

20  Rapholt, she worked early.  Jeff Jensen came in a

21  little later.  Other people came in early, you know.

22  It was kind of, seemed like a mixed bag as to -- but I

23  wasn't there to see or really observe or really that I

24  thought it was my place to take notes as to when people

25  arrived and left.  It's really none of my business what

59

1    other people do.  I'm accountable to myself and to

2    whoever the manager would be to try and keep him happy

3    with job performance.

4         Q.    Thinking about the time when you were having

5    theater meetings with Mr. Rawls, were there any issues

6    relative to your performance under the contract that

7    were brought up -- brought to your attention?

8         A.    Not really.  It was -- seemed like a lot of

9    things where he would say I wouldn't communicate enough

10   information to him, but sometimes I feel that when I

11   write E-mails apparently I must be writing in gibberish

12   because it seems clear to me what I'm writing, but

13   other people seem to say they don't understand certain

14   things, but it looks perfectly clear to me as a

15   technical thing that I'm putting out, and some other

16   things he would call you in and discuss.  One of the

17   other things was, I got called in about, that I wasn't

18   basically at work for nine hours a day when I was there

19   because I was -- originally it was an eight and a half

20   hour day.  It was eight hours with a half hour lunch.

21   And then Mr. Rawls stipulated that I had to take an

22   hour for lunch.  So that extended the day to a nine

23   hour day with an hour mandated for lunch.  So I pretty

24   much, for the most part, left the plant for an hour and

25   then came back.

1      Q.   Do you know if the regular employees had a

2  similar work schedule of nine hours with a one hour

3  lunch?

4      A.   Yeah.  I think that's pretty much what he

5  ended up setting, was a schedule like that for

6  everybody, because I think he really seemed to really

7  scrutinize the hours that I was putting in and saying,

8  you know, why was I recording -- he thought I was

9  recording on the tenth and he got a little pissed that

10  I was recording hours on the tenth and he said, report

11  them fifteen minutes because I guess he didn't want to

12  have to calculate the tenths of an hour, I guess, so he

13  made a comment about that, and then the comment about

14  the one hour lunch came up at some point.

15      Q.   So when you say you were recording on the

16  tenth, do you mean in six minute increments?

17      A.   Yeah.

18      Q.   And he wanted you to do it in fifteen minute

19  increments?

20      A.   Yes.

21      Q.   Did you have the opportunity to provide any

22  feedback or comments on your own performance before the

23  meetings occurred?  I'm thinking something akin to a

24  self evaluation or --

25      A.   I don't think so because it wasn't -- I don't

1   think it was or I can't remember because it wasn't a

2   requirement for people as contract employees to fill

3   out all the Goodyear review forms and all that stuff.

4   That was really geared towards -- physical employees

5   had to fill out all of that paperwork.  I do know what

6   you're referencing because everybody always moaned and

7   groaned about it --

8        Q.   Okay.

9        A.   -- as probably everybody does.

10       Q.   So, in that regard, your experience at

11  Goodyear Sumitomo was a little bit different than the

12  regular employees --

13       A.   Yes.

14       Q.   -- when it came to reviews?  Okay.  At any

15  point in time, while you were placed through Systems

16  Personnel, did your pay rate increase?

17       A.   Yes.

18       Q.   Do you know who increased that rate?

19       A.   I believe I went in and asked Mr. Papelow for

20  an increase.  I believe that -- I don't know what the

21  change was, but it went up.

22       Q.   Do you know if he had to talk with someone

23  from Systems Personnel to get approval for that?

24       A.   I don't know.  I would expect he did because

25  it would -- they would want to increase their side on

```
 1   the contract, but I don't know.  I think it might have
 2   been around the six month timeframe, six months to a
 3   year or something that I went and talked to Mr.
 4   Papelow, but I don't know exactly.
 5        Q.   So pretty early on during your placement?
 6        A.   Yeah, because it was, from my previous
 7   position to there it was a substantial cut.
 8        Q.   You mentioned or you talked earlier about a
 9   period of time when you went down to thirty hours per
10   week or about thirty-two hours per week.  Can you do
11   you recall the time when that happened?
12        A.   It happened right after that that I talked to
13   Ms. Walleshauser and then I had the meeting with Kirk
14   Rawls and in that review meeting he cut my hours to
15   thirty in that meeting and that's when it started.
16        Q.   And so do you remember what year that was or
17   what --
18        A.   It was 2014.
19        Q.   Would that have been around August of 2014?
20        A.   I believe that was possibly right.  I think it
21   was August and...
22        Q.   And then how long did that continue?  How long
23   did you continue to work about thirty hours?
24        A.   It seemed until I was assigned the AS/400
25   project and I think that was in the fall of 2015
```

1    because nobody else wanted to take it on and I agreed

2    kind of reluctantly because I knew the IBM hardware and

3    the -- basically the virtualization kind of stuff that

4    was going to go on that, so I was familiar with that

5    part of it, but I knew nothing about how the AS/400

6    worked, other than it was on the IBM power system as a

7    virtual machine.

8        Q.    So when you were restored back to the -- you

9    were restored back to forty hours per week?

10       A.    Yes.

11       Q.    Was that something that you asked for?  Was

12   that something the company proposed?

13       A.    That was -- Mr. Rawls asked if I would go back

14   to forty too for the AS/400 project.

15       Q.    And you agreed to that?

16       A.    Why wouldn't I?  I was there for the company,

17   for their needs and whatever they wanted.

18       Q.    And after you returned to that full-time or

19   forty hour commitment, did you continue to have

20   absences related to your migraines?

21       A.    Occasionally, yes.

22       Q.    When you say occasionally, did you have a

23   recollection of the frequency with which that occurred?

24       A.    That would be in that stuff I kind of -- it

25   would show when I was not at work, but the migraines

1  still continued.  It's not like they went away.

2      Q.   Do you know in your log if the reason for

3  absences distinguished if it was something for other

4  than a medical reason?

5      A.   Yes.

6      Q.   So if you were absent for personal reasons,

7  that it would be --

8      A.   I believe that would be listed in there also

9  because I kind of was keeping track of my sick time

10 kind of as a general reference just to kind of know how

11 much I was out so I could kind of gauge that.

12              MS. HEMENWAY:  So I'd like to have this

13     marked as Exhibit 1, please.

14              (Whereupon, Exhibit 1, questionnaire, was

15     marked for identification.)

16 BY MS. HEMENWAY:

17     Q.   Mr. Borders, I'm going to hand you what's been

18 marked as Deposition Exhibit 1.  I'll ask you to take a

19 minute to review it and then, once you've had a chance

20 to do so, I will ask you some questions about it.

21     A.   Okay.

22     Q.   Do you recognize Deposition Exhibit 1?

23     A.   No, I don't, because that's not my writing.

24     Q.   Okay.  So that was my next question.  Do you

25 know whose handwriting this is?  If you don't recognize

1  it.

2      A.   I can't remember, but I do know that's not my

3  writing.

4      Q.   Do you remember or recall anytime having a

5  meeting where you were asked the questions that appear

6  on Deposition Exhibit 1?

7      A.   I can't at this time.

8      Q.   Okay.  I'll take that back then.  Thank you.

9          MS. HEMENWAY:  I will give you this to be

10     marked as Deposition Exhibit 2, please.

11          (Whereupon, Exhibit 2, performance

12     evaluation, was marked for identification.)

13  BY MS. HEMENWAY:

14     Q.   Before I give you Deposition Exhibit 2, I just

15  wanted to circle back.  Earlier we talked about a

16  meeting that you had with Ms. Walleshauser about where

17  you say you requested FMLA leave.  And do you recall

18  when that meeting occurred?

19     A.   It was roughly, I believe, a week before my

20  hours were cut to thirty.

21     Q.   Okay.  I'll show you Exhibit 2.  Take a minute

22  to review it and then, once you've had a chance to do

23  so, I'll ask you some questions about it.

24     A.   Okay.

25     Q.   So, taking a look at Deposition Exhibit 2, it

1   appears to be a performance evaluation; right?

2        A.   Yes.

3        Q.   And that's for you, and it looks like it's

4   dated February 25th of 2014; correct?

5        A.   Yes.

6        Q.   And in here, if we look under attendance

7   punctuality, it mentions that you're late or not

8   available to work frequently; right?

9        A.   Yes.

10        Q.   And then down under dependability it indicates

11   because of tardiness you've not been available for a

12   forty hour work week; right?

13        A.   Correct.

14        Q.   And then, if we look at the comments under the

15   evaluation heading, about two-thirds of the way down

16   the page, at the end of that paragraph it says,

17   attendance has been lacking due to illness but is

18   expected to improve.  Do you see that?

19        A.   Yes.

20        Q.   And I believe earlier you mentioned that

21   towards the end of 2013 you suffered an illness and

22   you weren't working for a period of time; is that

23   correct?

24        A.   Yeah.  I was out for about, I believe, the

25   whole month of October.  There was some work performed

1    using VPN access --

2         Q.    Okay.

3         A.    -- but not a lot because I was heavily

4    medicated, in a lot of pain.

5         Q.    Was that related to your migraines or was that

6    a different condition?

7         A.    That was a kidney stone.

8         Q.    Okay.

9         A.    They had to put in a stent for a couple weeks.

10        Q.    And you think that was the October 2013

11   timeframe?

12        A.    Yeah, it was.

13        Q.    And, after you returned or started working

14   again, after that -- well, scrap that.  So when you see

15   that comment in here under additional comments, and

16   it's referencing that your attendance was due to

17   illness, is it your understanding that it was referring

18   to that period of time when you were out for the kidney

19   stone?

20        A.    No.  It was referring to my migraines and

21   possibly that he didn't -- he mentioned -- I don't know

22   when he mentioned it, but there was something about

23   that I'm sick a lot, I'm not a healthy person because

24   of that, and the main focus, I think a lot of it was

25   around the migraines, and this review is what led to

1    that me working trying to work through everything and
2    then what prompted me to seek relief under the Family
3    Medical Leave Act, and then after that, at the end of
4    the year, I ended up doing something kind of unrelated
5    and for my health and well-being that actually saved my
6    life.  I got two cats at the end of December of 2014
7    and a third cat in 2015 and those cats gave me better
8    mental stability and I believe they saved my life in
9    helping to overcome some of the issues with my
10   migraines.  So call it whatever you want, animal
11   therapy, pet therapy, whatever.
12        Q.    So that was, you said, end of 2013, early
13   2014?
14        A.    End of 2014.
15        Q.    Okay.  So end of 2014, early 2015?
16        A.    Yeah, is when I got the pets, and they turned
17   out to be pet therapy for me.
18        Q.    So during 2014 were you absent from work for
19   any reasons other than migraines that you recall, other
20   illnesses or medical reasons?
21        A.    I can't think of any, but if there were it
22   would be listed in my thing as to if I was out sick for
23   an illness as opposed to not just the migraines.  I was
24   pretty -- documenting pretty much everything that
25   related to being away from work because I tried --

1    anybody who's sick, I tried to avoid them, because when

2    I get sick it usually gets chest, sinuses, ears, the

3    whole gambit, and then I have coughing fits, and I

4    coughed myself unconscious once.

5        Q.   I don't go that far, but I can understand the

6    coughing situation.

7        A.   Yeah, because I still have a -- from 2012, I

8    still have an issue with coughing that I'll lay down,

9    I'll start coughing, and then from that initial bout in

10   2014 -- 2012, that I did pass out from that and had to

11   go to the emergency.

12       Q.   Okay.  So it looks like here in February of

13   2014 under additional comments it says that

14   reevaluation would occur in ninety days, and, to your

15   knowledge, did that happen?  Was there a follow-up

16   discussion to this performance evaluation?

17       A.   I would -- that would have been the evaluation

18   in August.

19       Q.   During this meeting in February of 2014 did

20   you and Mr. Rawls discuss specific goals that you could

21   achieve during the interim before that reevaluation was

22   to occur?

23       A.   I think it was just really trying to address

24   -- my thing out of that was addressing the attendance,

25   that seemed to be his big emphasis, was that I was out,

1   I was sick a lot.  He always stressed that he wanted

2   somebody for forty hours and it turned out to be his

3   idea of forty hours between the hours of like eight and

4   five.

5       Q.   And were those the standard working hours for

6   the plant?

7       A.   No.  It turned out that I guess he kind of

8   wanted everybody there from, I think his idea was

9   everybody there at 7:30 or earlier, and then he wanted

10  -- although with the way it was initially, people were

11  doing -- we had people in early and we had people

12  coming in later so you had longer kind of coverage time

13  of personnel in the IT office.  So we generally had

14  people there, I would say, from probably from maybe

15  like 6:30 to 6:00, kind of like, almost like it seemed

16  like a twelve-hour coverage period because the plant

17  did run 24/7, and when people weren't there, then it

18  would be off-hours pager calls.

19      Q.   So you said at some point there was about a

20  twelve-hour coverage period.  Did that change under Mr.

21  Rawls?

22      A.   It seemed to be where he wanted everybody

23  there between, I think probably from seven to five.

24  That's the best estimate I can probably give you.

25      Q.   So to your -- as it relates to you, he was

1   looking for you to work within a more specific --

2        A.    Yeah.

3        Q.    -- window of time?

4        A.    I was coming in -- generally I would be there

5   8:30 to 9:00 and then he moved it to 8:00 and then he

6   did it -- from then he added that hour for lunch so

7   however that works out, from 8:00 to 5:00 or whatever

8   is probably nine hours, I think.

9        Q.    And this impacted not just you -- or this

10  change and this movement towards a shortened coverage

11  period didn't just impact you, it impacted others as

12  well?

13       A.    I'm not really sure on how it impacted the

14  shift, but his main thing -- one of the things that he

15  said to me -- one time he goes, why are you coming in

16  at this time, everybody else is coming in at this time.

17  He goes, I want you here at this time.  So that was, I

18  think, the eight o'clock shift change, and then I think

19  he made another comment that if I didn't like it he

20  would have me come in at 7:30.  It almost felt like he

21  was trying to antagonize me enough to say that I would

22  just quit, with all the things that were transpiring

23  with him.

24       Q.    So you mentioned that it felt to you like he

25  was trying to antagonize you, but he also, at the same

1  time, encouraged you to apply for the desktop support

2  position; right?

3      A.    Right, but that was at the very end.  That was

4  in December after he had already canceled the contract,

5  and when he canceled the contract I had asked him about

6  a full-time position that he had said that he was going

7  to offer to people, and then his comment was, I told

8  you to apply for that position that he posted in June

9  that was supposed to be an AS/400 position, and I

10  questioned him on that and he said, I never said that.

11  So that's all those kind of mixed things that I get

12  from him where he'll say, I never said that or I said

13  this, and then, the thing that cemented it in my mind

14  that he knows everything maybe when he had basically

15  total recall with Robert Dege about the interview in

16  June, I told you this, don't you remember that, and

17  went down all this stuff about how the position was

18  supposed to be taken care of.

19      Q.    I just want to clarify a couple of things.

20  You just mentioned that, when you were informed that

21  your contract was being canceled, you had asked about a

22  full-time position?

23      A.    Yes.

24      Q.    So what was the response at that time?

25      A.    He said that -- he had said he told me to

1    apply for that other position, which he never did, and

2    that's when I said that, you had said you were creating

3    a position for an AS/400, and then he said, I never

4    said that.  So when you get those kind of two

5    responses, you kind of shut down and don't really kind

6    of press the issue anymore.

7        Q.    Do you have any -- I guess, why do you think

8    he was antagonizing or berating, to use some of the

9    terms you had used earlier?

10       A.    I think.

11                  MR. MILLER:  I'm going to raise only one

12           objection, that this is sheer speculation on his

13           part.

14                  MS. HEMENWAY:  Sure.

15                  MR. MILLER:  You may answer if you

16           understand the question.

17                  THE WITNESS:  Okay.  I think it's because

18           he came up in the Goodyear facility in Lawton and

19           everything was very strict hours.  He was --

20           initially told us some of his background, that he

21           used to make tires for Goodyear and then he moved

22           into the IT department, and I think his envision of

23           everything was, you know, you're here for eight

24           hours a day, forty hours a week, and whenever we

25           want you on the weekends to perform upgrades as

```
 1         overtime or whatever.  So I think that was just his
 2         thinking, and he couldn't get past the idea that
 3         people have medical issues and that in the IT they
 4         always tell us that we're 7/24/365, so there's
 5         always been flexibility in the IT environment of
 6         working extra, taking some comp time and other
 7         things.  It's -- at my previous jobs it's never been
 8         a problem with accommodations for being able to work
 9         around my medical issue with the migraines.  Even at
10         the current job, they're very accommodating.  If I
11         say I'm not feeling well, they go, okay, go ahead,
12         go home, get yourself better, and we'll see you in
13         the morning.
14    BY MS. HEMENWAY:
15         Q.   Were there ever occasions when you wanted to
16    take off or not report to work when you were placed at
17    Goodyear or Sumitomo and you were denied the
18    opportunity to do that?
19         A.   I can't think of anything where I would have
20    asked for prior time off and not been given the time
21    off.  It was really, if you need time off tell them
22    when you're not going to be there in advance.  The only
23    kind of bad conversation I had with Kirk, when I was
24    out on a migraine they had an AS/400 problem with a
25    failed disc drive and I was out with a severe migraine
```

1    and they called and I said, I'm not available, I can't

2    drive.  I had a really bad headache over the period of

3    a couple calls, and I was also talking with Carey Dewer

4    about this incident, because this piece of equipment

5    was under contract with IBM.  The thing was, you call

6    IBM, they send the service tech out and he fixes the

7    problem.  There's really nothing that I needed to do

8    other than be the -- I guess you would say the go

9    between.  So Carey Dewer was handling that and they

10   actually, as they usually did, they sent out the wrong

11   service tech so he didn't know how to fix it, and I

12   heard him talking and I told Carey, don't let him do

13   what he's going to do, and Carey was going to stop him

14   anyway, because I go, you need to get the right person

15   on the site to fix this, and Kirk had called back and

16   made a comment of when we're discussing and I said, I'm

17   not feeling well, I can't drive, and he said something

18   to the effect with an expletive -- I can't believe I

19   can't get expletive support and hung up.  When I was

20   talking with Carey and I realized that the guy was

21   going to screw up the system, I told Carey, don't let

22   him touch it, we've got to get the right guy in there,

23   and then I drove to Dunlop to be on-site for that

24   problem, to make sure that they didn't screw up the

25   system.

1      Q.   Did anyone specifically ask you to report at

2  that time?

3      A.   No.  I came in on my own to say I will be

4  there, and the last thing, when Kirk said what he said,

5  I said, I really shouldn't be driving, but I ended up

6  going anyway at a relative risk because when you're not

7  -- I guess you could compare it to driving under the

8  influence of whatever you want to call it, because

9  you're not really able to focus well and concentrate,

10  which you need to do when you're driving, so there was

11  a risk involved, but I did get there and I was on-site

12  for that final support of that system.

13      Q.   When Mr. Rawls said that he couldn't believe

14  he couldn't get support, what support did you

15  understand him to be referring to?

16      A.   Me being on-site to work on the system because

17  I told him we have an IBM contract that takes care of

18  everything.  There's nothing more that I would do

19  because they bring the part.  They put the part in and

20  they do whatever they need to do on the system to fix

21  it because they're being paid for that.  They're the

22  absolute experts on that system.  We may touch that

23  system once or twice a year, but it's a 24/7 system.

24  It runs the factory, the AS/400, and it's the only

25  reason I was involved because underneath it was Unix

1    that operated the system that they then put the AS/400

2    machine on.  Had they lost the AS/400, they lose the

3    whole factory.  They have to do everything on paper

4    until it's recovered, so it was very important, and I'm

5    -- I'll bet they're off it by now because they were

6    supposed to be moving to -- what's the other SAP

7    transfer with Sumitomo they wanted -- I think it was

8    SAP, to do everything on.

9        Q.    So then, looking again at Deposition Exhibit

10   2, there are some goals that are stated in that

11   evaluation section.  One of those is to establish a set

12   work schedule.  Did you and Mr. Rawls discuss what that

13   schedule might look like?

14       A.    That's what he wanted.  He wanted me there

15   from, I believe it was 8:30 to 5:00 or whatever, and

16   that's where I just -- I said, okay, fine, you want me

17   here every day, I'll be here every day, no matter how I

18   feel, and that's where it just kept building and

19   building and building to the point where I -- it was

20   getting to the point where I couldn't continue because

21   I wasn't really doing a competent job for the company.

22   I would say I was wasting some of their money, and

23   that's when I went to talk to Linda Walleshauser about

24   being able to get, I guess you would say protection

25   under FMLA, because if I filled out that paperwork he

78

1    couldn't then, in my mind, hold against me that I was

2    out sick for the migraines.

3         Q.    Thank you.  When your contract -- or when you

4    were informed your contract was ending, were you given

5    any reason?  Was any reason given to you?

6         A.    Yeah.  He had just said that they weren't

7    doing any contracts past 2017.

8         Q.    Past 2016?

9         A.    Yeah, into 2017.

10        Q.    To your knowledge, at the time were there any

11   other contract employees or contract workers in the IT

12   area?

13        A.    I think I was the last one.

14        Q.    And, during the time you were placed, there

15   had been a number of other individuals that had been in

16   a contract position; right?

17        A.    Yes.

18        Q.    And they had -- either their contracts had

19   either ended or they had been moved into a permanent

20   position?

21        A.    The ones under Kirk Rawls were John Cook, he

22   was hired full-time, and then Brian Keogh was brought

23   over to desktop full-time, and that just left me to see

24   what was going to do with me.

25        Q.    Okay.

1     A.   I had fully expected, from the thing in

2    September, that he was going to continue it on through

3    September, but a month later he informed me that it was

4    ending and he asked me if I wanted to stay on to train,

5    make sure the other guy got fully trained up and I said

6    sure.  I don't harbor any ill will against anybody.

7     Q.   When did you first start developing the

8    product that eventually you filed a patent for?

9     A.   It came to me in August of 2016.  I was

10   actually -- I guess the end of 2015 it was kind of -- I

11   was trying to come up with something to, I don't really

12   want to say circumvent the Safe Act, but to work within

13   the Safe Act terms to where I wouldn't have to worry

14   about anything that I owned being illegal or wanted to

15   buy being illegal, because it was all based around the

16   semiautomatic action of the rifle with a detachable

17   magazine, and I go, there's got to be a way to fix

18   this.  I was working with a gun shop that I found over

19   around the area, throwing some ideas at them, and then

20   this one came to me in August and I made sure that I

21   wasn't doing anything with that on company time or

22   anything with them.  I was pretty adamant to make sure

23   that nothing that I did could ever be basically claimed

24   by the Sumitomo or Goodyear Dunlop.

25   Q.   When did you make the decision to pursue that

1  or that you would pursue that -- pursue that as a

2  business as opposed to a personal venture?

3     A.   I was looking at doing that right from the

4  beginning, to try and sell it, but because I was going

5  to open up an LLC in December or November, it was

6  fortunate in my case that Mr. Rawls informed me that

7  the job was canceled in October before I opened the

8  LLC, because, had I opened the LLC, I would have been

9  no longer eligible for unemployment.  So there was a

10 lucky break there for me.

11    Q.   Once you had opened the LLC, if you had been

12 able to pursue that, your initial plan of opening the

13 LLC in November of 2016, how long did you anticipate

14 continuing to work on a full-time basis?

15    A.   I guess I would say once the company was

16 making at least one to two million dollars a year, but

17 then it would become a full-time job, but it was all

18 considered side work until, I guess you would say, the

19 patent was official, until the patent is official.

20 It's really nothing.  You have the right to pursue

21 selling it under patent pending, but if somebody else

22 beats you, then you just did all this work for nothing.

23    Q.   You mentioned that you were taking classes at

24 NCCC and through some other state organized program.

25 When did you start taking those classes?

```
1        A.    I think it might have been -- again, I would
2    be able to, probably more detailed information, but I
3    think I applied in February for the program.
4        Q.    Of?
5        A.    Of 2017.
6        Q.    So after your contract ended?
7        A.    Yeah, because you had to have so much time
8    left to get accepted into the SEAP program and then you
9    had to apply and, until you applied and got accepted,
10   you really didn't have to do it, but I may have taken
11   some earlier because I was doing nothing, so it was
12   like I had all this time on my hands.  I can only --
13   you can look for all the Unix and Linux jobs in the
14   world, but there's maybe a handful here in Western New
15   York.  I was tied -- I couldn't leave the state at the
16   time because I was tied in with my patent thing with
17   the lawyers here so it wouldn't have been a good time
18   to leave the state.
19       Q.    You mentioned that there's a handful of jobs
20   in Western New York in the Unix/Linux area.  Do you
21   know why that is?  Do you have an understanding of that
22   as working in that area?
23       A.    Well, Windows is dominant on most of the
24   stuff.  There's, you know, there's companies that have
25   it but there's not that many positions open.  UB has
```

1   stuff.  Buff State, M&T has some stuff.  I think

2   because there was another position that opened up with

3   Tech Systems possibly with -- I can't even think of the

4   company, but there was a company over by the airport

5   there that they were looking at getting me in, but I

6   didn't make the cut on that one, and it's just -- it's

7   a little -- it's a niche kind of thing.  There's -- who

8   else is it?  Big company, big company up in Niagara

9   County.  They put an epic data center.

10     Q.   Yahoo?

11     A.   Yeah, that's it, Yahoo.  That's another one

12   there, so there's not -- you'll see probably ten other

13   things to one Unix.  Unix is really small.  Linux is a

14   little bigger in this area and then Windows is

15   dominant.

16          MS. HEMENWAY:  Okay.  So if I could have

17     this marked, please, as Exhibit 3.

18          (Whereupon, Exhibit 3, 2014 objective

19     plan, was marked for the identification.)

20          THE WITNESS:  On the job front, there was

21     a possible prospect with Tech Systems out of

22     Virginia at the Radford arsenal that looked like it

23     was promising, but then it just seemed to die.  So I

24     don't know if it was Tech Systems.  Tech Systems

25     kind of putting a squash on it from here down to

1        there, but they were interested in what I had,

2        possibly, for their position down the Radford

3        arsenal down in Virginia.

4    BY MS. HEMENWAY:

5        Q.    Mr. Borders, I'm showing you what's been

6    marked as Deposition Exhibit 3.  If you would take a

7    couple minutes to look at that and then I'll ask you

8    some questions about it.

9        A.    Okay.

10        Q.    So do you recognize Exhibit 3?

11        A.    Yeah.  I do.

12        Q.    Okay.  This looks to be an objective plan that

13    is dated August 22 of 2014?

14        A.    Yes.

15        Q.    So if we take a look at the second page of

16    Deposition Exhibit 3, did you sign this document?

17        A.    Yes.

18        Q.    And where on this page does your signature

19    appear?

20        A.    It's the last one.

21        Q.    So it's the one sort of next to manager's

22    signature?

23        A.    Yes, it is.

24        Q.    So it just looks maybe the individual's signed

25    out of order; right?

1    A.    Yeah.

2    Q.    And then it looks like Mr. Rawls and Mr.

3    Jensen also signed this document?

4    A.    Yes.

5    Q.    So, taking a look at the first page of the

6    document, do you know who the matrix manager would have

7    been?

8    A.    In which part of the --

9    Q.    So, it looks like there are comments by matrix

10   manager, comments by manager, and I'm wondering if you,

11   at the time, knew who wrote which comments?

12   A.    I don't know.

13   Q.    If we take a look at the bottom of the first

14   page of Deposition Exhibit 3, in that paragraph that's

15   under mid-year opportunities by manager, and looking

16   sort of at the second half of that paragraph it talks

17   about your hours will be reduced to thirty per week

18   Monday through Friday, 8:00 to 5:00 p.m.  Do you see

19   that?

20   A.    Yes.

21   Q.    So is this -- does this language memorialize

22   the discussion that you had with Mr. Rawls and Mr.

23   Jensen about what your hours would look like going

24   forward?

25   A.    Yes, and, looking at this now, the manager

1   item is Kirk Rawls.

2       Q.   Okay.

3       A.   And then the matrix manager would be Jeff

4   Jensen then.

5       Q.   Okay.

6       A.   Just because Jeff Jensen would have no --

7   didn't do the thirty hours.

8       Q.   Okay.  So after your hours were reduced to

9   thirty per week and the expectation was that you would

10  be there thirty hours per week, did you -- were you

11  able to work those thirty hours on a consistent basis

12  or did you have occasions when you weren't able to work

13  thirty hours per week?

14      A.   I believe I was -- I believe I did, for the

15  most part, the thirty.  Once again, I would have to

16  refer to that, my hours log, to confirm.

17      Q.   So when was the next time that you recall

18  talking with Mr. Rawls and Mr. Jensen about your

19  performance?

20      A.   I can't recall anything at this time.  I'm

21  sorry.

22      Q.   That's okay.

23              MS. HEMENWAY:  So if I can have this

24      marked, please, as Exhibit 4?

25              (Whereupon, Exhibit 4, 2014 objective

 1      plan, was marked for identification.)

 2   BY MS. HEMENWAY:

 3      Q.   Mr. Borders, I'm showing you what's been

 4   marked as Deposition Exhibit 4.  I'll ask you to take a

 5   minute to review that and then I'll ask you some

 6   questions about it.

 7      A.   Okay.

 8      Q.   Do you recognize Deposition Exhibit 4?

 9      A.   Yeah, I do.

10      Q.   And this appears to be a review, or an

11   objective plan regarding your performance, that is

12   dated May 4th of 2015; right?

13      A.   Yes.

14      Q.   It looks like you Mr. Jensen and Mr. Rawls all

15   signed off on this; correct?

16      A.   Yes.

17      Q.   And so I'm -- for my reading, it looks like

18   the first page of Exhibit 4 is very similar to what was

19   on Exhibit 3; right?

20      A.   It's the same.

21      Q.   And then the second page of Exhibit 4 includes

22   some new comments and new material that we didn't see

23   in Exhibit 3; right?

24      A.   Yes.

25      Q.   And this would reflect comments about your

1    performance from August of 2014 up through May of 2015?

2        A.    Yes.

3        Q.    Your progress.  Okay.  So here, when we'll --

4    let's talk about the purpose of your assignment at

5    Sumitomo.  As you understood it, what was your role to

6    be in your contract place patent?

7        A.    Unix and Linux support.

8        Q.    And who else at either Goodyear or Sumitomo

9    provided that Unix/Linux support?

10       A.    Nobody.

11       Q.    And so, if you were not there for any reason,

12   who would have provided the backup or been able to

13   perform the tasks that you would have performed had you

14   been available?

15       A.    We had some people who knew some Unix and

16   Linux and could do back stuff.  Carey Dewer could do

17   some stuff.  Jeff Jensen could do some stuff.  If need

18   be they could also have reached out to the support,

19   some Linux and Unix support people in Akron.

20       Q.    Okay.  Aside from the basic support that you

21   would provide, were you also tasked with working on

22   projects that related to the Unix/Linux systems?

23       A.    Yes.

24       Q.    And, if you were not present or available at

25   work, who would have provided the support on those

1   projects, or who would have performed those projects in

2   your absence?

3       A.   For the support that was needed for what I was

4   doing there probably would have been nobody, but most

5   of the support I provided was mainly front end support

6   for the projects of creating new systems for the

7   application upgrades, so, once those were complete, my

8   role would have been very limited.

9       Q.   So, in performing those or creating the

10  systems for the application upgrades, were there time

11  constraints on how long you would have to complete

12  those projects?

13      A.   I would say yes.

14      Q.   And if for some reason you got delayed in

15  creating the new system, then the project was really

16  delayed from the outset, right; it wouldn't be able to

17  move forward?

18      A.   I don't know if that ever happened, but I

19  can't remember, but that would be the case if something

20  like that did happen.  And you're not asking a

21  question, so...

22      Q.   Thank you.  Are there any other individuals

23  associated with SSBC Arms besides yourself?

24      A.   Just myself.

25      Q.   Okay.  What does SSBC stand for?

```
 1        A.    Single shot bull catch.
 2                    MS. HEMENWAY:   Can I have that marked as
 3        Exhibit 4 -- or, sorry, Exhibit 5?
 4                    (Whereupon, Exhibit 5, summons, was
 5        marked for identification.)
 6   BY MS. HEMENWAY:
 7        Q.    Mr. Borders, I'm going to show you what's been
 8   marked as Deposition Exhibit 5.  You can take a couple
 9   of minutes to review it and once you've had a chance to
10   do so I'll ask you some questions about it.  All set?
11   Do you recognize Exhibit 5?
12        A.    Yeah.  This is the claim that they submitted.
13        Q.    So this is a copy of the Complaint that was
14   filed against Goodyear Sumitomo; correct?
15        A.    Yes.
16        Q.    If we can take a look at paragraph eleven,
17   please?
18        A.    Are these the ones that are numbered?
19        Q.    Yeah.  So, looking at paragraph eleven,
20   numbered paragraph eleven, it indicates that you are a
21   cancer survivor.  At any point in time did the fact
22   that you were a cancer survivor impact on your ability
23   to perform your job or perform the work that you were
24   expected to perform at Goodyear or Sumitomo?
25        A.    Well, that is related, as far as I can tell,
```

1   to the migraines.  The migraines started shortly after

2   my cancer treatment.  I also have some other issues

3   with the, I guess you would call it affecting the job,

4   which was what they could only classify it as irritable

5   bowel syndrome that at times I would have to run to the

6   bathroom, but it's not -- that's the only category that

7   the VA had to classify it.

8        Q.   With respect to the migraines, how did they

9   impact your ability to perform your job?

10       A.   I would not be able to come to work all the

11  time.  I would have to possibly leave early.  On one

12  occasion John McClain drove me to the VA hospital to

13  try and get some treatment and it took too long and I

14  left the emergency room because it was starting to

15  subside and he drove me home.

16       Q.   If we can take a look at paragraph sixteen,

17  please, so looking at paragraph sixteen in here, you

18  mentioned that when Mr. Rawls would not allow overtime

19  that resulted in confrontations and you cite to an

20  example occurring in July of 2014 where it looks like

21  Mr. Rawls questioned the amount of time that or there

22  was a dispute between you and Mr. Rawls about how long

23  a particular project or task should take; right?

24       A.   Correct.

25       Q.   And, so, what was the result of that

1    discussion?

2        A.    The result was, I believe it came down to that

3    he had to be asked and given permission to authorize

4    any overtime.  So after that point, whenever they would

5    call me I would ask, did Mr. Rawls approve this.  If

6    not, I told them they had to call him for approval, and

7    then after that happened for a while, he came back and

8    said, don't have them call me, if it's broke, fix it.

9    So that was kind of how that whole thing about overtime

10   kind of evolved, because his thing about this

11   particular paragraph was that I was installing patches

12   on the production system and they were running, so I

13   went home and was checking in periodically.  I was only

14   logging the little bit of time that it was taking me to

15   check in periodically and he got upset because he goes,

16   it doesn't take that long to install patches, but they

17   wanted the system to be available first thing in the

18   morning, so I was checking it possibly every hour to

19   see when they finished so that I could bring the system

20   back up.

21       Q.    Okay.  And, despite the disagreement about the

22   amount of time that it would take to complete that

23   project, did you, in fact, complete it?

24       A.    Yes.

25       Q.    And were you paid for the time?

1    A.    Yeah.  I only -- I believe I only billed him

2   for the little bit of time.  I didn't bill him

3   basically saying, I went home, logged on at five

4   o'clock or six or whatever until like two o'clock in

5   the morning.  There's no way I know.  There's no way I

6   billed him for that whole time.  I would have only

7   billed him for the portion, the little slices that I

8   was actually engaged and looking at the system and

9   doing things.

10    Q.    If we can take a look at paragraph eighteen,

11   please.

12    A.    Okay.

13    Q.    So, looking at paragraph eighteen, the second

14   -- I'm sorry, sort of the second sentence indicates the

15   meeting was arranged during the week of August 4 of

16   2017 and that's concerning a meeting you had with Ms.

17   Walleshauser, but in 2017 you were no longer placed at

18   Sumitomo?

19    A.    Yeah, that would be a mistake on the date.

20    Q.    And so would that have -- would that meeting

21   have occurred, actually, in August of 2014?

22    A.    Yes.

23    Q.    I just want to clarify that.

24    A.    Had I read this after I just took some classes

25   from ECC, I would have noticed that.

1      Q.    Okay.

2      A.    Because they tell you to notice things more.

3    It's amazing that they tell you how your brain just

4    flows right over stuff.

5      Q.    So the next sentence says, during this meeting

6    with Ms. Walleshauser, the plaintiff discussed Kirk

7    Rawls' and Mr. Rawls' persecution of the plaintiff

8    about being out sick with migraines.  What specifically

9    did you discuss with Ms. Walleshauser?

10     A.    I told her the whole scenario of how I was

11   working through all the migraines from that meeting

12   where he said I needed to improve my stuff in February

13   until that time point.  It just got so unbearable that

14   it was just, it almost seemed like I had a headache

15   every day during that whole period because of the added

16   stress of, well, you have to be here from this time to

17   this time no matter what, and so I went and told her

18   all of that and how he was always saying that, you

19   know, you're sick, I need you here basically forty

20   hours a week, you know, maybe I should look for

21   part-time work because I'm not here all the time.  All

22   those kind of things all just came to a head where it

23   was like where I just can't do this anymore and that's

24   when I went to go and get relief under the Family

25   Medical Leave Act to be able to say, okay, I can take

1    this day off under FMLA and then be back the next day

2    and, if it happened again, I could take another day.

3    You had up to, I think it was twelve weeks of total

4    days of unpaid time, and it's not like when I was out

5    sick that they remember paying me.  They were only

6    paying me when I was physically at work.  So anytime I

7    was out sick I wasn't getting any benefit from the

8    position, so it was like all on me anyway.  So it was,

9    I guess, sort of a win-win for the company that they

10   don't have to pay for sick time.

11        Q.   After August of 2014 and this conversation

12   where you say that you asked Ms. Walleshauser about

13   FMLA, did you ever go back to anyone at Sumitomo and

14   again request FMLA time?

15        A.   Shortly after this I had the meeting with

16   Kirk, Mr. Rawls, and he cut my hours to thirty, so at

17   that point it's like, well, if you bring anything more

18   up he'll just fire you because it already seemed like

19   it was retaliation for going to HR and bringing up this

20   issue to Ms. Walleshauser and everything that I had

21   said to her came basically right out of Mr. Rawls'

22   mouth almost verbatim to what I had talked to her about

23   and then my hours get cut to thirty.  What else am I

24   supposed to think?  I didn't get any.

25        Q.   I don't want to interrupt you but my question

1  was, did you go ask anyone else at other any time about

2  FMLA?

3      A.    No, because of what had transpired.

4      Q.    And you acknowledge that in this timeframe you

5  weren't performing to the best of your ability; right?

6      A.    That is correct.

7      Q.    When you talked with Ms. Walleshauser about

8  the stress that the schedule was creating for you, did

9  you ask for any accommodations in the form of a

10  shortened schedule or a variable schedule?

11      A.    Well, I told her that I had accommodations

12  before to be able to work a flexible schedule with Mr.

13  Papelow and that all ended under Mr. Rawls and that I

14  wanted to apply for the FMLA program to be able to get

15  the flexibility of sick time without that sick time

16  being held against me as a bad point because that's

17  what it seemed like, everything was -- was all my

18  absentees or coming in late was all related because I

19  was sick and it was all being held against me because I

20  have a disability.

21      Q.    And so when you were given the thirty hour per

22  week expectation, was it your understanding that so

23  long as you were working thirty hours per week there

24  wouldn't be an issue, the difference in the ten hours

25  would not be held against you?

1      A.   Yes, because he had said, well, you're not

2    here forty, let's reduce it to thirty, and then that

3    basically was a day off every week to accommodate the

4    possibility of a migraine, and it was also asked at

5    that time about the thirty, if I was available would I

6    be able to work the extra and he had said, yes, but

7    then when I continued to ask him there were some times

8    that he had me come in for the extra day and then it

9    came down to that he kept saying no for the extra time

10   if it was available, and that's at a point I just

11   stopped asking him.  If my thirty to thirty-two hours

12   were up, then the next day I was off.

13      Q.   So did you have an understanding of why he

14   would tell you no in those instances?

15      A.   No.  He just said no.

16      Q.   Did you ask why he didn't want you coming in?

17      A.   No, because that would create more

18   confrontation that I didn't need.

19      Q.   Taking a look at paragraph twenty-five,

20   please.

21      A.   Okay.

22      Q.   So this talks about the Unix/Linux

23   administrator position that was posted in May of 2016.

24   Do you see that?

25      A.   Yes, I do.

1      Q.    You indicate that the position as posted

2   included the bachelor of science degree and that you

3   were precluded from applying for the position.  Do you

4   see that?

5      A.    Yes.

6      Q.    No one actually told you you couldn't apply

7   for the position; right?

8      A.    That is correct.

9      Q.    So you just made a decision yourself not to

10   apply, based on the express requirement of a bachelor

11   or science degree; right?

12      A.    No.  I had looked at the whole job position

13   and that was prior to that he had said that he was

14   posting a position for AS/400.  So it was my

15   understanding at the time when this came out that it

16   had -- not only did it have Unix and Linux and it was a

17   title of Unix and Linux, but it had networking,

18   Windows, VMware, AS/400, so in my mind, in addition to

19   the bachelor's degree that it said that that was a hard

20   requirement and I didn't have it, that he was looking

21   for a third person because he had said he was putting

22   out a requisition for an AS/400 administrator, so in my

23   mind he was looking for an AS/400 administrator with

24   all these other abilities to be able to work as an

25   extra person with John Cook, the Windows administrator,

1   and myself as Unix to have three people to cover the

2   positions that we had really more work than two of us

3   could do.

4       Q.   I guess I'm not quite understanding.  Why

5   didn't you apply for the position?  What factors?  In

6   your mind you obviously looked at the position?

7       A.   Right.

8       Q.   You looked at the posting.  Why did you look

9   at the posting?

10      A.   Because it said Unix/Linux administrator.

11      Q.   So did you look at it to see if it was

12  something you would be interested in posting for?

13      A.   Yes.

14      Q.   And why did you decide not to post for it?

15      A.   As I just explained, that he had said he was

16  looking for AS/400 administrator he posted this, he had

17  all that immense stuff on there that I didn't even have

18  any knowledge, very little knowledge or no knowledge

19  of, so I believed that this was a third position that

20  he was hiring an AS/400 administrator with all this

21  extra background is what he was looking for and that

22  was not me.

23      Q.   So you didn't think you were qualified with

24  the experience required for the position either?

25      A.   Correct.

1      Q.   Okay.  So, in addition to the FMLA time that

2  you were saying you were not afforded, you're also

3  making a claim that Sumitomo discriminated against you

4  because of disability; right?  That's part of your

5  lawsuit?

6      A.   Yes.

7      Q.   And what, in particular, are you claiming the

8  company did that you considered to be discrimination,

9  based on disability?

10     A.   The constant holding my disability against me

11 as a detriment of not being available to work there.

12 He kept saying that he needs somebody for forty hours

13 and that since I'm not there or able to do forty hours

14 all the time that maybe I should look for part-time

15 work.  Cutting my hours to thirty in retaliation for

16 asking for FMLA relief to be able to not have the sick

17 time held against me.

18     Q.   Anything else?

19     A.   I can't think of anything else.  Something

20 else may come up, but I can't think of anything right

21 now, because it was attendance he was holding against

22 me because of my migraines.  He cut my hours to thirty

23 because of it.  He constantly would say that I'm out

24 sick a lot because of it.

25     Q.   And that occurred for the entire time that he

1  supervised you; right?

2      A.    The comments.

3      Q.    According to you; right?

4      A.    There was always comments.  He was always

5  making a point to say things detrimental about me in

6  relation to my disability of the migraines.

7      Q.    So that occurred in 2013 when he started?

8      A.    I don't remember if anything in November,

9  December, but, in the February review, it was clearly

10  spelled out.

11      Q.    So in 2014 he was raising attendance as an

12  issue; right?

13      A.    Yes.

14      Q.    And your contract was renewed or the contract

15  with Systems Personnel was renewed for 2015; right?

16      A.    Yes.

17      Q.    And, in 2015, you continued to have absences,

18  right, and the contract was renewed in 2016; correct?

19      A.    Correct.

20      Q.    And then at the end of 2016 the company didn't

21  have anymore contractors in the IT area; right?

22      A.    Correct, but the comments about not being in,

23  always being out sick, it all continued.  It was

24  non-stop.  So it's...

25      Q.    And the company, if it was concerned about

1   having someone there on a full-time basis, could have

2   asked Systems Personnel to send someone else over and

3   take on that role; right?

4       A.   I would agree with that.

5       Q.   But it didn't do that; right?

6       A.   No, they didn't ask for anybody else, so

7   they...

8       Q.   You continued to fill that spot?

9       A.   Yes, with myself.

10      Q.   One of your other claims is that the company

11  failed to provide reasonable accommodations for

12  disability; right?

13      A.   Yes.

14      Q.   And that as part of that, you're claiming that

15  the company should have permitted you to have a

16  flexible work schedule; right?

17      A.   Correct.

18      Q.   And, in fact, for a long time they did that

19  and then in the 2014 to 2015 timeframe they gave you a

20  flex time of thirty hours per week; right?

21      A.   I wouldn't really call it flex time, but...

22      Q.   You had the ability to work any thirty hours

23  within the normal work week; right?

24      A.   Well, it was expected that I would be on

25  Monday if I wasn't sick and work thirty hours through

1   Friday; however that worked out.  So it was still that
2   I was expected to be there on Monday through thirty
3   hours.  I couldn't say that, okay, I'm going to work
4   Monday, Tuesday, Thursday, Friday this week or
5   whatever.  It was really a start to thirty hours.
6       Q.   But you could flex it as needed, based on your
7   medical condition; right?
8       A.   I'm not really sure if you really call that
9   flex because I had eight hours off during the week and
10  he said it was, if I'm sick, I would be out sick and I
11  would work the fifth day if needed.  I'm not really
12  sure if that's really considered flexible because it's
13  still 8:00 to 5:00 and it's flexible on his perspective
14  if he wants me there from 8:00 to 5:00 and he wants to
15  call me on call, it's flexible for him, and if he wants
16  me to work holidays on upgrades it's flexible for him,
17  but there's no --
18      Q.   How frequently were you called outside of the
19  normal workday?
20      A.   Maybe once a month.
21      Q.   And how much time would you spend performing
22  work on those occasions?
23      A.   It was usually if the system was down, but,
24  once again, I would have to refer to my logs to give
25  you exact time, but generally if there was a holiday we

1  were working, especially over Thanksgiving and

2  Christmas, we were generally doing upgrades and other

3  things.

4      Q.   Were you also claiming that the company should

5  have accommodated you by providing you with the

6  opportunity to work overtime?

7      A.   I'm not really sure I understand that, but

8  I'll try and answer it.

9              MR. MILLER:  If you don't understand,

10     please don't answer it.

11  BY MS. HEMENWAY:

12     Q.   Let me --

13     A.   Which paragraph?

14     Q.   I'm going to find one that I can point to.  So

15  if we take a look at paragraphs 56 through 58 of the

16  Complaint, it says here that, Mr. Rawls, you had been

17  -- well, it says, Mr. Rawls unilaterally ended overtime

18  for the plaintiff as well as flex time.  These were

19  both accommodations that had been in place under the

20  previous supervisor.

21     A.   That's all in 58?

22     Q.   That's in 56.

23     A.   Okay.

24     Q.   57 mentions you were accommodated with

25  overtime when needed?

1        A.    Because you had said 56, then you went to 58.

2        Q.    Yeah, 56 through 58, those three paragraphs.

3   So in here you're mentioning that you had had overtime

4   as an accomodation and that that practice was ended by

5   Mr. Rawls, and I'm asking if it's your contention as

6   part of this lawsuit that the company had an obligation

7   to provide you with a reasonable accomodation in the

8   form of overtime work?

9        A.    What this is referencing is the -- when I was

10  with Mr. Papelow, that if I had more than forty hours a

11  week I was able to save that extra time and use it

12  later on on another week that I needed to make up some

13  time for being out sick.  There was really a

14  cumulative, the ability to save up some sick time.

15       Q.    And is that -- as part of this lawsuit are you

16  claiming that the company should have continued to

17  provide that option to you as a reasonable

18  accomodation?

19       A.    Yes, that was an accomodation that I feel

20  could have been continued because it was of really no

21  cost to the company and, basically, if I ended up

22  having 20 hours extra at the end of the contract, that

23  would have been on me as providing extra stuff for the

24  company that I never billed.

25                    MS. HEMENWAY:  Can I have this marked as

1      Exhibit 6, please?

2                (Whereupon, Exhibit 6, disclosures

3      pursuant to Fed. R. Civ. P. 26(a)(1), was marked for

4      identification.)

5  BY MS. HEMENWAY:

6      Q.   Mr. Borders, I'm showing you what's been

7  marked as Deposition Exhibit 6.  I ask you to take a

8  minute to review it and then I'll ask you some

9  questions about it, please.  If we can take a minute to

10 look at this, do you recognize Exhibit 6?

11     A.   Yes.

12     Q.   And this is a copy of initial disclosures that

13 were provided by you as part of this lawsuit; right?

14     A.   Correct.  The only page I'm probably not

15 familiar with is the last one saying that they served.

16     Q.   Okay.  Fair enough.  If we take a look at the

17 first page, this appears to include -- this is

18 actually, first and top of the second page, a list of

19 individuals who may have information about your claims

20 in the lawsuit; right?

21     A.   That is correct.

22     Q.   So if we start with Jim Cipriani, who's listed

23 on page one as the owner of Systems Personnel.  Do you

24 see that?

25     A.   Correct.

1      Q.    So here you indicate that Mr. Cipriani has

2    knowledge of the discriminatory actions by Kirk Rawls

3    during the time of plaintiff's employ, so during your

4    placement at Goodyear Sumitomo.  Do you see that?

5      A.    I believe that is correct.

6      Q.    So what knowledge do you believe Mr. Cipriani

7    has concerning Mr. Rawls' alleged actions?

8      A.    Mr. Cipriani or Jack Hayes were generally in

9    the meetings between myself and the Dunlop IT manager.

10     Q.    And, during those meetings, did you discuss or

11   did you in any way indicate that you believed Mr. Rawls

12   was acting in a discriminatory manner towards you?

13     A.    I don't believe so.

14     Q.    Did Mr. Cipriani or Mr. Hayes ever express to

15   you anything they had observed relative to Mr. Rawls

16   appeared discriminatory?

17     A.    No.

18     Q.    Did you have any discussions with Mr. Cipriani

19   or Mr. Hayes about what you believed to be

20   discriminatory actions by Mr. Rawls?

21     A.    No, I did not.

22     Q.    Did you speak to anyone else at Systems

23   Personnel about alleged discrimination by Mr. Rawls or

24   anyone else at Goodyear Sumitomo?

25     A.    I think the only person that I may have

1   discussed it with would have been during those lunch

2   meetings with Lynn.  I may have went out to lunch with

3   Mr. Cipriani and it may have come up during that, but I

4   can't remember if it did or not.

5       Q.   So, looking at the next page, with respect to

6   Jeff Jensen, you indicate that Mr. Jensen may have

7   knowledge of the discriminatory actions by Mr. Rawls

8   during the time of your placement with Goodyear

9   Sumitomo.  Do you see that?

10      A.   Yes, I do.

11      Q.   Did you have any discussions with Mr. Jensen

12  about what you believed to be discriminatory actions by

13  Mr. Rawls?

14      A.   I probably did.

15      Q.   When do you recall having those discussions?

16      A.   I don't recall the time or date, but I'm

17  pretty sure that in talking we would have -- we

18  probably -- I don't believe I ever had an official

19  saying let's have an official meeting.  I think it

20  might have just been general conversation talks with

21  Mr. Jensen.

22      Q.   Did you have specific discussions with Mr.

23  Jensen about what you believed to be discrimination,

24  based on disability or retaliation for having requested

25  FMLA leave?

```
 1        A.    Probably both.

 2        Q.    Or were these just discussions about how Mr.

 3   Rawls, you know, generally treated people in the

 4   workplace?

 5        A.    That was probably also included.

 6        Q.    Can you remember any of those discussions in

 7   any level of detail?

 8        A.    Not really that I could say, that I could

 9   swear that it's absolute fact.

10        Q.    Okay.  Aside from Dr. -- was it Mechtler at

11   Dent, did you treat with any other physicians for your

12   migraines?

13        A.    I did some work at the VA with them.

14        Q.    But that you said stopped sometime before the

15   end of 2012?

16        A.    Yes.

17        Q.    In here, looking at the paragraph under

18   differential treatment on page two, do you see that?

19        A.    Okay.

20        Q.    You indicate that you have copies of E-mails

21   and letters and copies of job postings from defendant.

22   Do you see that?

23        A.    Yes.

24        Q.    Do you still have those E-mails and letters

25   and job postings that you're referring to here?
```

1        A.    I may have them.

2        Q.    Towards the very bottom of the page you list

3    that, and these, again, are documents that you might

4    rely on.  You indicate there are records of plaintiff's

5    request for accomodation.  Do you see that?

6        A.    Yes.

7        Q.    Did you make any requests for accomodation in

8    writing?

9        A.    No, I did not.

10        Q.    Aside from requesting to use FMLA time in

11    order to have some flexibility your schedule, did you

12    request any other reasonable accommodations from

13    Goodyear or Sumitomo?

14        A.    The only accommodations that I would ask for

15    would be the flexible time with regards to the

16    migraines and the other problem I have with the

17    reference to irritable bowel syndrome.  I did have to

18    leave work at one time when Mr. Rawls was there because

19    the plumbing wasn't working and there were some

20    bathrooms working on the other end of the plant and I

21    was having an issue and I said, I have to go home.

22        Q.    Okay.  Were there any occasions where you

23    needed to use a bathroom and you weren't permitted to

24    do so?

25        A.    No, but it was brought up front to say that if

1   I get up and walk out of a meeting it's not because I'm

2   just getting up and walking out of a meeting.

3        Q.   So, were there any accommodations you

4   requested with respect to the irritable bowel condition

5   that were not granted?

6        A.   Not that I can recall.  There was a couple

7   incidents that I was driven from the plant during the

8   maintenance that they were doing with the heavy

9   solvents and stuff they were using remodeling the front

10  end.  They were driving me out of the building because

11  of the solvents.  I had to tell them I had to leave

12  because of that because it was getting to be a migraine

13  so I don't know necessarily if you really call that

14  accomodation, being I'm going to leave or not, but I

15  did have to leave a couple of times because of the

16  fumes.

17       Q.   Was there any issue with you doing that; to

18  your knowledge?

19       A.   Not that I can recall but I'm -- I could guess

20  he wasn't happy.

21       Q.   Did he make any comment to you about it

22  specifically?

23       A.   No, not that I'm -- no, not at the time.

24       Q.   At any time did he make a comment to you about

25  needing to leave because of the solvents?

1      A.    Not that I can recall, but, you know, I wasn't
2  going to press the issue and ask him.  From the way I
3  was treated previously, I'm sure it was going to be
4  held against me.
5      Q.    When did that occur?  When were the solvents
6  being used in the building?
7      A.    I don't know.  It was when they were doing the
8  remodeling in the front area stuff.  They were doing a
9  bunch of lacquering, whatever, with doing and stuff,
10  and the fumes were all throughout the whole front of
11  the building.
12     Q.    How many times did you have to leave?
13     A.    I believe it was at least two.
14     Q.    Just under the -- we were just looking at the
15  records of plaintiff's request for accommodations and
16  just under that you list records of plaintiff's
17  complaint to defendant human resources.  Do you see
18  that?
19     A.    Yes.
20     Q.    Did you make any written complaints to
21  Sumitomo or Goodyear's human resources department
22  regarding Mr. Rawls?
23     A.    Well, that would have been just the talk that
24  I had with Linda Walleshauser.  She was writing some
25  stuff down so I would assume that could be considered a

```
 1    record.

 2        Q.   So that the only complaint that you made was

 3    to Ms. Walleshauser in August of 2014?

 4        A.   Correct.

 5                  MS. HEMENWAY:  If we can just take a

 6         quick break?

 7                  (A recess was taken.)

 8                  MS. HEMENWAY:  So I don't have anymore

 9         questions at this time.  If you think you're going

10         to go longer than twenty minutes, half an hour...

11                  MR. MILLER:  I don't think it'll take

12         that long.

13    EXAMINATION BY MR. MILLER:

14        Q.   Mr. Borders, you were asked at one point if

15    your disability made it impossible for you to do your

16    job.  Were you able -- strike all of that.  You were

17    asked if you were able to do the job to the best of

18    your ability and you responded no.  Do you recall that

19    question?

20        A.   Yes, I do.

21        Q.   When you say your ability, are you talking

22    about your actual training and ability to do the job?

23        A.   No, I was not.

24        Q.   What were you referring to?

25        A.   That was referring to the incapacity that the
```

1  migraines were causing of me not being able to focus

2  and concentrate properly to be able to do an

3  outstanding job like I normally do on being able to

4  work on the systems.

5      Q.    Are you in any way, shape or form aware of any

6  of the training for Mr. Rawls to be running an IT

7  department?

8      A.    No, I do not.

9      Q.    Last question.  At any time during the period

10  of 2012 to the end of your employment, did anybody at

11  Sumitomo or Goodyear Dunlop ever approach you and ask

12  you to discuss your disabilities in order to see if

13  they could come up with a reasonable accomodation?

14      A.    No, they did not.

15              MR. MILLER:  I'm done.

16              MS. HEMENWAY:  I think we're all set.

17  Thank you.

18              ***12:48 p.m.***

19

20

21

22

23

24

25

114

1    STATE OF NEW YORK

2    COUNTY OF ERIE

3        I, Molly Fenske, a Notary Public in and for the State
     of New York, do hereby certify:

4
         That the witness whose testimony appears herein
5    before was, before the commencement of his deposition,
     duly sworn to testify to the truth, the whole truth and
6    nothing but the truth; that such testimony was taken
     pursuant to notice at the time and place herein set forth;
7    that said testimony was taken down in shorthand by me and
     thereafter under my supervision transcribed into the
8    English language, and I hereby certify the foregoing
     testimony is a full, true and correct transcription of the
9    shorthand notes so taken.

10       I further certify that I am neither counsel for nor
     related to any parties to said action, nor in anywise
11   interested in the outcome thereof.

12       IN WITNESS WHEREOF, I have hereunto subscribed my
     name this 11th day of February, 2019.

13

14

15

16

17                Notary Public

18                State of New York

19

20

21

22

23

24

25

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 117 of 131

BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

---

\*

**\*\*\*12:48 (1)**
113:18

---

**A**

**abilities (1)**
97:24
**ability (17)**
6:15;11:1,4;17:12;
26:15;27:6;28:24;
32:21;49:22;89:22;
90:9;95:5;101:22;
104:14;112:18,21,22
**able (40)**
11:7,8,11;18:3;
24:21;25:22,23;
27:14;29:1;32:6;
34:24;45:13;46:12;
47:21;50:7,17;57:8;
74:8;76:9;77:24;
80:12;81:2;85:11,12;
87:12;88:16;90:10;
93:25;95:12,14;96:6;
97:24;99:13,16;
104:11;112:16,17;
113:1,2,3
**absence (4)**
29:4;31:2,3;88:2
**absences (4)**
26:5;63:20;64:3;
100:17
**absent (3)**
25:25;64:6;68:18
**absentees (2)**
25:3;95:18
**absolute (2)**
76:22;108:9
**accepted (2)**
81:8,9
**access (5)**
42:16,18;50:7,7;
67:1
**accommodate (1)**
96:3
**accommodated (2)**
103:5,24
**accommodating (1)**
74:10
**accommodations (9)**
74:8;95:9,11;
101:11;103:19;
109:12,14;110:3;
111:15
**accomodation (8)**
104:4,7,18,19;
109:5,7;110:14;
113:13
**According (1)**
100:3
**accountable (1)**

59:1
**achieve (1)**
69:21
**acknowledge (1)**
95:4
**Act (6)**
27:11,15;68:3;
79:12,13;93:25
**acting (1)**
106:12
**action (1)**
79:16
**actions (5)**
106:2,7,20;107:7,
12
**active (1)**
21:14
**actively (2)**
46:3,19
**activities (1)**
52:1
**actual (2)**
15:14;112:22
**Actually (12)**
4:13;7:25;15:2;
16:14;28:4;68:5;
75:10;79:10;92:8,21;
97:6;105:18
**adamant (1)**
79:22
**Adamitis (3)**
19:8,17;20:7
**Adamitis' (2)**
20:10,17
**add (1)**
26:5
**added (4)**
9:24;50:9;71:6;
93:15
**addicted (1)**
32:25
**addition (2)**
97:18;99:1
**additional (5)**
37:24;45:11;50:9;
67:15;69:13
**address (2)**
27:6;69:23
**addressing (1)**
69:24
**adjust (1)**
14:7
**administration (2)**
38:4;51:17
**administrator (16)**
9:4;21:20,25;
41:19;44:17,25;45:5;
55:4,8;96:23;97:22,
23,25;98:10,16,20
**Adrian (2)**
38:19,20
**advance (1)**
74:22

**advantage (1)**
46:13
**adversarial (2)**
39:8,15
**advertising (1)**
8:21
**advice (4)**
26:18,24;27:8;
30:25
**affecting (1)**
90:3
**afforded (1)**
99:2
**afraid (1)**
32:24
**aftermath (1)**
42:10
**afternoon (2)**
11:7;41:9
**again (12)**
23:16;24:22;41:7;
58:12;67:14;77:9;
81:1;85:15;94:2,14;
102:24;109:3
**against (14)**
5:8;6:18;49:13;
78:1;79:6;89:14;
95:16,19,25;99:3,10,
17,21;111:4
**agencies (1)**
48:13
**ago (1)**
42:3
**agree (3)**
14:15;57:18;101:4
**agreed (2)**
63:1,15
**ahead (1)**
74:11
**airport (1)**
82:4
**AJ (1)**
38:19
**akin (1)**
60:23
**Akron (1)**
87:19
**alleged (2)**
106:7,23
**allow (4)**
13:25;27:17;49:5;
90:18
**allowance (1)**
10:25
**allowances (1)**
11:20
**allowed (5)**
10:25;11:4;49:20;
50:1,24
**almost (7)**
15:21;40:4;57:3;
70:15;71:20;93:14;
94:22

**alternate (1)**
36:13
**although (2)**
37:19;70:10
**always (13)**
25:2,4;39:8,11;
50:3;61:6;70:1;74:4,
5;93:18;100:4,4,23
**amazing (1)**
93:3
**America (2)**
7:18;8:2
**Amherst (1)**
4:25
**amount (5)**
28:20;53:9,11;
90:21;91:22
**Amy (1)**
5:4
**animal (1)**
68:10
**annual (1)**
25:14;54:21
**antagonize (2)**
71:21,25
**antagonizing (1)**
73:8
**anticipate (1)**
80:13
**anymore (10)**
17:6;18:7;33:2;
37:6;43:18,20;73:6;
93:23;100:21;112:8
**apparently (1)**
59:11
**appear (2)**
65:5;83:19
**appeared (2)**
43:7;106:16
**appears (3)**
66:1;86:10;105:17
**application (6)**
38:23;41:13,22;
42:19;88:7,10
**applications (2)**
38:21;48:7
**applied (9)**
37:15,21;38:10,22;
40:16;46:8,24;81:3,9
**apply (14)**
24:21;30:1;37:11;
40:13;45:16,23;72:1,
8;73:1;81:9;95:14;
97:6,10;98:5
**applying (1)**
97:3
**appointment (1)**
26:16
**appointments (2)**
17:23,24
**approach (2)**
30:22;113:11
**approval (2)**

61:23;91:6
**approve (1)**
91:5
**approved (4)**
9:19;46:22;50:21,
22
**approximately (2)**
25:10;51:6
**April (1)**
6:24
**AR-15 (1)**
47:15
**area (11)**
16:22;19:3;39:14,
24;78:12;79:19;
81:20,22;82:14;
100:21;111:8
**Arms (3)**
47:12;51:3;88:23
**army (2)**
33:24;56:17
**around (17)**
25:15,22,22;32:7;
37:1,24;42:25;47:18;
50:1,14;53:12;62:2,
19;67:25;74:9;79:15,
19
**arranged (2)**
7:7;92:15
**arrangement (3)**
13:22;16:20;37:3
**arrangements (1)**
14:6
**arranging (1)**
7:9
**arrived (1)**
58:25
**arsenal (2)**
82:22;83:3
**AS/400 (17)**
44:14,16;62:24;
63:5,14;72:9;73:3;
74:24;76:24;77:1,2;
97:14,18,22,23;
98:16,20
**ascertain (1)**
32:6
**Aside (5)**
52:11,20;87:20;
108:10;109:10
**aspect (1)**
30:17
**aspirin (1)**
34:16
**asset (1)**
50:19
**assigned (2)**
56:23;62:24
**assignment (1)**
87:4
**Assistance (1)**
46:9
**associated (2)**

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 118 of 131

BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

44:3;88:23

**assume (3)**
6:4;45:25;111:25
**attempt (1)**
48:18
**attendance (7)**
24:6;66:6,17;
67:16;69:24;99:21;
100:11
**attention (1)**
59:7
**attitude (1)**
16:23
**attorney (2)**
5:4;26:23
**at-will (1)**
21:22
**August (11)**
62:19,21;69:18;
79:9,20;83:13;87:1;
92:15,21;94:11;
112:3
**authorize (1)**
91:3
**authorized (1)**
11:21
**available (13)**
28:2;47:3;48:20;
51:10;66:8,11;75:1;
87:14,24;91:17;96:5,
10;99:11
**avoid (3)**
57:19,22;69:1
**avoiding (1)**
14:14
**aware (2)**
21:8;113:5
**away (3)**
50:15;64:1;68:25

**B**

**bachelor (2)**
97:2,10
**bachelor's (3)**
45:8;46:6;97:19
**back (28)**
14:24;20:9,17,21,
22;33:17;37:16;
40:21;41:12,21;42:8,
21;43:20;48:8;54:3;
56:10;59:25;63:8,9,
13;65:8,15;75:15;
87:16;91:7,20;94:1,
13
**backfill (3)**
11:1,12;12:3
**backfilling (1)**
11:22
**background (2)**
73:20;98:21
**backstop (1)**
28:25

**backup (2)**
41:11;87:12
**bad (4)**
36:20;74:23;75:2;
95:16
**bag (1)**
58:22
**bank (6)**
11:1,5;12:11,12;
46:25;47:24
**Baranyi (3)**
7:11;13:12,18
**based (7)**
15:20;31:21;79:15;
97:10;99:9;102:6;
107:24
**basic (2)**
45:17;87:20
**Basically (18)**
9:17;24:5;29:9;
30:20;41:1;42:19;
43:9;45:4;55:25;
59:18;63:3;72:14;
79:23;92:3;93:19;
94:21;96:3;104:21
**basis (5)**
12:25;43:21;80:14;
85:11;101:1
**bathroom (2)**
90:6;109:23
**bathrooms (1)**
109:20
**beats (1)**
80:22
**became (2)**
8:5;15:1
**become (2)**
20:4;80:17
**beginning (3)**
6:23;21:3;80:4
**belittled (1)**
42:23
**benefit (6)**
10:24;32:20,24;
34:12;53:11;94:7
**benefits (6)**
9:21;10:19,22;
30:6,8;52:24
**berated (2)**
42:23;43:20
**berating (6)**
41:7;42:20;43:6,
25;44:1;73:8
**besides (1)**
88:23
**best (6)**
5:15;26:15;27:5;
70:24;95:5;112:17
**bet (1)**
77:5
**better (2)**
68:7;74:12
**big (3)**

**bigger (1)**
82:14
**bill (1)**
92:2
**billed (5)**
49:12;92:1,6,7;
104:24
**bit (5)**
11:19;46:8;61:11;
91:14;92:2
**blaming (1)**
41:2
**blatant (1)**
57:21
**blood (1)**
34:17
**books (1)**
11:11
**BORDERS (9)**
4:24;5:3;54:3;
64:17;83:5;86:3;
89:7;105:6;112:14
**both (3)**
45:14;103:19;
108:1
**bottom (2)**
84:13;109:2
**bout (1)**
69:9
**bowel (1)**
90:5;109:17;110:4
**brain (1)**
93:3
**break (6)**
6:7,10;47:8;53:25;
80:10;112:6
**breaks (1)**
50:11
**BRIAN (6)**
4:24;19:8,24;
37:18;38:1;78:22
**bridge (1)**
45:12
**bring (8)**
25:3,4;39:20;42:8,
21;76:19;91:19;
94:17
**bringing (1)**
94:19
**broke (3)**
43:10;50:19;91:8
**broken (1)**
50:12
**brought (12)**
6:17;8:22;19:8;
27:14,21;32:20;33:2;
47:4;59:7,7;78:22;
109:25
**Buff (1)**
82:1
**building (6)**
77:18,19,19;

69:25;82:8,8

**bull (2)**
47:18;89:1
**bunch (2)**
45:10;111:9
**business (13)**
46:12,13,19,21;
47:10,11,13;50:6;
51:9,16,16;58:25;
80:2
**buy (1)**
79:15

**C**

**calculate (1)**
60:12
**call (18)**
49:6;50:3,5;56:10;
58:6;59:16;68:10;
75:5;76:8;90:3;91:5,
6,8;101:21;102:8,15,
15;110:13
**called (8)**
5:1;22:24;41:22;
54:18;59:17;75:1,15;
102:18
**calls (3)**
17:9;70:18;75:3
**came (30)**
15:18;16:19;22:19,
23;26:9;29:22;37:16;
41:12;43:1;44:9;
47:14;48:22;50:13;
56:25;58:18,20,21;
59:25;60:14;61:14;
73:18;76:3;79:9,20;
91:2,7;93:22;94:21;
96:9;97:15
**can (38)**
4:13,14;5:7;11:3;
13:16;14:15,16;
16:12;22:20;23:16;
27:25;33:25;34:22;
35:19;40:2;49:7;
50:4;62:10;69:5;
70:24;81:12,13;
85:23;89:2,8,16,25;
90:16;92:10;93:25;
103:14;104:25;
105:9;108:6;110:6,
19;111:1;112:5
**cancel (2)**
42:22;44:8
**canceled (6)**
45:24;48:17;72:4,
5,21;80:7
**cancer (3)**
89:21,22;90:2
**Care (5)**
36:21,22,23;72:18;
76:17
**Carey (8)**

110:10;111:6,11

38:7;75:3,9,12,13,
20,21;87:16
**case (2)**
80:6;88:19
**cat (1)**
68:7
**catch (3)**
5:22;47:18;89:1
**category (1)**
90:6
**cats (2)**
68:6,7
**causing (1)**
113:1
**cemented (1)**
72:13
**center (1)**
82:9
**certain (4)**
14:22;17:19;58:8;
59:13
**certification (1)**
4:6
**chance (4)**
58:3;64:19;65:22;
89:9
**change (7)**
16:5,10;58:13;
61:21;70:20;71:10,
18
**changed (2)**
16:9;32:5
**changes (3)**
16:18,21;32:7
**charge (1)**
44:15
**check (3)**
31:9;42:15;91:15
**checking (2)**
91:13,18
**chest (1)**
69:2
**chitchat (1)**
56:9
**choice (1)**
36:18
**Christmas (1)**
103:2
**Cipriani (8)**
54:24;105:22;
106:1,6,8,14,18;
107:3
**circle (1)**
54:3;65:15
**circumvent (1)**
79:12
**cite (1)**
90:19
**Civ (1)**
105:3
**claim (2)**
89:12;99:3
**claimed (1)**

Case 1:17-cv-01159-FPG-HKS     Document 29-4     Filed 11/25/19     Page 119 of 131

BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

79:23
**claiming (4)**
99:7;101:14;103:4;
104:16
**claims (4)**
5:7;6:17;101:10;
105:19
**clarify (2)**
72:19;92:23
**classes (10)**
46:20;51:4,9,14,15,
18,20;80:23,25;92:24
**classify (2)**
90:4,7
**clear (2)**
59:12,14
**cleared (1)**
42:5
**clearly (1)**
100:9
**clinic (1)**
32:10
**clock (1)**
18:7
**coffee (1)**
6:7
**College (2)**
51:15,19
**combination (1)**
45:7
**coming (9)**
20:22;28:7;58:9;
70:12;71:4,15,16;
95:18;96:16
**comment (9)**
17:8;60:13,13;
67:15;71:19;72:7;
75:16;110:21,24
**comments (16)**
16:24,25;55:17;
57:6;60:22;66:14;
67:15;69:13;84:9,10,
11;86:22,25;100:2,4,
22
**commit (1)**
56:14
**commitment (1)**
63:19
**communicate (1)**
59:9
**Community (1)**
51:15
**comp (1)**
74:6
**companies (3)**
8:1;48:8;81:24
**company (29)**
7:6;15:12,13;16:6;
22:7;30:21;47:5;
50:10,19;63:12,16;
77:21;79:21;80:15;
82:4,4,8,8;94:9;99:8;
100:20,25;101:10,15;

103:4;104:6,16,21,24
**compare (1)**
76:7
**compensation (1)**
10:23
**competent (1)**
77:21
**Complaint (4)**
89:13;103:16;
111:17;112:2
**complaints (1)**
111:20
**complete (5)**
5:15;88:7,11;
91:22,23
**completed (2)**
41:15;44:14
**computer (1)**
51:1
**concentrate (2)**
76:9;113:2
**concerned (1)**
100:25
**concerning (2)**
92:16;106:7
**conclusion (1)**
8:20
**condition (3)**
67:6;102:7;110:4
**conducting (1)**
5:6
**confirm (1)**
85:16
**confirmation (1)**
30:18
**confrontation (4)**
40:25;57:19,23;
96:18
**confrontations (1)**
90:19
**confusing (1)**
14:25
**confusion (1)**
14:14
**connected (1)**
7:4
**consider (2)**
49:18;52:17
**considered (6)**
29:5;30:20;80:18;
99:8;102:12;111:25
**consistent (1)**
85:11
**constant (4)**
21:5,6;39:20;99:10
**constantly (5)**
25:1;26:13;42:24;
43:20;99:23
**constraints (1)**
88:11
**contact (3)**
13:13;48:9;50:6
**contacted (1)**

48:15
**contention (1)**
104:5
**continue (7)**
33:19;34:25;62:22,
23;63:19;77:20;79:2
**continued (8)**
12:2;64:1;96:7;
100:17,23;101:8;
104:16,20
**continuing (1)**
80:14
**contract (47)**
6:19;8:18,20,23,
25;9:1,9:1;9:15;23;16:1;
19:1,2;20:8,17,19,23;
21:1,1,4;23:3,15,19;
24:7;33:7;38:13;
45:25;48:17,25;
52:21;59:6;61:2;
62:1;72:4,5,21;75:5;
76:17;78:3,4,11,11,
16;81:6;87:6;100:14,
14,18;104:22
**contracted (1)**
30:21
**contracting (1)**
49:15
**contractor (16)**
8:17;18:16;19:8;
22:16;30:1,4,5,20;
37:13;47:3,5;48:24;
52:12,13,15,18
**contractors (3)**
15:22;18:13;
100:21
**contracts (3)**
18:20;78:7,18
**control (1)**
41:18
**convenient (1)**
50:9
**conversation (5)**
37:4;39:9;74:23;
94:11;107:20
**conversations (1)**
58:16
**convert (3)**
18:12,20;47:16
**converted (1)**
19:9
**converting (1)**
18:16
**Cook (16)**
15:25;17:5,11;
18:6,9;19:1,19;41:10,
17;44:6;45:7,13;
55:4,5;78:21;97:25
**Cook's (1)**
21:24
**copies (2)**
108:20,21
**copy (2)**

89:13;105:12
**correction (1)**
57:22
**correctly (1)**
16:11
**cost (1)**
104:21
**costs (1)**
57:20
**coughed (1)**
69:4
**coughing (4)**
69:3,6,8,9
**counsel (1)**
4:4
**counseling (1)**
57:2
**count (1)**
20:5
**County (1)**
82:9
**couple (13)**
13:2;42:21;52:6;
54:3,17;58:3;67:9;
72:19;75:3;83:7;
89:8;110:6,15
**court (3)**
5:12,19,23
**cover (2)**
45:13;98:1
**coverage (4)**
70:12,16,20;71:10
**covered (2)**
10:16;33:23
**create (3)**
12:11;45:11;96:17
**created (1)**
12:12
**creating (5)**
73:2;88:6,9,15;
95:8
**credit (1)**
29:16
**cumulative (1)**
104:14
**current (1)**
74:10
**cut (8)**
20:5;62:7,14;
65:20;82:6;94:16,23;
99:22
**Cutting (1)**
99:15

**D**

**data (1)**
82:9
**date (4)**
22:6;24:18;92:19;
107:16
**dated (3)**
66:4;83:13;86:12

**day (23)**
5:9;11:9;12:19;
29:2,4;31:14;49:7;
51:9;59:18,20,22,23;
73:24;77:17,17;
93:15;94:1,1,2;96:3,
8,12;102:11
**days (7)**
9:23;28:6;31:15,
17,19;69:14;94:4
**de (2)**
30:20;52:17
**deathly (1)**
33:16
**December (9)**
43:7,23,24;46:1,
22;68:6;72:4;80:5;
100:9
**decide (1)**
98:14
**decided (1)**
44:8
**decision (3)**
41:5;79:25;97:9
**deemed (1)**
39:5
**defendant (2)**
108:21;111:17
**defense (6)**
47:3;48:24;49:12,
15;52:11,18
**define (1)**
49:19
**defined (1)**
21:7
**Dege (7)**
42:12;43:6,9,13;
44:1,9;72:15
**degree (8)**
45:8,15,20;46:6,
16;97:2,11,19
**delayed (2)**
88:14,16
**delve (1)**
27:1
**denied (1)**
74:17
**Dent (8)**
32:9;34:13,19,25;
35:7,14;36:5;108:11
**department (3)**
73:22;111:21;
113:7
**dependability (1)**
66:10
**depending (1)**
53:3
**deposition (15)**
5:6;64:18,22;65:6,
10,14,25;77:9;83:6,
16;84:14;86:4,8;
89:8;105:7
**designated (1)**

13:10

**desk (1)**
 38:9

**desktop (12)**
 20:15;22:10;24:21;
 37:21,25;38:2,8;
 40:9;45:24;50:25;
 72:1;78:23

**despite (1)**
 91:21

**detachable (1)**
 79:16

**detail (2)**
 43:11;108:7

**detailed (1)**
 81:2

**details (1)**
 54:7

**determine (3)**
 31:19;32:10,11

**detriment (1)**
 99:11

**detrimental (1)**
 100:5

**developer (2)**
 55:8;58:19

**developing (1)**
 79:7

**development (2)**
 51:10;55:6

**devoting (1)**
 51:7

**Dewer (4)**
 38:7;75:3,9;87:16

**die (1)**
 82:23

**differ (1)**
 15:13

**difference (1)**
 95:24

**different (12)**
 14:8;15:10,16;
 21:11,11,16,19;
 49:25;51:20;52:1;
 61:11;67:6

**differential (1)**
 108:18

**differentiating (1)**
 15:6

**difficult (1)**
 39:15

**directly (4)**
 15:14;31:1,4;55:5

**disabilities (3)**
 17:12;27:16;
 113:12

**disability (12)**
 17:21;25:3;29:10,
 19;95:20;99:4,9,10;
 100:6;101:12;
 107:24;112:15

**disabled (3)**
 29:11,16;33:22

**disagreement (1)**
 91:21

**disc (2)**
 42:3;74:25

**disclosures (2)**
 105:2,12

**discriminated (1)**
 99:3

**discrimination (3)**
 99:8;106:23;
 107:23

**discriminatory (6)**
 106:2,12,16,20;
 107:7,12

**discuss (7)**
 56:4;59:16;69:20;
 77:12;93:9;106:10;
 113:12

**discussed (4)**
 27:2,20;93:6;107:1

**discussing (3)**
 27:12;55:15;75:16

**discussion (9)**
 24:8,10,12,16,17;
 57:1;69:16;84:22;
 91:1

**discussions (7)**
 18:14;106:18;
 107:11,15,22;108:2,6

**dispute (1)**
 90:22

**dissolution (1)**
 16:13

**distinguished (1)**
 64:3

**divide (1)**
 14:24

**doctor (7)**
 33:22;35:7,12,13,
 14,18;36:6

**doctors (2)**
 32:9;35:20

**document (3)**
 83:16;84:3,6

**documenting (1)**
 68:24

**documents (3)**
 52:5,7;109:3

**dollars (1)**
 80:16

**dominant (2)**
 81:23;82:15

**done (8)**
 14:7;15:19;21:12,
 20;34:17;39:19;58:4;
 113:15

**double (1)**
 25:13

**down (20)**
 5:13,20,20;34:24;
 46:12;47:8;57:6;
 62:9;66:10,15;69:8;
 72:17;73:5;82:25;

83:2,3;91:2;96:9;
102:23;111:25

**Dr (12)**
 35:8,14,17,17,18,
 19,22,23,24;36:6,9;
 108:10

**drawback (1)**
 34:15

**drink (1)**
 53:25

**drive (3)**
 74:25;75:2,17

**driven (1)**
 110:7

**driving (4)**
 76:5,7,10;110:10

**drove (3)**
 75:23;90:12,15

**drug (1)**
 33:4

**due (2)**
 66:17;67:16

**duly (1)**
 4:25

**Dunlop (14)**
 7:17,20,23;8:2;
 9:19;29:10,15,25;
 30:9,15;75:23;79:24;
 106:9;113:11

**duress (2)**
 26:10;27:3

**during (34)**
 8:3;17:9;19:3;
 24:8;25:7;31:10;
 34:3;35:6,16;37:12;
 47:9,23;49:8,24;
 51:2;54:5;56:4;62:5;
 68:18;69:19,21;
 78:14;92:15;93:5,15;
 102:9;106:3,3,10;
 107:1,3,8;110:7;
 113:9

**duties (1)**
 45:6

**E**

**earlier (10)**
 14:10;31:14;43:3;
 54:4;62:8;65:15;
 66:20;70:9;73:9;
 81:11

**earliest (1)**
 31:25

**early (11)**
 12:2;13:23;14:10;
 15:18;58:20,21;62:5;
 68:12,15;70:11;
 90:11

**earning (1)**
 25:6

**ears (1)**
 69:2

**East (1)**
 4:25

**eat (1)**
 32:14

**ECC (1)**
 92:25

**effect (1)**
 75:18

**effort (1)**
 48:13

**efforts (1)**
 16:13

**eight (12)**
 11:8;28:5,8;49:7,
 23,23;59:19,20;70:3;
 71:18;73:23;102:9

**eighteen (2)**
 92:10,13

**either (7)**
 35:15;54:23;57:20;
 78:18,19;87:8;98:24

**elaborate (1)**
 36:19

**eleven (3)**
 89:16,19,20

**eligible (1)**
 80:9

**else (22)**
 8:10;17:3;20:2;
 21:14;28:11;33:20;
 58:10,13;63:1;71:16;
 80:21;82:8;87:8;
 94:23;95:1;99:18,19,
 20;101:2,6;106:22,24

**elsewhere (1)**
 24:14

**E-mail (1)**
 39:2

**E-mails (3)**
 59:11;108:20,24

**emergency (2)**
 69:11;90:14

**Emery (1)**
 5:5

**emphasis (1)**
 69:25

**emphasized (1)**
 24:22

**employ (1)**
 106:3

**employed (1)**
 23:8

**employee (14)**
 6:19;9:1,10;18:11,
 17;19:2;20:4;21:23;
 22:13;24:24;30:15,
 21;48:25;52:18

**employees (20)**
 13:25;14:4,6,9,13,
 22,23;15:1,10,11,14;
 18:13;19:2;40:2;
 58:15;60:1;61:2,4,
 12;78:11

**employer (2)**
 9:13,16

**employment (6)**
 9:22;26:18;48:13;
 52:20,21;113:10

**empty (1)**
 42:7

**encouraged (1)**
 72:1

**end (35)**
 16:11,19;22:19,23;
 23:3,4;24:10,19;
 33:12,14,20;36:21;
 42:11;43:24;46:1;
 47:1,1;48:23;50:18;
 66:16,21;68:3,6,12,
 14,15;72:3;79:10;
 88:5;100:20;104:22;
 108:15;109:20;
 110:10;113:10

**ended (24)**
 8:5;12:12;13:21;
 14:21;16:6;18:10;
 20:8;28:4;37:3;
 45:25;46:7;48:14;
 49:23;52:22;53:5;
 60:5;68:4;76:5;
 78:19;81:6;95:13;
 103:17;104:4,21

**ending (2)**
 78:4;79:4

**engaged (1)**
 92:8

**engineer (4)**
 38:11,16,17,22

**engineering (1)**
 37:15

**enough (4)**
 42:23;59:9;71:21;
 105:16

**entered (1)**
 4:2

**entire (1)**
 99:25

**entitled (1)**
 30:6

**environment (3)**
 15:18;45:14;74:5

**envision (2)**
 49:19;73:22

**epic (1)**
 82:9

**equaled (1)**
 25:11

**equipment (1)**
 75:4

**especially (1)**
 103:1

**establish (1)**
 77:11

**estimate (2)**
 25:12;70:24

**evaluation (7)**

BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

60:24;65:12;66:1,
15;69:16,17;77:11
**even (8)**
21:23;30:19;32:9;
45:16;57:3;74:9;
82:3;98:17
**evening (3)**
11:9;42:13;49:21
**eventually (1)**
79:8
**everybody (12)**
29:10;39:17;40:5;
56:18;58:10;60:6;
61:6,9;70:8,9,22;
71:16
**everyone (1)**
40:7
**evolved (1)**
91:10
**exact (5)**
22:6;24:18;33:9;
53:14;102:25
**exactly (4)**
12:14;33:16;34:2;
62:4
**EXAMINATION (2)**
6:13;112:13
**examined (1)**
5:1
**example (2)**
35:21;90:20
**Excedrin (2)**
34:14;36:20
**except (1)**
4:7
**Exhibit (34)**
64:13,14,18,22;
65:6,10,11,14,21,25;
77:9;82:17,18;83:6,
10,16;84:14;85:24,
25;86:4,8,18,19,21,
23;89:3,3,4,8,11;
105:1,2,7,10
**expand (1)**
17:4
**expanding (1)**
38:2
**expect (1)**
61:24
**expectation (2)**
85:9;95:22
**expected (5)**
66:18;79:1;89:24;
101:24;102:2
**experience (8)**
15:13,14;16:5;
31:23;32:4;45:20;
61:10;98:24
**experienced (1)**
16:21
**experiences (1)**
39:14
**experts (1)**

76:22
**explain (1)**
11:3
**explained (1)**
98:15
**expletive (2)**
75:18,19
**explicit (1)**
43:11
**express (2)**
97:10;106:14
**extended (2)**
17:23;59:22
**extension (2)**
21:5,6
**extent (1)**
17:7
**extra (10)**
28:8;74:6;96:6,8,9;
97:25;98:21;104:11,
22,23

## F

**facility (1)**
73:18
**fact (5)**
26:11;89:21;91:23;
101:18;108:9
**facto (2)**
30:20;52:18
**factors (1)**
98:5
**factory (2)**
76:24;77:3
**failed (8)**
41:1,2,8,20;42:2,7;
74:25;101:11
**Fair (1)**
105:16
**fall (1)**
62:25
**familiar (2)**
63:4;105:15
**Family (5)**
27:11,15;30:23;
68:2;93:24
**far (3)**
21:8;69:5;89:25
**February (6)**
66:4;69:12,19;
81:3;93:12;100:9
**Fed (1)**
105:3
**federal (5)**
10:12;29:1,13;
30:11,13
**feedback (1)**
60:22
**feel (5)**
6:8;37:19;59:10;
77:18;104:19
**feeling (5)**

26:15;27:4,13;
74:11;75:17
**felt (2)**
71:20,24
**fifteen (2)**
60:11,18
**fifth (1)**
102:11
**fifty (1)**
24:25
**fifty-five (1)**
24:25
**file (1)**
42:7
**filed (3)**
46:3;79:8;89:14
**filing (2)**
4:5;9:19
**fill (12)**
27:10,17;29:8,13,
15;30:2,3,10;31:6;
61:2,5;101:8
**filled (3)**
29:12,18;77:25
**filling (3)**
30:15,23;48:7
**final (1)**
76:12
**finally (1)**
28:9
**financials (1)**
20:13
**find (1)**
103:14
**fine (5)**
4:12,23;28:23;
53:19;77:16
**finish (1)**
6:9
**finished (2)**
5:14;91:19
**fire (4)**
40:7,8;58:5;94:18
**Firearms (2)**
47:14,15
**fired (1)**
39:21
**firm (1)**
26:17
**first (10)**
6:22;31:23;40:20;
79:7;84:5,13;86:18;
91:17;105:17,18
**fits (1)**
69:3
**five (5)**
25:23;26:3;70:4,
23;92:3
**fix (5)**
75:11,15;76:20;
79:17;91:8
**fixed (3)**
42:14;43:10;50:12

**fixes (1)**
75:6
**flex (18)**
11:4,20;13:21;
14:1,6;16:20;31:12;
37:3;49:5,6,10,16,18;
101:20,21;102:6,9;
103:18
**flexibility (5)**
31:18;50:1;74:5;
95:15;109:11
**flexible (9)**
10:25;15:17;95:12;
101:16;102:12,13,15,
16;109:15
**flexing (1)**
11:16
**flows (1)**
93:4
**FMLA (18)**
27:15;28:19,24;
29:1,3,6,8;65:17;
77:25;94:1,13,14;
95:2,14;99:1,16;
107:25;109:10
**focus (7)**
18:19,22,23;32:2;
67:24;76:9;113:1
**follow (1)**
39:4
**following (1)**
4:1
**follows (1)**
5:2
**follow-up (1)**
69:15
**forgets (1)**
43:5
**form (9)**
4:7;29:13,18;
30:10,15;38:23;95:9;
104:8;113:5
**formally (1)**
26:20
**forms (2)**
27:10;61:3
**fortunate (1)**
80:6
**forty (19)**
11:10;25:19;27:24;
49:4,10,24;51:13;
63:9,14,19;66:12;
70:2,3;73:24;93:19;
96:2;99:12,13;
104:10
**forward (2)**
84:24;88:17
**found (3)**
39:15;42:9;79:18
**four (11)**
25:21,23;26:3;
28:5;31:15,17,19;
36:15;38:6;53:12,18

**Franzyck (1)**
38:20
**free (2)**
6:8;51:18
**frequency (1)**
63:23
**frequently (6)**
17:25;25:25;32:4;
57:24;66:8;102:18
**Friday (5)**
28:8;31:17;84:18;
102:1,4
**front (6)**
82:20;88:5;109:25;
110:9;111:8,10
**full-time (16)**
16:4;17:2;18:11;
19:9;20:4;21:23;
37:11;49:4;63:18;
72:6,22;78:22,23;
80:14,17;101:1
**fully (2)**
79:1,5
**fumes (2)**
110:16;111:10
**function (1)**
44:10
**further (1)**
48:18

## G

**gambit (1)**
69:3
**gauge (1)**
64:11
**gave (4)**
26:24;50:7;68:7;
101:19
**geared (1)**
61:4
**general (6)**
22:10;33:21;35:18;
56:8;64:10;107:20
**generalist (3)**
37:21;40:9;45:25
**generally (17)**
10:12;11:7;13:3;
14:9;23:20;26:4;
36:23;38:6;39:10;
54:21;58:1;70:13;
71:4;102:25;103:2;
106:8;108:3
**gets (2)**
14:25;69:2
**gibberish (1)**
59:11
**given (8)**
18:3;28:3;34:23;
74:20;78:4,5;91:3;
95:21
**giving (2)**
5:21;36:17

**Global (1)**
  19:21
**goals (2)**
  69:20;77:10
**goes (3)**
  71:15,17;91:15
**good (3)**
  4:22;5:3;81:17
**Goodyear (47)**
  7:17,20,23;8:2,23;
  10:5,12,17,20,23;
  14:5,9,13,15,23,24;
  15:6,11,15;16:7;
  20:6;21:17;25:7;
  27:9;29:21;30:6;
  31:1;32:3;34:4;
  37:12;49:17;54:6;
  58:15;61:3,11;73:18,
  21;74:17;79:24;87:8;
  89:14,24;106:4,24;
  107:8;109:13;113:11
**Goodyear's (2)**
  10:8;111:21
**government (2)**
  30:11;51:17
**grab (1)**
  53:25
**Grabowski (7)**
  19:7,12,13,14,21;
  20:3,14
**granted (1)**
  110:5
**groaned (1)**
  61:7
**group (3)**
  23:7;39:18,20
**guarantee (1)**
  21:22
**guaranteed (1)**
  50:18
**guess (32)**
  10:24;16:23;17:4,
  17,18;21:13;25:1;
  26:5,10;28:18,25;
  29:13,17;31:16;49:6;
  52:17;53:23;56:15;
  60:11,12;70:7;73:7;
  75:8;76:7;77:24;
  79:10;80:15,18;90:3;
  94:9;98:4;110:19
**gun (1)**
  79:18
**guy (8)**
  35:10;38:9;42:10;
  43:17,17;75:20,22;
  79:5
**guys (1)**
  38:5

## H

**half (4)**
  59:19,20;84:16;

**112:10**
**hand (1)**
  64:17
**handful (2)**
  81:14,19
**handling (1)**
  75:9
**hands (1)**
  81:12
**handwriting (1)**
  64:25
**happen (3)**
  24:10;69:15;88:20
**happened (8)**
  8:16;40:16;45:23;
  62:11,12;88:18;91:7;
  94:2
**happy (4)**
  6:3;36:14;59:2;
  110:20
**harbor (1)**
  79:6
**hard (5)**
  5:19;32:8;39:6,12;
  97:19
**hardware (2)**
  55:9;63:2
**Harter (1)**
  5:5
**Hayes (15)**
  23:1,11,14,17,23;
  24:9;28:15,15;55:1,
  12,20;57:9;106:8,14,
  19
**Hayes' (1)**
  56:20
**head (3)**
  5:18;20:5;93:22
**headache (2)**
  75:2;93:14
**heading (1)**
  66:15
**health (1)**
  68:5
**Healthcare (1)**
  7:2
**healthy (1)**
  67:23
**heard (1)**
  75:12
**heavily (1)**
  67:3
**heavy (1)**
  110:8
**held (5)**
  95:16,19,25;99:17;
  111:4
**help (1)**
  38:9
**helping (1)**
  68:9
**Hemenway (31)**
  4:9,11,13,17,23;

**5:3,4;6:13;15:8;**
  16:17;52:10;53:24;
  54:2;64:12,16;65:9,
  13;73:14;74:14;
  82:16;83:4;85:23;
  86:2;89:2,6;103:11;
  104:25;105:5;112:5,
  8;113:16
**hereby (1)**
  4:3
**H-E-Y-D-A-N (1)**
  35:15
**Heyden (5)**
  35:14,17,18,23,25;
  36:7,9
**high-strung (1)**
  17:18
**hire (5)**
  8:18,20,23;21:4;
  44:16
**hired (9)**
  8:17;9:9;11:18;
  22:2,12;33:7;38:15;
  42:11;78:22
**hiring (6)**
  8:24,24;18:10;
  29:16;37:24;98:20
**Hogan (5)**
  26:17,20;27:9;
  30:19,25
**hold (2)**
  11:25;78:1
**holding (2)**
  99:10,21
**holiday (1)**
  102:25
**holidays (6)**
  10:7,8,9,12,13;
  102:16
**home (7)**
  42:16;50:8;74:12;
  90:15;91:13;92:3;
  109:21
**hopefully (1)**
  47:21
**horrible (1)**
  56:16
**hospital (1)**
  90:12
**hour (19)**
  25:9,15;28:5;49:3;
  59:20,20,22,23,23,
  24;60:2,12,14;63:19;
  66:12;71:6;91:18;
  95:21;112:10
**hourly (1)**
  25:14
**hours (80)**
  9:19;11:1,5,8,11;
  12:12,25;14:7,9;
  15:11;16:4;25:17,19,
  21,24;26:6,7,7;27:22,
  22,25;28:3,8;31:10,

**13;49:4,7,8,10,11,23,**
  24,25;58:8,13;59:18,
  20;60:2,7,10;62:9,10,
  14,23;63:9;65:20;
  70:2,3,3,5;71:8;
  73:19,24,24;84:17,
  23;85:7,8,10,11,13,
  16;93:20;94:16,23;
  95:23,24;96:11;
  99:12,13,15,22;
  101:20,22,25;102:3,
  5,9;104:10,22
**HR (3)**
  27:11;39:2;94:19
**human (2)**
  111:17,21
**hundred (3)**
  33:24;53:13,18
**hung (1)**
  75:19

## I

**IBM (5)**
  63:2,6;75:5,6;
  76:17
**idea (9)**
  17:25;23:22;35:10;
  41:22;46:10,14;70:3,
  8;74:2
**ideas (1)**
  79:19
**identification (6)**
  64:15;65:12;82:19;
  86:1;89:5;105:4
**ill (2)**
  33:16;79:6
**illegal (2)**
  79:14,15
**illness (5)**
  12:5;66:17,21;
  67:17;68:23
**illnesses (1)**
  68:20
**Immediate (1)**
  36:22
**immense (1)**
  98:17
**impact (5)**
  6:15;30:5;71:11;
  89:22;90:9
**impacted (4)**
  17:12;71:9,11,13
**implication (3)**
  8:18,19;31:16
**important (4)**
  5:11,17;56:15;77:4
**impossible (1)**
  112:15
**improve (4)**
  24:5,7;66:18;93:12
**inadvertently (1)**
  30:12

**incapacity (1)**
  112:25
**incident (2)**
  43:22;75:4
**incidents (1)**
  110:7
**include (2)**
  11:22;105:17
**included (3)**
  10:7;97:2;108:5
**includes (1)**
  86:21
**income (1)**
  52:21
**incorrect (1)**
  43:15
**increase (3)**
  61:16,20,25
**increased (1)**
  61:18
**increments (2)**
  60:16,19
**indicate (6)**
  97:1;106:1,11;
  107:6;108:20;109:4
**indicates (3)**
  66:10;89:20;92:14
**individual (2)**
  7:8;15:21
**individually (1)**
  54:18
**individuals (6)**
  19:6;39:14;55:23;
  78:15;88:22;105:19
**individual's (2)**
  15:24;83:24
**influence (2)**
  41:5;76:8
**information (5)**
  26:18;53:21;59:10;
  81:2;105:19
**informed (8)**
  23:2,14,18;38:13;
  72:20;78:4;79:3;80:6
**initial (4)**
  41:14;69:9;80:12;
  105:12
**initially (4)**
  9:23;29:20;70:10;
  73:20
**input (2)**
  57:7,16
**install (1)**
  91:16
**installation (1)**
  41:14
**installing (1)**
  91:11
**installs (1)**
  55:10
**instances (2)**
  40:1;96:14
**Instead (1)**

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 123 of 131

BRIAN T. BORDERS vs.                                                    BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                                    January 23, 2019

29:2
**instructions (1)**
  6:11
**interaction (1)**
  9:18
**interchangeably (1)**
  14:17
**interested (4)**
  48:11;51:12;83:1;
  98:12
**interim (2)**
  50:23;69:21
**Interpage (1)**
  41:23
**interrupt (1)**
  94:25
**intervals (1)**
  49:12
**interview (23)**
  7:7,10,12;8:7,11,
  14,16,22;33:3;40:18,
  21,22;41:6;42:22;
  43:7,8,12,13;44:9;
  45:24;46:25;47:24;
  72:15
**interviewed (5)**
  7:15,19;8:8;39:1;
  47:4
**interviews (1)**
  48:3
**into (13)**
  4:2;9:24;11:19;
  18:9;27:1;37:18,20;
  38:20;50:17;73:22;
  78:9,19;81:8
**involved (4)**
  33:4;41:13;76:11,
  25
**irritable (3)**
  90:4;109:17;110:4
**issue (9)**
  69:8;73:6;74:9;
  94:20;95:24;100:12;
  109:21;110:17;111:2
**issues (10)**
  17:15,16;33:6;
  42:25;50:1;56:13;
  59:5;68:9;74:3;90:2
**item (1)**
  85:1

## J

**Jack (5)**
  23:1,11;28:15;
  55:1;106:8
**January (3)**
  40:19,19;53:6
**Jeff (15)**
  23:2,5;28:12;
  50:22;54:16;55:2;
  56:25;57:1,3,8;
  58:20;85:3,6;87:17;

107:6
**Jensen (23)**
  23:2,5;24:9;28:12;
  50:22;54:16;55:2;
  56:21;57:3,9;58:20;
  84:3,23;85:4,6,18;
  86:14;87:17;107:6,6,
  11,21,23
**Jim (2)**
  54:24;105:22
**job (21)**
  44:24;45:4;46:18,
  23;56:6;59:3;74:10;
  77:21;80:7,17;82:20;
  89:23;90:3,9;97:12;
  108:21,25;112:16,17,
  22;113:3
**jobs (5)**
  46:4,5;74:7;81:13,
  19
**John (11)**
  15:25;17:5;38:16;
  41:10,17;50:22;55:4,
  5;78:21;90:12;97:25
**joint (4)**
  7:25;8:4;14:21;
  16:6
**July (7)**
  33:17;46:24;48:1,
  5;53:5,6;90:20
**June (6)**
  43:7;46:24;48:1,5;
  72:8,16

## K

**keep (2)**
  46:18;59:2
**keeping (1)**
  64:9
**Keogh (8)**
  19:8,23,24,25;
  22:8;37:18;38:1;
  78:22
**kept (4)**
  50:17;77:18;96:9;
  99:12
**kidney (2)**
  67:7,18
**kind (43)**
  10:24;12:15;15:3,
  5,17,18,20;17:18;
  25:4;30:13;32:6,14;
  38:7,8;39:8,12;46:7;
  51:20;56:7;57:3;
  58:22;63:2,3,24;64:9,
  10,10,11;68:4;70:7,
  12,15;72:11;73:4,5,5;
  74:23;79:10;82:7,25;
  91:9,10;93:22
**kinds (1)**
  32:13
**Kirk (16)**

11:19;13:8;16:10;
  20:8;26:11;27:21;
  55:7;62:13;74:23;
  75:15;76:4;78:21;
  85:1;93:6;94:16;
  106:2
**knew (8)**
  23:21;30:17;48:21;
  50:24;63:2,5;84:11;
  87:15
**knowledge (14)**
  12:9;13:25;17:11;
  42:19;45:12;69:15;
  78:10;98:18,18,18;
  106:2,6;107:7;
  110:18
**knows (2)**
  29:10;72:14

## L

**lacking (1)**
  66:17
**lacquering (1)**
  111:9
**Lane (1)**
  4:25
**language (1)**
  84:21
**last (13)**
  13:14,20;19:23;
  33:1,13;35:9;46:22;
  56:22;76:4;78:13;
  83:20;105:15;113:9
**late (5)**
  12:13;13:23;41:8;
  66:7;95:18
**later (11)**
  11:9;14:11;15:20;
  24:16,17;42:15;
  58:12,21;70:12;79:3;
  104:12
**law (3)**
  26:17;29:1;30:13
**Lawson (2)**
  20:12,13
**lawsuit (7)**
  5:8;6:17;99:5;
  104:6,15;105:13,20
**Lawton (1)**
  73:18
**lawyers (1)**
  81:17
**lay (1)**
  69:8
**leader (1)**
  57:12
**leading (1)**
  43:19
**learning (2)**
  18:5;46:20
**least (3)**
  43:21;80:16;

111:13
**leave (22)**
  11:11;14:10;20:9,
  17;27:11,15;30:24;
  42:12;43:10;65:17;
  68:3;81:15,18;90:11;
  93:25;107:25;
  109:18;110:11,14,15,
  25;111:12
**led (3)**
  8:20;20:18;67:25
**left (10)**
  15:18;41:8;42:14;
  48:4;50:14;58:25;
  59:24;78:23;81:8;
  90:14
**legs (1)**
  53:25
**letters (2)**
  108:21,24
**level (1)**
  108:7
**life (2)**
  68:6,8
**limited (2)**
  46:15;88:8
**Linda (5)**
  27:12,19;29:9;
  77:23;111:24
**linked (1)**
  48:24
**Linux (8)**
  38:4;81:13;82:13;
  87:7,16,19;97:16,17
**Linux/Unix (1)**
  45:5
**list (3)**
  105:18;109:2;
  111:16
**listed (5)**
  8:1;46:5;64:8;
  68:22;105:22
**listening (1)**
  55:14
**little (19)**
  11:19;14:11,25;
  16:14;18:3;38:5;
  46:8;47:7;56:3;57:7;
  58:21;60:9;61:11;
  82:7,14;91:14;92:2,
  7;98:18
**LLC (7)**
  46:21;47:12;80:5,
  8,8,11,13
**log (10)**
  12:15,16,18;26:5;
  51:11,23,25;53:14;
  64:2;85:16
**logged (3)**
  49:8,13;92:3
**logging (2)**
  12:24;91:14
**logs (1)**

111:13
**long (15)**
  11:18;15:19;27:18;
  42:3;52:25;62:22,22;
  80:13;88:11;90:13,
  22;91:16;95:23;
  101:18;112:12
**longer (6)**
  41:3,3;70:12;80:9;
  92:17;112:10
**look (22)**
  12:15;65:25;66:6,
  14;77:13;81:13;83:7,
  15;84:5,13,23;89:16;
  90:16;92:10;93:20;
  96:19;98:8,11;99:14;
  103:15;105:10,16
**looked (8)**
  30:18;45:1,9,15;
  82:22;97:12;98:6,8
**looking (26)**
  7:2;15:3;17:3;46:4,
  15,18,23;48:6,21;
  71:1;77:9;80:3;82:5;
  84:15,25;89:19;
  90:17;92:8,13;97:20,
  23;98:16,21;107:5;
  108:17;111:14
**looks (10)**
  59:14;66:3;69:12;
  83:12,24;84:2,9;
  86:14,17;90:20
**lose (1)**
  77:2
**lost (1)**
  77:2
**lot (20)**
  16:25;25:5;26:10,
  12;32:14;34:15,16;
  36:19;39:18;45:2,3;
  46:20;58:18;59:8;
  67:3,4,23,24;70:1;
  99:24
**low (1)**
  51:13
**lucky (1)**
  80:10
**lunch (11)**
  56:2,3,5;59:20,22,
  23;60:3,14;71:6;
  107:1,2
**Lynn (7)**
  7:11;13:12,18;
  55:25;56:1,19;107:2

## M

**M&T (3)**
  46:25;47:24;82:1
**ma'am (1)**
  6:12
**machine (2)**
  63:7;77:2

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 124 of 131

BRIAN T. BORDERS vs.                                                    BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                         January 23, 2019

**magazine (1)**
79:17
**main (6)**
13:13;35:10;38:7,
8;67:24;71:14
**mainly (1)**
88:5
**maintenance (1)**
110:8
**making (3)**
80:16;99:3;100:5
**managed (1)**
41:3
**manager (17)**
8:9;9:3,8;13:10;
16:10,22;23:6,12;
38:18;59:2;84:6,10,
10,15,25;85:3;106:9
**managers (1)**
13:6
**manager's (1)**
83:21
**mandated (1)**
59:23
**manner (2)**
34:22;106:12
**many (5)**
17:9;25:17;26:2;
81:25;111:12
**Mark (3)**
8:9;9:8;13:8
**marked (17)**
64:13,15,18;65:10,
12;82:17,19;83:6;
85:24;86:1,4;89:2,5,
8;104:25;105:3,7
**MASH (1)**
36:21
**match (1)**
10:7
**material (1)**
86:22
**matrix (3)**
84:6,9;85:3
**matter (3)**
31:15;77:17;93:17
**may (27)**
5:23,23;6:14;13:2;
14:14,15;15:4;28:14;
44:13;50:12;51:25;
52:2;56:7;58:12;
73:15;76:22;81:10;
86:12;87:1;96:23;
99:20;105:19;
106:25;107:2,3,6;
109:1
**maybe (24)**
13:22;17:2;18:3;
22:17;26:3;28:15;
36:4;37:2;40:19;
43:5,23;51:13;53:16,
18;57:7,21;58:3;
70:14;72:14;81:14;

83:24;93:20;99:14;
102:20
**McClain (3)**
38:16;50:23;90:12
**mean (1)**
60:16
**meats (1)**
32:13
**Mechtler (5)**
35:8,17,19,22;
108:10
**Medaille (1)**
51:19
**medical (17)**
17:15,19,19;20:9;
27:11,15;30:24;
33:19;34:4;35:24;
64:4;68:3,20;74:3,9;
93:25;102:7
**medicated (1)**
67:4
**medication (3)**
17:24;25:21;32:16
**medications (1)**
6:14;35:3
**meet (3)**
45:17;51:21;56:19
**meeting (26)**
22:25;23:14,18,20;
24:15;28:10;55:13;
56:3,24;57:12;62:13,
14,15;65:5,16,18;
69:19;92:15,16,20;
93:5,11;94:15;
107:19;110:1,2
**meetings (27)**
18:25;44:14;54:5,
8,10,11,13,14,15,22,
25;55:2,3,11,11,19;
56:5,20,21;57:11,25;
58:3;59:5;60:23;
106:9,10;107:2
**memorialize (1)**
84:21
**memory (2)**
42:6;56:13
**mental (1)**
68:8
**mention (1)**
52:19
**mentioned (27)**
13:21;14:13;15:9;
16:18;18:19,21;19:1,
12,20;20:3;22:2;
44:15,18,21,22;52:7;
54:4;56:7;62:8;
66:20;67:21,22;
71:24;72:20;80:23;
81:19;90:18
**mentioning (1)**
104:3
**mentions (2)**
66:7;103:24

**mess (1)**
32:23
**met (2)**
55:20,22
**Meyer (5)**
4:10,12;14:19;
16:12,14
**mhmm (1)**
5:19
**mid-January (1)**
53:8
**mid-year (1)**
84:15
**might (15)**
14:19;15:25;18:3;
34:22,24;38:12;
41:16;51:13;53:12;
54:24;62:1;77:13;
81:1;107:20;109:3
**migraine (10)**
11:6;25:20;31:21;
32:15;34:14;36:20;
74:24,25;96:4;
110:12
**migraines (35)**
26:1,14;27:17;
29:2,3,4;31:24;32:4,
7,22;33:6;34:5;
36:10;42:25;50:2;
63:20,25;67:5,20,25;
68:10,19,23;74:9;
78:2;90:1,1,8;93:8,
11;99:22;100:6;
108:12;109:16;113:1
**Mike (2)**
19:7,17
**Miller (11)**
4:10,16,18,21;
52:6;73:11,15;103:9;
112:11,13;113:15
**million (1)**
80:16
**mind (6)**
30:4;72:13;78:1;
97:18,23;98:6
**minute (8)**
49:12;60:16,18;
64:19;65:21;86:5;
105:8,9
**minutes (5)**
36:24;60:11;83:7;
89:9;112:10
**miss (1)**
17:20
**mistake (1)**
92:19
**mixed (2)**
58:22;72:11
**moaned (1)**
61:6
**modified (2)**
42:4;47:15
**Monday (5)**

31:16;84:18;
101:25;102:2,4
**money (4)**
35:5;47:19,20;
77:22
**month (8)**
12:4;26:4;53:13;
56:10;62:2;66:25;
79:3;102:20
**months (5)**
22:17;53:1,2,10;
62:2
**more (22)**
10:12;11:10;13:16;
28:2,3;37:19;38:5;
49:7,8,24;51:14,24;
53:21;54:7;71:1;
76:18;81:2;93:2;
94:17;96:17;98:2;
104:10
**morning (7)**
5:3;11:6;25:21;
49:22;74:13;91:18;
92:5
**most (10)**
9:18;15:1;28:5;
42:24;54:16;57:20;
59:24;81:23;85:15;
88:4
**mouth (1)**
94:22
**move (4)**
21:10,15;58:5;
88:17
**moved (6)**
37:18,20;38:20;
71:5;73:21;78:19
**movement (1)**
71:10
**moving (3)**
38:1,3;77:6
**much (21)**
9:17;13:20;24:24;
25:6,11;32:16;34:10;
36:2,18;37:19;39:17;
40:4,6;51:6;55:2;
59:24;60:4;64:11;
68:24;81:7;102:21
**must (1)**
59:11
**myself (9)**
43:17;45:12;52:17;
59:1;69:4;88:24;
98:1;101:9;106:9

**N**

**name (9)**
5:4;13:14,20;
15:24;19:23;35:9;
47:11;56:2,18
**names (3)**
41:25;42:1;56:16

**narcotic (1)**
33:5
**narrow (1)**
34:24
**nature (2)**
47:13;50:5
**NCCC (1)**
80:24
**necessarily (2)**
49:6;110:13
**need (19)**
6:6;26:23;27:14,
16;29:8;31:5;43:19;
50:3,6,8,12,16;74:21;
75:14;76:10,20;
87:17;93:19;96:18
**needed (15)**
12:24;15:19;17:20;
24:5,22,23;30:3;
75:7;88:3;93:12;
102:6,11;103:25;
104:12;109:23
**needing (2)**
28:18;110:25
**needs (4)**
17:1;45:10;63:17;
99:12
**network (7)**
37:15;38:1,11,15,
16,21,22
**networking (1)**
21:25;97:17
**Neurologic (1)**
32:9
**New (13)**
4:25;7:2;16:10;
21:21;39:20;40:20;
46:8;81:14,20;86:22,
22;88:6,15
**news (1)**
35:11
**next (8)**
5:16;64:24;83:21;
85:17;93:5;94:1;
96:12;107:5
**Niagara (2)**
51:15;82:8
**niche (1)**
82:7
**night (3)**
41:8;42:13;51:8
**nine (4)**
59:18,22;60:2;71:8
**ninety (1)**
69:14
**nitrates (1)**
32:12
**nobody (3)**
63:1;87:10;88:4
**non-40 (1)**
16:1
**none (4)**
26:3;32:17;48:8;

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 125 of 131

BRIAN T. BORDERS vs.                                                    BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                                    January 23, 2019

58:25
**non-stop (1)**
  100:24
**non-verbal (1)**
  5:20
**noon (2)**
  25:23;49:22
**normal (3)**
  32:14;101:23;
  102:19
**normally (1)**
  113:3
**North (2)**
  7:17;8:2
**notebook (6)**
  12:21;50:10,10,13,
  16,16
**notes (1)**
  58:24
**notice (1)**
  93:2
**noticed (1)**
  92:25
**notified (1)**
  48:16
**November (6)**
  31:25;38:12,14;
  80:5,13;100:8
**November-December (1)**
  24:19
**number (2)**
  53:14;78:15
**numbered (2)**
  89:18,20
**nuts (1)**
  32:13

**O**

**oath (1)**
  4:4
**objection (1)**
  73:12
**objections (1)**
  4:7
**objective (4)**
  82:18;83:12;85:25;
  86:11
**obligation (1)**
  104:6
**observation (1)**
  43:2
**observations (1)**
  27:21
**observe (1)**
  58:23
**observed (2)**
  14:5;106:15
**obviously (1)**
  98:6
**occasion (1)**
  90:12
**occasionally (4)**

55:25;56:19;63:21,
  22
**occasions (5)**
  55:22;74:15;85:12;
  102:22;109:22
**occur (5)**
  11:15;24:17;69:14,
  22;111:5
**occurred (10)**
  16:19;18:1;22:5,
  15;60:23;63:23;
  65:18;92:21;99:25;
  100:7
**occurring (3)**
  39:22;58:14;90:20
**o'clock (5)**
  25:23;71:18;92:4,4
**October (11)**
  12:4,6,7;14:21;
  22:24;24:8;37:2;
  48:16;66:25;67:10;
  80:7
**off (15)**
  10:5,13,15;16:4;
  28:18;74:16,20,21,
  21;77:5;86:15;94:1;
  96:3,12;102:9
**offer (3)**
  11:20;55:17;72:7
**offered (2)**
  21:13;37:22
**off-hours (1)**
  70:18
**office (2)**
  58:6;70:13
**official (6)**
  54:21;58:2;80:19,
  19;107:18,19
**often (1)**
  36:19
**once (12)**
  16:5;64:19;65:22;
  69:4;76:23;80:11,15;
  85:15;88:7;89:9;
  102:20,24
**on-disc (1)**
  42:5
**one (40)**
  5:11;13:16;14:16;
  15:22;16:18;17:14;
  18:24;25:23;33:24;
  34:10,23;48:6;50:20;
  54:4,24;57:1;58:19;
  59:16;60:2,14;71:14,
  15;73:11;77:11;
  78:13;79:20;80:16;
  82:6,11,13;83:20,21;
  90:11;97:6;101:10;
  103:14;105:15,23;
  109:18;112:14
**ones (4)**
  31:2;54:11;78:21;
  89:18

**ongoing (3)**
  21:9;34:8,10
**online (5)**
  30:17;38:24,24;
  40:14;48:7
**only (27)**
  5:11;6:8;10:24;
  14:20;17:14;34:15;
  36:6;41:21;48:6;
  52:23;55:22;73:11;
  74:22;76:24;81:12;
  90:4,6;91:13;92:1,1,
  6;94:5;97:16;105:14;
  106:25;109:14;112:2
**on-site (3)**
  75:23;76:11,16
**open (5)**
  10:12;36:22;46:13;
  80:5;81:25
**opened (7)**
  37:16;38:17;46:21;
  80:7,8,11;82:2
**opening (4)**
  24:20;37:23;38:20;
  80:12
**operated (1)**
  77:1
**operating (1)**
  55:9
**operation (2)**
  47:16,17
**operations (2)**
  38:18,18
**opioid (1)**
  32:23
**opportunities (3)**
  24:13,13;84:15
**opportunity (5)**
  25:1;49:9;60:21;
  74:18;103:6
**opposed (4)**
  38:6;57:2;68:23;
  80:2
**option (2)**
  36:13;104:17
**order (6)**
  17:21;21:9;27:6;
  83:25;109:11;113:12
**organization (1)**
  51:18
**organized (1)**
  80:24
**originally (1)**
  59:19
**others (4)**
  19:10,11;39:24;
  71:11
**ounces (1)**
  36:15
**out (82)**
  11:2,12;12:4,6;
  16:25;17:19;20:9,21,
  23;25:4,20;26:12;

27:10,18;28:20;29:3,
  8,12,14,15,18;30:2,4,
  10,15,23;31:6,14;
  32:5;41:23;42:2,3,9;
  43:1;44:16,18,21;
  48:7;49:9,21;50:2,5;
  56:2;59:15;61:3,5;
  64:11;66:24;67:18;
  68:17,22;69:10,24,
  25;70:2,7;71:7;
  74:24,25;75:6,10;
  77:25;78:2;82:21;
  83:25;87:18;93:8;
  94:4,7,21;97:15,22;
  99:23;100:10,23;
  102:1,10;104:13;
  107:2;110:1,2,10
**outgoing (1)**
  47:20
**outset (1)**
  88:16
**outside (1)**
  102:18
**outstanding (1)**
  113:3
**over (18)**
  16:11,22;22:20;
  32:5;38:4;41:17;
  44:10;46:16;51:20;
  53:3;57:16;75:2;
  78:23;79:18;82:4;
  93:4;101:2;103:1
**overcome (1)**
  68:9
**overly (1)**
  56:15
**overtime (11)**
  11:13,14;74:1;
  90:18;91:4,9;103:6,
  17,25;104:3,8
**own (5)**
  47:10,10;55:17;
  60:22;76:3
**owned (1)**
  79:14
**owner (2)**
  54:23;105:23
**oxy (1)**
  33:8
**oxycodone (4)**
  32:21;33:3;36:12,
  15

**P**

**page (14)**
  66:16;83:15,18;
  84:5,14;86:18,21;
  105:14,17,18,23;
  107:5;108:18;109:2
**pager (1)**
  70:18
**pagers (1)**

41:24
**pages (1)**
  41:23
**paging (1)**
  41:24;42:4
**paid (10)**
  9:17,19,20;10:4,11,
  14,15;11:14;76:21;
  91:25
**pain (1)**
  67:4
**Papelow (10)**
  8:9;9:8;13:8;
  49:20;50:14,23;
  61:19;62:4;95:13;
  104:10
**paper (1)**
  77:3
**papers (1)**
  22:21
**paperwork (6)**
  27:18;29:8,12;
  31:6;61:5;77:25
**paragraph (14)**
  66:16;84:14,16;
  89:16,19,20;90:16,
  17;91:11;92:10,13;
  96:19;103:13;108:17
**paragraphs (2)**
  103:15;104:2
**parse (1)**
  32:5
**part (17)**
  28:5;42:24;47:15,
  22;57:20;59:24;63:5;
  73:13;76:19,19;84:8;
  85:15;99:4;101:14;
  104:6,15;105:13
**particular (7)**
  7:8;31:20;40:2;
  56:12;90:23;91:11;
  99:7
**parties (2)**
  4:2,4
**part-time (5)**
  16:2,3;17:3;93:21;
  99:14
**pass (1)**
  69:10
**past (3)**
  74:2;78:7,8
**patches (2)**
  91:11,16
**patching (1)**
  55:9
**patent (11)**
  46:13,21;47:14,20,
  22;79:8;80:19,19,21;
  81:16;87:6
**patented (1)**
  46:11
**Paul (2)**
  19:7,12

**pay (8)**
11:13;24:24;49:2;
52:13,14,16;61:16;
94:10
**paying (3)**
35:5;94:5,6
**payroll (1)**
20:13
**pays (1)**
52:15
**PC (1)**
50:11
**pending (1)**
6:10;80:21
**people (24)**
8:24;13:6;14:8,10,
11;18:20;35:20;
58:18,21,24;59:1,13;
61:2;70:10,11,11,14,
17;72:7;74:3;87:15,
19;98:1;108:3
**per (19)**
15:16;25:11,15,17;
27:23;28:4;31:11;
49:4;51:6;62:9,10;
63:9;84:17;85:9,10,
13;95:21,23;101:20
**percent (2)**
33:23,24
**perfectly (2)**
43:12;59:14
**perform (7)**
17:12;73:25;87:13;
89:23,23,24;90:9
**performance (10)**
55:20;59:3,6;
60:22;65:11;66:1;
69:16;85:19;86:11;
87:1
**performed (3)**
66:25;87:13;88:1
**performing (3)**
88:9;95:5;102:21
**perhaps (1)**
36:5
**period (19)**
6:19;21:2;26:6,12,
16;32:5;34:7,8;
49:25;53:2;62:9;
66:22;67:18;70:16,
20;71:11;75:2;93:15;
113:9
**periodically (2)**
91:13,15
**periods (1)**
21:7
**permanent (3)**
18:16,20;78:19
**permanently (1)**
22:3
**permission (1)**
91:3
**permitted (2)**

**101:15;109:23**
**persecution (1)**
93:7
**person (14)**
20:15;21:19;27:11;
37:25;39:12;41:9,13;
45:13;57:5;67:23;
75:14;97:21,25;
106:25
**personal (4)**
10:16;15:21;64:6;
80:2
**personally (1)**
49:19
**Personnel (36)**
7:6,9,13;8:13;9:10,
12,15,22;10:2,10;
13:10,11;19:15;21:1,
10,18;22:19,23,25;
23:9,12;25:7;28:13;
30:23;31:7;48:19;
54:19,23;55:23;
61:16,23;70:13;
100:15;101:2;
105:23;106:23
**perspective (3)**
14:20;16:9;102:13
**pet (2)**
68:11,17
**pets (1)**
68:16
**pharmaceuticals (1)**
32:18
**phone (2)**
46:25;47:24
**physical (2)**
30:15;61:4
**physically (2)**
36:2;94:6
**physicians (1)**
108:11
**picked (1)**
43:16
**piece (1)**
75:4
**pieces (1)**
13:2
**pills (1)**
33:1
**pinpoint (2)**
34:22;35:21
**pissed (1)**
60:9
**place (4)**
16:10;58:24;87:6;
103:19
**placed (17)**
6:19,22;8:4;13:9;
15:13;19:3,14;25:7;
29:20;32:3;34:3;
37:13;54:6;61:15;
74:16;78:14;92:17
**placement (15)**

**6:25;15:12;16:21;**
20:11;21:24;22:18,
22;34:9;48:4,14,18;
49:17;62:5;106:4;
107:8
**plaintiff (3)**
93:6,7;103:18
**plaintiff's (4)**
106:3;109:4;
111:15,16
**plan (5)**
80:12;82:19;83:12;
86:1,11
**planet (1)**
32:16
**planning (1)**
20:22
**plant (8)**
14:23;16:7,8;
59:24;70:6,16;
109:20;110:7
**platform (2)**
41:15;47:15
**play (1)**
56:21
**please (13)**
5:21;6:2;64:13;
65:10;82:17;85:24;
89:17;90:17;92:11;
96:20;103:10;105:1,
9
**plumbing (1)**
109:19
**pm (2)**
49:23;84:18
**pm*** (1)**
113:18
**point (26)**
6:6;8:3;12:4;
22:13;30:22;31:9;
34:10,18;35:3;43:1;
47:10;57:1;60:14;
61:15;70:19;77:19,
20;89:21;91:4;93:13;
94:17;95:16;96:10;
100:5;103:14;112:14
**portal (2)**
38:24;40:14
**portion (2)**
29:1;92:7
**position (54)**
7:1,3,4;8:23;21:11,
16;24:11,20;37:16,
17,18,20,23;38:11,
17,20,23;39:1;40:10,
10,17;45:11,11,18,
25;46:25;47:3,4;
49:2;52:22;62:7;
72:2,6,8,9,17,22;
73:1,3;78:16,20;
82:2;83:2;94:8;
96:23;97:1,3,7,12,14;
98:5,6,19,24

**positions (7)**
7:12;18:20;37:11,
14;46:15;81:25;98:2
**possession (1)**
50:25
**possibility (1)**
96:4
**possible (2)**
47:3;82:21
**possibly (8)**
36:22;51:12;62:20;
67:21;82:3;83:2;
90:11;91:18
**post (1)**
98:14
**posted (6)**
44:24,25;72:8;
96:23;97:1;98:16
**posting (4)**
97:14;98:8,9,12
**postings (2)**
108:21,25
**power (1)**
63:6
**practice (1)**
104:4
**practicing (1)**
33:22
**precluded (1)**
97:3
**predecessor (2)**
7:20,23
**premise (1)**
47:18
**preparation (1)**
46:19
**prepare (2)**
12:18,23
**preparing (1)**
12:20
**prescription (1)**
36:12
**present (11)**
8:10,13;23:18;
28:11,13;54:8,15,20;
55:12,24;87:24
**press (2)**
73:6;111:2
**Prestonwood (1)**
4:24
**pretty (17)**
9:17;25:16;32:16;
34:10,15;39:17;40:4,
6;43:11;55:2;59:23;
60:4;62:5;68:24,24;
79:22;107:17
**prevents (1)**
34:16
**previous (4)**
7:1;62:6;74:7;
103:20
**previously (2)**
11:21;111:3

**primarily (1)**
8:1
**primary (1)**
35:20
**prior (6)**
14:3;17:24;54:11,
25;74:20;97:13
**privileged (1)**
26:25
**probably (24)**
11:17;12:14;13:12;
16:12;24:19;28:16,
16;52:4;53:8;56:10,
11;61:9;70:14,23,24;
71:8;81:2;82:12;
88:4;105:14;107:14,
18;108:1,5
**problem (8)**
14:20;33:7;56:17;
74:8,24;75:7,24;
109:16
**problems (1)**
26:14
**procedures (1)**
17:19
**processed (1)**
32:13
**product (1)**
79:8
**production (1)**
91:12
**program (9)**
9:24;27:18;46:9,
10;51:22;80:24;81:3,
8;95:14
**progress (1)**
87:3
**project (7)**
44:15;49:14;62:25;
63:14;88:15;90:23;
91:23
**projects (5)**
87:22;88:1,1,6,12
**promising (1)**
82:23
**prompted (1)**
68:2
**pronounce (1)**
13:16
**properly (1)**
113:2
**proposed (1)**
63:12
**prospect (1)**
82:21
**prospects (1)**
46:7
**protected (1)**
29:14
**protection (1)**
77:24
**provide (10)**
13:1;51:12;53:13;

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 127 of 131
BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

57:7,16;60:21;87:21;
101:11;104:7,17
**provided (6)**
13:2;87:9,12,25;
88:5;105:13
**providing (2)**
103:5;104:23
**punctuality (1)**
66:7
**purchase (1)**
21:9
**purpose (2)**
50:18;87:4
**purposes (1)**
14:16
**pursuant (1)**
105:3
**pursue (6)**
46:14;79:25;80:1,
1,12,20
**push (1)**
18:9
**put (10)**
4:14;11:19;17:17;
45:10;50:2;57:6;
67:9;76:19;77:1;82:9
**putting (7)**
44:16,18,21;59:15;
60:7;82:25;97:21

**Q**

**qualified (3)**
37:19;39:3;98:23
**query (1)**
58:18
**Quest (1)**
19:21
**questionnaire (1)**
64:14
**quick (2)**
53:24;112:6
**quickly (1)**
28:22
**quit (1)**
71:22
**quite (1)**
98:4

**R**

**Radford (2)**
82:22;83:2
**raise (1)**
73:11
**raising (1)**
100:11
**RAM (1)**
42:6
**ran (1)**
42:3
**Rapholt (1)**
58:20

**rate (4)**
25:14;49:2;61:16,
18
**rated (1)**
33:22
**Rawls (79)**
11:19;13:8,21;
16:10,19,22;18:5,25;
20:8,16,23;22:25;
23:21,24;24:1,9;
26:11;27:19;28:10;
36:25;37:22;39:7,15;
40:11;41:1;43:3,8,
15;44:19,22;50:21,
24;54:11,12,14,14,
18;55:1,5,15;56:8,25;
57:2,10;59:5,21;
62:14;63:13;69:20;
70:21;76:13;77:12;
78:21;80:6;84:2,22;
85:1,18;86:14;90:18,
21,22;91:5;94:16;
95:13;103:16,17;
104:5;106:2,11,15,
20,23;107:7,13;
108:3;109:18;
111:22;113:6
**Rawls' (5)**
57:4;93:7,7;94:21;
106:7
**reached (1)**
87:18
**read (3)**
4:19;30:17;92:24
**reading (1)**
86:17
**ready (1)**
20:21
**real (2)**
32:24;41:21
**realized (2)**
41:25;75:20
**really (73)**
13:19,19;14:24;
15:16,17;16:3,23;
17:7,18;18:2,9,18;
23:21;26:15;28:16;
29:17;30:14;32:17,
19;34:11;35:4;36:20;
38:8;42:17;43:18;
44:12;48:8;49:14;
50:3;51:8;52:3,19;
56:2,11,14,15;57:4,
21;58:17,17,23,23,
25;59:8;60:6,6;61:4;
69:23;71:13;73:5;
74:21;75:2,7;76:5,9;
77:21;79:11;80:20;
81:10;82:13;88:15;
98:2;101:21;102:5,8,
8,11,12;103:7;
104:13,20;108:8;
110:13

**realtor (3)**
16:4;17:6;18:6
**reason (16)**
20:18,20;29:7;
37:7,9;55:3,6,7;
56:12;64:2,4;76:25;
78:5,5;87:11;88:14
**reasonable (5)**
101:11;104:7,17;
109:12;113:13
**reasons (3)**
64:6;68:19,20
**recall (25)**
7:9;8:7;11:15;
14:3;15:24;18:5;
22:15;38:10;40:2;
43:8;53:11;55:18;
62:11;65:4,17;68:19;
72:15;85:17,20;
107:15,16;110:6,19;
111:1;112:18
**receive (7)**
9:21;10:4,15,19,
22;36:9;52:25
**received (3)**
48:9;52:20,23
**receiving (1)**
34:4
**recess (2)**
54:1;112:7
**recognize (6)**
64:22,25;83:10;
86:8;89:11;105:10
**recollection (5)**
12:10;25:10;31:25;
34:21;63:23
**recommended (1)**
40:10
**record (2)**
29:24;112:1
**recording (4)**
60:8,9,10,15
**records (4)**
35:24;109:4;
111:15,16
**recovered (1)**
77:4
**recruiters (1)**
48:12
**reduce (2)**
27:25;96:2
**reduced (6)**
26:7;27:7,22;
31:10;84:17;85:8
**reevaluation (2)**
69:14,21
**refer (5)**
14:14,15;56:1;
85:16;102:24
**referee (1)**
4:5
**reference (6)**
14:16;15:7;17:5;

42:5;64:10;109:17
**referencing (3)**
61:6;67:16;104:9
**referring (10)**
13:5;40:7;44:19,
22;67:17,20;76:15;
108:25;112:24,25
**reflect (1)**
86:25
**refused (1)**
27:17
**regard (1)**
61:10
**regarding (2)**
86:11;111:22
**regards (1)**
109:15
**registered (1)**
30:10
**regular (9)**
22:12;33:21;35:7,
12,14;36:6;58:15;
60:1;61:12
**regulatory (1)**
53:2
**relate (1)**
20:11
**related (7)**
49:16;63:20;67:5;
68:25;87:22;89:25;
95:18
**relates (1)**
70:25
**relation (1)**
100:6
**relative (4)**
41:6;59:6;76:6;
106:15
**released (2)**
20:6;37:25
**relief (3)**
68:2;93:24;99:16
**reluctantly (1)**
63:2
**rely (1)**
109:4
**remained (1)**
8:25
**remember (25)**
8:12,15;12:14;
18:2;20:1;28:14,16;
34:23;37:10;41:16;
51:14;53:19,20;
54:25;56:9;61:1;
62:16;65:2,4;72:16;
88:19;94:5;100:8;
107:4;108:6
**remembered (2)**
43:12,13
**remind (1)**
5:23
**remodeling (2)**
110:9;111:8

**Renee (1)**
58:19
**renew (1)**
24:7
**renewed (7)**
23:3,15,19;24:11;
100:14,15,18
**repeat (2)**
6:2;7:22
**rephrase (1)**
6:3
**replaced (1)**
44:10
**replacement (2)**
41:10;44:12
**replacing (1)**
42:11
**report (3)**
60:10;74:16;76:1
**reported (1)**
13:6
**REPORTER (6)**
4:9,15,19;5:12,19,
23
**reporting (1)**
46:18
**reports (1)**
35:22
**represent (1)**
5:5
**representative (2)**
23:1;54:22
**req (2)**
44:16,19
**request (12)**
21:9,14,18;27:7,
10;29:12;30:23;50:9;
94:14;109:5,12;
111:15
**requested (4)**
50:15;65:17;
107:24;110:4
**requesting (2)**
31:3;109:10
**requests (2)**
52:5;109:7
**required (2)**
46:6;98:24
**requirement (8)**
45:8,16,21;46:16,
17;61:2;97:10,20
**requirements (3)**
45:1,17;51:21
**requisition (3)**
44:22;45:9;97:22
**reserved (1)**
4:8
**resources (2)**
111:17,21
**respect (5)**
20:25;49:10;90:8;
107:5;110:4
**respective (2)**

Case 1:17-cv-01159-FPG-HKS     Document 29-4     Filed 11/25/19     Page 128 of 131

BRIAN T. BORDERS vs.                                                                   BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                                                   January 23, 2019

4:2,4
**responded (2)**
43:13;112:18
**response (3)**
5:21;32:25;72:24
**responses (3)**
5:22,25;73:5
**responsibilities (1)**
45:6
**responsibility (1)**
41:19
**restore (3)**
41:11;42:1,15
**restored (2)**
63:8,9
**restroom (1)**
6:8
**result (3)**
25:25;90:25;91:2
**resulted (1)**
90:19
**retain (1)**
26:20
**retaliation (3)**
94:19;99:15;
107:24
**retired (2)**
33:24;50:23
**returned (2)**
63:18;67:13
**review (22)**
23:20,22;26:9;
27:19;48:10;54:5,14,
21;55:16;56:20;57:7,
24;61:3;62:14;64:19;
65:22;67:25;86:5,10;
89:9;100:9;105:8
**reviews (1)**
61:14
**revolve (1)**
32:7
**rifle (1)**
79:16
**right (48)**
7:21;8:5;18:15;
36:7;40:11;44:4;
51:4;62:12,20;66:1,8,
12;72:2,3;75:14,22;
78:16;80:3,20;83:25;
86:12,19,23;88:16;
90:23;93:4;94:21;
95:5;97:7,11;98:7;
99:4,20;100:1,3,12,
15,18,21;101:3,5,12,
16,20,23;102:7;
105:13,20
**risk (2)**
76:6,11
**Robert (4)**
42:11;43:6,8;72:15
**role (14)**
20:10;21:20,24;
22:8;38:21;55:12;

56:20,21,24;57:10,
13;87:5;88:8;101:3
**room (1)**
90:14
**rough (1)**
25:12
**roughly (1)**
65:19
**ruffling (1)**
22:20
**run (2)**
70:17;90:5
**running (2)**
91:12;113:6
**runs (1)**
76:24

**S**

**Safe (2)**
79:12,13
**sake (1)**
14:14
**same (4)**
14:16;35:7;71:25;
86:20
**SAP (2)**
77:6,8
**save (3)**
49:25;104:11,14
**saved (2)**
68:5,8
**saving (1)**
49:11
**saw (1)**
45:15
**saying (16)**
25:4;29:16;36:16;
39:3;43:9,19;48:9;
53:21;60:7;92:3;
93:18;96:9;99:2,12;
105:15;107:19
**SBA (1)**
51:16
**scenario (1)**
93:10
**schedule (12)**
27:7;31:11;60:2,5;
77:12,13;95:8,10,10,
12;101:16;109:11
**scheduled (1)**
40:18
**scheduling (2)**
15:21;51:11
**science (2)**
97:2,11
**SCORE (1)**
51:17
**scrap (1)**
67:14
**screenings (1)**
48:4
**screw (2)**

75:21,24
**scrutinize (1)**
60:7
**se (1)**
15:17
**SEAP (2)**
46:8;81:8
**second (6)**
83:15;84:16;86:21;
92:13,14;105:18
**Secrest (1)**
5:5
**section (1)**
77:11
**secure (1)**
48:13
**seeing (5)**
35:7,8,17,17,22
**seek (2)**
48:18;68:2
**seeking (1)**
28:20
**seem (6)**
28:6;32:7,19;33:6;
35:4;59:13
**seemed (16)**
15:10;32:17;39:8;
45:6;57:5;58:22;
59:8;60:6;62:24;
69:25;70:15,22;
82:23;93:14;94:18;
95:17
**seems (2)**
34:14;59:12
**self (1)**
60:24
**Self-Employment (3)**
46:9,17;47:10
**self-imposed (2)**
26:10;27:3
**self-medicating (1)**
36:17
**sell (1)**
80:4
**selling (3)**
46:14;47:22;80:21
**semiautomatic (2)**
47:16;79:16
**semi-individually (1)**
39:19
**send (6)**
4:14;21:19;36:1;
52:8;75:6;101:2
**sending (2)**
35:22;41:23
**sent (3)**
35:25;39:2;75:10
**sentence (2)**
92:14;93:5
**separate (1)**
55:19
**September (5)**
23:25;24:2,2;79:2,

3
**series (1)**
5:9
**serve (1)**
21:19
**served (1)**
105:15
**service (2)**
75:6,11
**set (6)**
31:11;48:22;58:8;
77:11;89:10;113:16
**setting (2)**
51:3;60:5
**seven (2)**
42:12;70:23
**several (3)**
29:22;32:9;48:7
**severe (1)**
74:25
**shake (1)**
5:18
**shape (1)**
113:5
**sheer (1)**
73:12
**shift (2)**
71:14,18
**shifting (2)**
46:7,16
**shirts (1)**
56:18
**shop (1)**
79:18
**shortened (2)**
71:10;95:10
**shortly (2)**
90:1;94:15
**shot (4)**
36:22;47:17,18;
89:1
**show (4)**
26:5;63:25;65:21;
89:7
**showing (3)**
83:5;86:3;105:6
**shut (1)**
73:5
**sick (32)**
10:16;11:1,12;
12:11;16:25;25:4;
26:12;31:14;43:1;
64:9;67:23;68:22;
69:1,2;70:1;78:2;
93:8,19;94:5,7,10;
95:15,15,19;99:16,
24;100:23;101:25;
102:10,10;104:13,14
**side (11)**
22:1;23:6;38:1,2,4;
46:12,17,19;51:13;
61:25;80:18
**sides (1)**

45:14
**sign (3)**
4:20;30:12;83:16
**signature (2)**
83:18,22
**signed (4)**
29:19;83:24;84:3;
86:15
**signing (2)**
4:5;30:11
**similar (5)**
14:7;39:14;58:15;
60:2;86:18
**simply (1)**
8:5
**single (3)**
47:16,17;89:1
**sinuses (1)**
69:2
**site (6)**
8:4,5;21:11;31:3;
41:24;75:15
**site-wide (1)**
41:23
**sitting (1)**
55:14
**situation (3)**
27:13;57:4;69:6
**situations (1)**
40:2
**six (9)**
22:17;49:12;53:1,
2,10;60:16;62:2,2;
92:4
**sixteen (2)**
90:16,17
**skill (1)**
48:22
**slices (1)**
92:7
**small (4)**
51:9,16,16;82:13
**software (3)**
23:6;41:14;55:10
**solvents (4)**
110:9,11,25;111:5
**somebody (7)**
17:2;20:2;24:23;
42:4;70:2;80:21;
99:12
**someone (4)**
7:15;61:22;101:1,2
**sometime (4)**
12:13;13:22;36:4;
108:14
**Sometimes (4)**
26:3;35:20;58:2;
59:10
**somewhere (4)**
17:3;21:14;24:25;
33:20
**soon (2)**
42:6;47:21

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 129 of 131

BRIAN T. BORDERS vs.                                                    BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                        January 23, 2019

**Sorry (11)**
8:15;19:11;22:22;
28:22;35:10;37:1;
45:24;53:22;85:21;
89:3;92:14
**sort (6)**
12:11;16:19;83:21;
84:16;92:14;94:9
**sounds (5)**
12:11;36:25;43:22;
44:1;47:9
**space (1)**
42:3
**speak (3)**
5:11;28:17;106:22
**specialist (1)**
35:19
**specific (8)**
21:2;28:20;34:8;
40:1;49:13;69:20;
71:1;107:22
**Specifically (8)**
24:12;29:25;34:5;
36:11;49:13;76:1;
93:8;110:22
**speculation (1)**
73:12
**spell (3)**
13:14;35:9;56:1
**spelled (1)**
100:10
**spend (1)**
102:21
**split (1)**
4:10
**spot (1)**
101:8
**spreadsheet (1)**
12:22,23;13:1
**squash (1)**
82:25
**SSBC (5)**
47:12,18;51:3;
88:23,25
**stability (1)**
68:8
**staffing (1)**
7:6
**stand (1)**
88:25
**standard (1)**
70:5
**start (13)**
22:20;31:23;46:21;
47:21;52:4;54:13;
58:8,13;69:9;79:7;
80:25;102:5;105:22
**started (12)**
12:5;16:13,14;
36:25;37:2;47:9;
48:24;50:24;62:15;
67:13;90:1;100:7
**starting (3)**

28:22;54:8;90:14
**state (7)**
21:22;46:8;51:23;
80:24;81:15,18;82:1
**stated (3)**
24:24;26:18;77:10
**statement (1)**
27:23
**stating (1)**
26:11
**status (4)**
18:16,17;29:14;
30:5
**stay (2)**
50:25;79:4
**stayed (2)**
15:1;42:13
**stent (1)**
67:9
**still (19)**
25:2;30:1,20;33:1;
39:6;41:12;42:5;
46:14,14,15,22;49:9;
52:17;64:1;69:7,8;
102:1,13;108:24
**stipulated (2)**
4:3;59:21
**stipulation (1)**
46:6
**stipulations (3)**
4:1,19,21
**stone (2)**
67:7,19
**stop (4)**
11:19;32:17;33:8;
75:13
**stopped (12)**
8:23;28:9;32:18,
22;33:16;34:13,18;
35:1,2;36:5;96:11;
108:14
**stopping (1)**
36:15
**storage (1)**
56:16
**straight (1)**
11:14
**stress (2)**
93:16;95:8
**stressed (2)**
17:19;70:1
**stressful (1)**
38:3
**stretch (1)**
53:25
**strict (1)**
73:19
**strictly (1)**
49:15
**strike (1)**
112:16
**stuff (32)**
17:6;18:6;32:13,

15;35:25;42:5;43:5;
45:2,3;51:19,22,23,
24;56:7;61:3;63:3,
24;72:17;81:24;82:1,
1;87:16,17,17;93:4,
12;98:17;104:23;
110:9;111:8,9,25
**subject (1)**
31:20
**submitted (1)**
89:12
**submitting (1)**
58:7
**subside (1)**
90:15
**substantial (1)**
62:7
**substitute (1)**
45:20
**suffered (1)**
66:21
**Sumitomo (61)**
5:5,8;6:18,19;7:5,
15,20,24;8:4,5;10:5,
17,20,23;14:4,14,22;
15:1,7;16:7,7;18:12,
15;19:4;21:18;22:7,
19,23;23:8,10;24:14;
25:8;30:7,9;32:3;
34:4;37:12;38:25;
48:5;49:18;52:22;
54:6;55:24;58:15;
61:11;74:17;77:7;
79:24;87:5,8;89:14,
24;92:18;94:13;99:3;
106:4,24;107:9;
109:13;111:21;
113:11
**summons (1)**
89:4
**supervised (1)**
100:1
**supervisor (3)**
56:23,24;103:20
**supply (2)**
4:10,15
**support (23)**
20:15;22:10,11;
24:21;37:21,25;38:5,
18,21;72:1;75:19;
76:12,14,14;87:7,9,
18,19,20,25;88:3,5,5
**supposed (6)**
21:3;52:19;72:9,
18;77:6;94:24
**supposedly (1)**
27:21
**sure (23)**
5:13,21;12:3;
13:19;17:7;25:16;
33:16;34:12;44:12;
55:3;58:17;71:13;
73:14;75:24;79:5,6,

20,22;102:8,12;
103:7;107:17;111:3
**surgery (4)**
20:9,18,22,24
**survivor (2)**
89:21,22
**swear (1)**
108:9
**switch (1)**
35:20
**sworn (1)**
5:1
**syndrome (2)**
90:5;109:17
**system (29)**
20:13;41:1,2,3,8,
11,20;42:2,6,14;
52:12;55:4,8;63:6;
75:21,25;76:12,16,
20,22,23,23;77:1;
88:15;91:12,17,19;
92:8;102:23
**Systems (56)**
7:6,9,13;8:13;9:4,
10,12,15,20,20,22;
10:2,9;13:9,11;
19:15;21:1,10,18;
22:18,23,25;23:8,12;
25:6;28:13;30:22;
31:6;44:25;47:2;
48:15,19,23;50:8,17;
52:13,15,16;54:19,
22;55:9,23;61:15,23;
82:3,21,24,24;87:22;
88:6,10;100:15;
101:2;105:23;
106:22;113:4

---

### T

**table (1)**
42:4
**talk (16)**
18:18;23:24;24:1,
4;26:17;39:7,12,16;
40:9;45:19;49:16;
56:6;61:22;77:23;
87:4;111:23
**talked (12)**
13:19;30:19;42:10;
54:18;56:11,20;62:3,
8,12;65:15;94:22;
95:7
**talking (7)**
24:2;75:3,12,20;
85:18;107:17;112:21
**talks (3)**
84:16;96:22;
107:20
**tardiness (1)**
66:11
**task (1)**
90:23

20,22;102:8,12;
103:7;107:17;111:3
**tasked (1)**
87:21
**tasks (1)**
87:13
**team (3)**
18:25;38:8;55:6
**Tech (13)**
47:2;48:15,23;
52:12,13,15,16;75:6,
11;82:3,21,24,24
**technical (1)**
59:15
**temporary (1)**
48:12
**ten (3)**
9:23;82:12;95:24
**tend (1)**
56:9
**tenth (1)**
60:9,10,16
**tenths (1)**
60:12
**terminated (3)**
20:16,23;38:13
**terminating (2)**
20:8,19
**terms (2)**
73:9;79:13
**test (2)**
33:4;41:24
**testified (1)**
5:1
**testimony (2)**
5:13;6:15
**Thanksgiving (1)**
103:1
**theater (1)**
59:5
**therapy (3)**
68:11,11,17
**thin (1)**
34:17
**Thinking (3)**
59:4;60:23;74:2
**third (5)**
45:13;57:5;68:7;
97:21;98:19
**thirty (32)**
26:7;27:22,25;
28:1,3;31:10,13;62:9,
15,23;65:20;84:17;
85:7,9,10,11,13,15;
94:16,23;95:21,23;
96:2,5,11;99:15,22;
101:20,22,25;102:2,5
**thirty-hour (1)**
15:23
**thirty-two (4)**
28:4,6;62:10;96:11
**THOMAS (1)**
4:24
**though (1)**
30:19

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 130 of 131

BRIAN T. BORDERS vs.                                                          BRIAN T. BORDERS
GOODYEAR DUNLOP NA & SUMITOMO RUBBER                                          January 23, 2019

**thought (6)**
23:23;37:2;38:2;
55:7;58:24;60:8
**threaten (1)**
58:5
**threatening (1)**
40:7
**threats (1)**
39:20
**three (4)**
38:5,6;98:1;104:2
**throughout (3)**
5:9;50:18;111:10
**throwing (1)**
79:19
**Thursday (1)**
102:4
**tied (2)**
81:15,16
**timeframe (14)**
11:16;14:3;15:4,6;
24:19;32:2;33:9;
47:23;50:14;53:6;
62:2;67:11;95:4;
101:19
**times (11)**
11:10;26:2,3;
36:19;39:18;42:22;
54:17;90:5;96:7;
110:15;111:12
**Tires (4)**
7:17,20;8:2;73:21
**title (3)**
45:4,4;97:17
**today (3)**
5:6;6;6,14
**told (17)**
9:5,7;18:6;36:14;
42:24;72:7,16,25;
73:20;75:12,21;
76:17;91:6;93:10,17;
95:11;97:6
**took (7)**
16:10,11,22;20:17;
44:10;90:13;92:24
**top (1)**
105:18
**Toradol (1)**
36:23
**total (3)**
43:8;72:15;94:3
**touch (2)**
75:22;76:22
**towards (7)**
16:24;47:1;61:4;
66:21;71:10;106:12;
109:2
**track (1)**
64:9
**tracked (1)**
49:15
**train (1)**
79:4

**trained (1)**
79:5
**training (2)**
112:22;113:6
**transaction (1)**
43:14
**transcript (2)**
4:6;52:8
**transfer (1)**
77:7
**transition (1)**
18:12
**transitioned (2)**
16:6;41:17
**transpired (1)**
95:3
**transpiring (1)**
71:22
**treat (1)**
108:11
**treated (2)**
108:3;111:3
**treating (2)**
35:6;36:6
**treatment (7)**
17:15;33:19;34:5;
36:9;90:2,13;108:18
**trial (1)**
4:8
**Tricare (1)**
34:1
**tried (5)**
25:22;32:16;35:25;
68:25;69:1
**trigger (1)**
32:15
**triggers (2)**
32:11,12
**trouble (2)**
30:13;36:3
**trust (1)**
43:18
**truthful (1)**
6:15
**try (8)**
32:17;57:16,21;
58:18;59:2;80:4;
90:13;103:8
**trying (16)**
10:6;17:22;19:9;
30:8;32:10;35:3,21;
41:10,20;56:16;
57:19;68:1;69:23;
71:21,25;79:11
**Tuesday (1)**
102:4
**turned (4)**
42:2;68:16;70:2,7
**twelve (1)**
94:3
**twelve-hour (1)**
70:16,20
**twenty (2)**

51:13;112:10
**twenty-five (1)**
96:19
**twice (1)**
76:23
**two (15)**
8:1;26:2,2;36:15;
37:14;38:6;54:24;
58:1;68:6;73:4;
80:16;92:4;98:2;
108:18;111:13
**two-thirds (1)**
66:15
**type (1)**
21:11
**types (3)**
10:22;30:5;56:4
**typical (2)**
25:19;26:6
**typically (1)**
25:17

---

**U**

**UB (1)**
81:25
**uh-uh (1)**
5:19
**ultimately (1)**
37:18
**unbearable (1)**
93:13
**unconscious (1)**
69:4
**under (29)**
20:5;26:10;27:3;
41:18;47:22;48:10;
55:5,6;59:6;66:6,10,
14;67:15;68:2;69:13;
70:20;75:5;76:7;
77:25;78:21;80:21;
84:15;93:24;94:1;
95:13;103:19;
108:17;111:14,16
**underneath (1)**
76:25
**understood (3)**
6:5;15:15;87:5
**undertook (1)**
52:1
**unemployment (4)**
46:3;52:24,25;80:9
**unfortunately (1)**
14:25
**unilaterally (1)**
103:17
**unit (2)**
9:4;21:19
**Univera (1)**
7:2
**Unix (13)**
38:3;44:10;45:4;
76:25;81:13;82:13,

13;87:7,15,19;97:16,
17;98:1
**Unix/Linux (6)**
44:25;81:20;87:9,
22;96:22;98:10
**unpaid (2)**
29:5;94:4
**unqualified (2)**
37:17;39:5
**unrelated (1)**
68:4
**up (66)**
10:7;11:12,18;
12:2;18:10;20:8;
22:24;24:20;25:3,4;
26:3;27:14,21;28:4;
30:18;32:20;33:3;
36:21;37:16,23;
38:17;39:4;42:11;
43:16;46:7,10,13;
47:14;48:5,22,24;
49:21,23;51:3;56:25;
58:19;59:7;60:5,14;
61:21;68:4;73:18;
75:19,21,24;76:5;
79:5,11;80:5;82:2,8;
87:1;91:20;94:3,18,
19;96:12;99:20;
104:12,14,21;107:3;
109:25;110:1,2;
113:13
**upgrade (1)**
41:15
**upgrades (5)**
73:25;88:7,10;
102:16;103:2
**upset (1)**
91:15
**Urgent (1)**
36:21
**use (14)**
6:7;12:10;14:17;
27:10;28:24;29:1,3;
32:21;34:13;36:18;
73:8;104:11;109:10,
23
**used (3)**
73:9,21;111:6
**using (3)**
33:8;67:1;110:9
**Usual (2)**
4:19,21
**usually (6)**
11:8;25:13;28:9;
69:2;75:10;102:23

---

**V**

**VA (11)**
33:2,13,17,23;35:1,
25;36:1,13;90:7,12;
108:13
**vacation (5)**

9:23;10:1,4,16;
50:15
**value (1)**
35:5
**variable (1)**
95:10
**varied (1)**
53:3
**venture (6)**
7:25;8:4;14:21;
16:6;51:7;80:2
**verbal (3)**
5:17,21,24
**verbatim (1)**
94:22
**versus (1)**
15:7
**vet (1)**
33:22
**veteran (4)**
29:11,14,17,19
**veterans (1)**
29:23
**Virginia (2)**
82:22;83:3
**virtual (1)**
63:7
**virtualization (1)**
63:3
**VMware (5)**
41:11,18,18;42:18;
97:18
**vodka (1)**
36:16
**VPN (3)**
42:16;50:7;67:1

---

**W**

**waived (2)**
4:5,6
**walk (1)**
110:1
**walking (1)**
110:2
**Walleshauser (18)**
27:12,20;28:11,17;
29:7,9;31:5;62:13;
65:16;77:23;92:17;
93:6,9;94:12,20;
95:7;111:24;112:3
**wants (3)**
102:14,14,15
**wasting (1)**
77:22
**water (1)**
6:7
**way (9)**
11:18;66:15;70:10;
79:17;92:5,5;106:11;
111:2;113:5
**weather (1)**
32:8

Case 1:17-cv-01159-FPG-HKS    Document 29-4    Filed 11/25/19    Page 131 of 131

BRIAN T. BORDERS vs.
GOODYEAR DUNLOP NA & SUMITOMO RUBBER

BRIAN T. BORDERS
January 23, 2019

**week (40)**
18:10;25:17;26:2,
7;27:23;28:4;31:11,
14,14,20;40:19,20;
49:4,8,10,24;50:15;
51:6;53:18;62:10,10;
63:9;65:19;66:12;
73:24;84:17;85:9,10,
13;92:15;93:20;
95:22,23;96:3;
101:20,23;102:4,9;
104:11,12
**weekends (1)**
73:25
**weekly (3)**
12:25;18:24;43:21
**weeks (2)**
67:9;94:3
**well-being (1)**
68:5
**weren't (12)**
8:24;27:4,4,5;46:4;
48:10;66:22;70:17;
78:6;85:12;95:5;
109:23
**Western (2)**
81:14,20
**what's (9)**
47:13;49:2;53:4;
64:17;77:6;83:5;
86:3;89:7;105:6
**whenever (5)**
23:20;25:1;51:10;
73:24;91:4
**Whereupon (7)**
4:1;64:14;65:11;
82:18;85:25;89:4;
105:2
**whole (14)**
39:20;41:17;43:14;
47:19,20;66:25;69:3;
77:3;91:9;92:6;
93:10,15;97:12;
111:10
**Who's (3)**
23:5;69:1;105:22
**whose (1)**
64:25
**Willig (5)**
26:17,21;27:9;
30:19,25
**window (1)**
71:3
**Windows (9)**
21:25;22:1;38:4;
41:14;45:3;81:23;
82:14;97:18,25
**win-win (1)**
94:9
**wise (1)**
30:9
**within (3)**
71:1;79:12;101:23

**without (2)**
55:23;95:15
**WITNESS (5)**
6:12;15:5;16:16;
73:17;82:20
**witnessed (2)**
39:22;40:3
**wondering (2)**
54:7;84:10
**word (1)**
47:2
**wordy (1)**
47:7
**work (77)**
9:1,5;11:5,8,25;
15:11;16:4;17:3,9,13,
20;18:9;21:22;25:18;
27:7,22;28:3;31:19;
32:18;34:14;36:21;
38:16;41:12;43:9,19;
48:12;49:7,20,22;
50:1;52:9,11;59:18;
60:2;62:23;63:25;
66:8,12,25;68:1,18,
25;71:1;74:8,16;
76:16;77:12;79:12;
80:14,18,22;85:11,
12;87:25;89:23;
90:10;93:21;94:6;
95:12;96:6;97:24;
98:2;99:11,15;
101:16,22,23,25;
102:3,11,16,22;
103:6;104:8;108:13;
109:18;113:4
**workday (1)**
102:19
**worked (14)**
11:3,10;13:11;
14:8;15:14;20:12;
31:11,15;32:3;41:22;
42:9;58:20;63:6;
102:1
**workers (1)**
78:11
**working (34)**
7:9;16:2;26:14,15;
27:5;28:4;29:24;
31:4;40:5;41:10,25;
42:16;46:11,16,19,
23;48:25;49:14;51:2;
55:8;58:8;66:22;
67:13;68:1;70:5;
74:6;79:18;81:22;
87:21;93:11;95:23;
103:1;109:19,20
**workplace (1)**
108:4
**works (3)**
29:18;50:6;71:7
**world (1)**
81:14
**worry (2)**

28:6;79:13
**worth (1)**
42:25
**write (4)**
36:11,13;42:7;
59:11
**writing (6)**
59:11,12;64:23;
65:3;109:8;111:24
**written (1)**
111:20
**wrong (1)**
75:10
**wrote (1)**
84:11

---

**Y**

**Yahoo (2)**
82:10,11
**year (13)**
21:9;25:11,13;
33:1;40:20;46:22;
55:15;58:1;62:3,16;
68:4;76:23;80:16
**years (1)**
29:22
**York (5)**
4:25;21:21;46:8;
81:15,20

---

**1**

**1 (5)**
64:13,14,18,22;
65:6
**14051 (1)**
4:25
**15 (1)**
36:23
**1985 (1)**
32:1

---

**2**

**2 (6)**
65:10,11,14,21,25;
77:10
**20 (2)**
32:25;104:22
**2007 (4)**
6:23;11:18;32:20;
33:3
**2012 (14)**
33:12,12,13,14,17,
20;35:2;36:4,5;37:1;
69:7,10;108:15;
113:10
**2013 (12)**
12:8,13;13:23;
16:11;37:1,1,2;
50:14;66:21;67:10;
68:12;100:7

**2014 (26)**
11:19;12:2,7;
13:23;26:9;62:18,19;
66:4;68:6,13,14,15,
18;69:10,13,19;
82:18;83:13;85:25;
87:1;90:20;92:21;
94:11;100:11;
101:19;112:3
**2015 (12)**
14:21;16:12;41:16;
62:25;68:7,15;79:10;
86:12;87:1;100:15,
17;101:19
**2016 (15)**
22:24;23:4;24:2,8,
11;38:14;43:23;46:1,
10;78:8;79:9;80:13;
96:23;100:18,20
**2017 (11)**
46:24;47:1,9;48:1,
5,23;78:7,9;81:5;
92:16,17
**22 (1)**
83:13
**24/7 (2)**
70:17;76:23
**25th (1)**
66:4
**26 (1)**
4:24
**26a1 (1)**
105:3
**27 (1)**
33:3

---

**3**

**3 (8)**
82:17,18;83:6,10,
16;84:14;86:19,23
**30 (1)**
36:24
**34.70 (2)**
25:9,15
**35 (1)**
16:1
**3rd (2)**
40:19,19

---

**4**

**4 (8)**
85:24,25;86:4,8,18,
21;89:3;92:15
**401k (3)**
9:24;10:1,19
**40-hour (2)**
18:9;24:23
**42 (1)**
49:3
**4th (1)**
86:12

---

**5**

**5 (4)**
89:3,4,8,11
**5:00 (5)**
71:7;77:15;84:18;
102:13,14
**56 (4)**
103:15,22;104:1,2
**57 (1)**
103:24
**58 (4)**
103:15,21;104:1,2

---

**6**

**6 (4)**
105:1,2,7,10
**6:00 (1)**
70:15
**6:30 (1)**
70:15
**68 (1)**
25:13
**69,000 (1)**
25:13

---

**7**

**7/24/365 (1)**
74:4
**7:30 (2)**
70:9;71:20

---

**8**

**8:00 (5)**
71:5,7;84:18;
102:13,14
**8:30 (2)**
71:5;77:15
**80 (1)**
33:23

---

**9**

**9:00 (1)**
71:5